———o-o-o———

## The People v. William Tyler.

Upon the high seas every vessel, public and private, is, for jurisdictional purposes, a part of the territory of the nation where it belongs; and an offence committed on board of it is an offence against the sovereignty of that nation. But, where a private ship enters a foreign jurisdiction, it becomes, with all on board, in the absence of treaty stipulations to the contrary, subject to the municipal laws and control of the country it visits.

When a Legislature, out of abundant caution, enumerates a great number of possible places, and punishes crimes committed in any of them, there is no rule of construction which requires the law to be regarded as an assertion that there are such places within the jurisdiction. It does not, therefore, necessarily follow, because Congress in the Crimes Act of 1857 provided for the punishment of offences upon bays, creeks, havens and rivers, not within states nor forming a part of the high seas that the existence of such within the admiralty jurisdiction must be assumed.

The said act of 1857 being amendatory and supplementary to other acts of identical extent, commencing in 1790, it is not to be supposed that it was intended to use these terms in different senses at the different periods. And, as there were at the date of the first act navigable waters open from the ocean, not admitted to have been within the exclusive jurisdiction of any particular state, and as, upon the Pacific coast, we have still some waters of this description, there is no necessity to go beyond our own territory to satisfy the terms of the act. And the jurisdiction referred to by the language used being a local one, referring to a fixed natural locality, and not satisfied by a vessel, the claim of jurisdiction should not be extended into foreign parts, unless such an intention is clearly expressed in the act.

As the states lying upon the lakes and their connecting waters extend to the national boundary, and their jurisdiction is co-extensive with their territory and legislative power, the said Crimes Act of 1857, if it applies at all to these waters, can only take effect without the United States, and within British waters.

As a general principle, the criminal laws of no nation can operate beyond its territorial limits, and to give any government or its judicial tribunals the right to punish any act or transaction as a crime, it must have occurred within those limits. The exceptions to this rule relate to crimes which are peculiarly injurious to the rights or interests of the nation or of its subjects, and which, if committed by its citizens or subjects, may be punished wherever committed. As in the case of treason committed abroad, or criminal acts on the part of the crews or passengers of its ships in a foreign port, whereby its commerce or its pacific relations with other powers would be endangered. But these exceptions to the general rule of the locality of crimes are never understood to be included in the general provisions of criminal statutes, but require to be specifically mentioned and defined.

THE PEOPLE *v.* TYLER.

The territory of a state or nation includes, as a part of its domain, the lakes and rivers which lie within its limits. And these waters being thus susceptible of appropriation as territory in the same way as the land, are in like manner capable of division, by which a part may be appropriated by one adjoining nation and a part by another; and when so divided, the part belonging to each nation is as completely a part of its territory as the whole lake or river if wholly within its limits.

The United States and Great Britain having in this manner, by the treaty of 1783, divided and appropriated the lakes and their connecting waters, the courts of neither, while this treaty remains in force, can for jurisdictional purposes, and especially for criminal jurisdiction, consider that portion of these waters within the limits of the other, as differing in any respect from the lands. The treaty of 1842, conceding to the vessels, &c., of both nations a right of passage through the channels and passages thus appropriated, does not deprive either of that complete and exclusive jurisdiction over that part of the lakes and rivers on its side the line which any nation may exercise upon land within its acknowledged limits.

The said Crimes Act of 1857 was not understood or intended by Congress to extend to any waters not essentially maritime; much less to a river in the interior of the continent, not navigable from the ocean; and least of all to a portion of that river within the territory and exclusive jurisdiction of a foreign sovereignty.

Nor was the said Crimes Act of 1857 intended to go beyond the class of assaults made manslaughter under the former statutes to which it was amendatory and supplementary; or, to do more than provide for the case of death on land, resulting from assaults which were already made punishable when death resulted at the place where the fatal blow was given.

And, therefore, manslaughter committed by a mortal blow given on the River St. Clair, beyond the boundary line between the United States and the Province of Canada, and within a county in said province, from which blow death ensued on land, is not within the intent and meaning of the said act, though the blow was given on an American vessel.

The subject of admiralty jurisdiction over the lakes and navigable waters connecting them considered, and the case of the *Genesee Chief* (12 *How.* 443) commented on, *per Christiancy J.*

The admiralty jurisdiction over the said lakes and navigable waters connecting them, and the constitutional validity of the act of Congress of February 25th, 1845, relating to the same, considered and denied, *per Manning J.**

*Heard June 1st, 2d, 3d & 4th. Decided October 14th.*

Case reserved from St. Clair Circuit.

On the fourth day of February, 1859, defendant was indicted in the Circuit Court for the county of St. Clair for murder. The indictment charged that Tyler, on the twen-

---

* On the cause being announced as ready for decision, MARTIN CH. J., made an oral statement of the case, and then proceeded to say, that he had not written out his opinion, but that he held the following views:

Jurisdiction is co-extensive with the territorial limits of the government exercising it. Admiralty jurisdiction is that which a nation exercises beyond its territorial limits, and upon the high seas. This is exercised because these seas are the

THE PEOPLE v. TYLER.

---

ty-ninth day of November, 1858, "with force and arms, on navigable waters without the limits of the state, in and on board the brig Concord then and there being in the river St. Clair, without the limits of the state of Michigan, in and upon one Henry Jones in the peace of God then and there being, feloniously, willfully, and of his malice aforethought, did make an assault, and that the said William Tyler a certain pistol of the value of two dollars then and there charged with gunpowder and one leaden bullet, which said pistol he, the said William Tyler, in his right hand then and there had and held, then and there feloniously, wilfully, and of his malice aforethought, did

peculiar property of no nation, but a common highway for all; and is properly exclusively confined to cases of civil jurisprudence. The United States has never conferred upon its admiralty courts criminal jurisdiction. It is true that criminal jurisdiction over certain specified offenses is conferred by Congress upon the courts exercising admiralty jurisdiction, but such jurisdiction is never administered under the admiralty code, but after the course of the common law.

In England, at the time of our revolution, and for a long time prior, no power existed in the courts of admiralty to try and punish for crime. This power was conferred upon a commission which proceeded under the common law. Thus the right of trial by jury, and of being confronted by witnesses, was secured to persons charged with the commission of offenses upon the high seas, as well as to those charged with their commission upon land. This common law was brought to this country by our ancestors, and at the time of the revolution, and the formation of our federal government, was the law of every colony. The objections which had prevailed in England to the trial of those charged with crime, under the admiralty code—whereby the right of trial by jury was refused—and which ultimately led to the withdrawal of this jurisdiction from the admiralty courts, equally prevailed here; and, when the framers of the constitution inserted in it the clause conferring admiralty and maritime jurisdiction upon

the Federal judiciary, they conferred such only as existed in the mother country at the time of the separation. This is manifest from the fact that provision is made in a separate clause of the constitution for the power to define and punish piracies and felonies committed on the high seas, and offenses against the law of nations, and in also providing that the trial of all crimes shall be by jury. Had crimes been considered as embraced within the admiralty jurisdicton, this power would be unnecessary, if not inconsistent with the provision conferring judicial power; and certainly the provision for trial by jury would be wholly inconsistent with the power and practice of admiralty courts.

If the admiralty courts had no jurisdiction over crimes committed on the high seas, what court has, and what is the extent of that jurisdiction? Congress, by various acts from 1789 to the present day, has conferred that jurisdiction upon the Circuit and District Courts of the United States.

Such jurisdiction is confined to the high seas, or other waters out of the jurisdiction of any particular state.

When, therefore, Congress provides for the punishment of felonies, if committed within the admiralty and maritime jurisdiction of the United States, such jurisdiction must be regarded as confined to the high seas, or, probably, tide-waters in certain instances—as such only are within the dominion of Congress for such purpose. The constitutional limitation

discharge and shoot off, to, against, and upon the said Henry Jones, and that the said William Tyler, with the leaden bullet aforesaid, out of the pistol aforesaid, then and there, by force of the gunpowder aforesaid, by the said William Tyler discharged and shot off as aforesaid, then and there feloniously, wilfully, and of his malice afore-thought, did strike, penetrate and wound him, the said Henry Jones, in and upon the left side of the head of him, the said Henry Jones, giving to him, the said Henry Jones, then and there, with the leaden bullet aforesaid so as aforesaid discharged and shot out of the pistol aforesaid, by the said William Tyler, in and upon the left

must be considered as incorporated into and as controlling the act. And Congress, in every or nearly every instance, has accordingly respected this limitation of power by enacting that the offences shall have been committed on waters out of the jurisdiction of any state.

The words "admiralty and maritime jurisdiction," as used in the criminal code, must then be interpreted by the grant of power to Congress in the Constitution, and construed as signifying the high seas. Whether there be a civil admiralty jurisdiction extending elsewhere, and on other waters, it is immaterial to inquire.

This leads us to the inquiry, are the waters of the St. Clair River which are without the boundaries of the United States and within those of Canada, within the admiralty jurisdiction of the United States, and without the jurisdiction of any particular state, within the meaning of the Crimes act? When the Constitution was framed, it cannot—except by the most violent presumption—be presumed that the lakes and their connecting waters were intended to be embraced within the admiralty jurisdiction of the United States. The term was employed in the sense it had been for centuries used in the mother country, and, from their first settlement, in the colonies, to designate jurisdiction upon the ocean—that space without the territorial limits of any government—the common highway of all nations. The lakes, and rivers or straits connecting them, were not presumed to be of such a character.

They were, before the revolution, within the exclusive dominion of Great Britain, and, by the treaty of peace, dominion over them was divided. No waste of waters beyond any territorial jurisdiction—no common highway of nations, ever existed upon them. By the treaty of 1788, the boundary line between Great Britain and the United States ran through the centre. They can, therefore, in no sense, be denominated "high seas" within the meaning of the constitution.

Nor are their waters which are within the boundaries of the United States without the jurisdiction of any particular state. Each state lying upon their borders is bounded by the national boundary line. Beyond such line, the waters are within an acknowledged foreign jurisdiction, and, so far as I can ascertain, (at least in this case, as admitted by the pleadings,) within the body of foreign counties. Under no known rule of admiralty law, then, can they be regarded as within admiralty and maritime jurisdiction.

Nor were they ever regarded as being within such by Congress, nor by the courts of the United States, until the decision of the case of the *Genesee Chief v. Fitzhugh* (12 *Howard*, 443).—If they had been within this jurisdiction, there was no occasion for the passage of the act of 1845, extending what Judge Conklin very properly calls a *quasi* admiralty jurisdiction over them.

This act does not extend full admiralty jurisdiction over them, nor include them within such jurisdiction. It only extends

THE PEOPLE v. TYLER.

side of the head of him, the said Henry Jones, one mortal wound, of the depth of four inches, and of the breadth of half an inch, of which said mortal wound the said Henry Jones, from the said twenth-ninth day of November, in the year aforesaid, until the thirtieth day of November, as well on the navigable waters aforesaid, as in the city of Port Huron, in the county of St. Clair, in the state of Michigan, did languish, and languishing did live, on which said thirtieth day of November, in the year aforesaid, the said Henry Jones, in the said city of Port Huron, in the said county of St. Clair, in the state of Michigan aforesaid, of the said mortal wound died: and

the jurisdiction of the District Court over cases of contract and tort arising in, upon, or concerning certain classes of boats and vessels navigating them, to be exercised in the same manner as jurisdiction was exercised over contracts and torts upon like vessels navigating the high seas or tidewaters, *within the admiralty and maritime jurisdiction* of the United States, and secures to parties a concurrent remedy at common law, and by the state laws, when competent.

As I understand it, this act distinctly recognizes the distinction between these waters and the high seas, and regards them as being without the admiralty and maritime jurisdiction of the United States. Its language will not admit of a construction which will embrace them within such jurisdiction. The jurisdiction conferred is likened to the admiralty, but it is not the full and exclusive admiralty jurisdiction which it extended over them. As it did not exist over the lakes before the act, Congress had no power to extend it over them. I am aware that the Supreme Court of the United States, in the case of the *Genesee Chief*, regard this as being an extension of the admiralty jurisdiction; or rather, as I understand the opinion of Chief Justice Taney, as a recognition of the existence of such jurisdiction under the constitution. To my mind it is certain that it exists as admiralty jurisdiction by virtue of the Constitution, or not at all. Congress cannot extend such jurisdiction over waters not recognized by the law of nations

as the proper subjects of it. That law was in the eye of the framers of the Constitution when the provision conferring admiralty and maritime jurisdiction upon the Federal courts was incorporated into it, and this includes only the high seas or tidewaters.

If Congress had the power to pass the act at all, it was under the power to regulate commerce between the several states. This seems to have been the aim of Congress, for the act confers jurisdiction only in cases of contract or tort arising upon vessels "employed in business of commerce and navigation between ports and places in *different States and Territories.*" And this appears to be the later view of that court. (*See Allen v. The Fashion*, 21 *How.*) It was said, in the argument of the prisoner's counsel, that this court in *Amer. Trasportation Co. v. Moore* had recognized these waters as within the original grant of admiralty jurisdiction, and of like character with the sea in respect to maritime legislation and jurisdiction. In this the counsel is mistaken. No such question was before us, nor did we undertake to determine under what grant such jurisdiction was exercised. As an exercise of the power to regulate commerce between the different states, I am still of the opinion that the civil jurisdiction of the District Court might have been extended in the manner and with the limitation that it was. If these views are correct, the Crimes acts of of 1825 and 1857 do not embrace the offense for which Tyler stands charged, as the of-

THE PEOPLE *v.* TYLER.

so the jurors aforesaid, upon their oaths aforesaid, do say that the said William Tyler, the said Henry Jones, in manner and by the means aforesaid, feloniously, willfully, and of his malice aforethought, did kill and murder, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the People of the state of Michigan."*

fense was not committed on the high seas, or in any arm of the sea, or within any river, haven, creek, basin or bay within the admiralty jurisdiction of the United States.

The act of 1857 was additional to that of 1825, and the section under which Tyler was indicted in the Federal court was passed to supply a *casus omissus.* The act of 1825, which defined and punished certain crimes committed on "the high seas, or in any arm of the sea, or in any river, &c., within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular State," was so passed before any jurisdiction of the Federal courts was extended over the lakes or their connecting waters. This act, then, could not have embraced offences committed upon these waters; 1st: Because they are not high seas; and, 2d: Because Federal jurisdiction had not been extended by Congress over them. The act of 1845, extending the jurisdiction of the District Court over them in certain cases, is confined to civil cases alone, and does not confer full admiralty jurisdiction. Had Congress intended to extend the Crimes act over them, it is natural to suppose that such intention would have been declared. But it did not so intend, for it had not the power. The act of 1857 defined and provided for the punishment of another felony, but did not enlarge, or undertake to enlarge, the jurisdiction of the courts, or to confer jurisdiction over waters not within the act of 1825.

It is to my mind an utter impossibility to extend the provisions of these acts over the lakes and their connecting waters. They are operative only within the admiralty jurisdiction of the courts of the United States. Now, such jurisdiction can exist only on the high seas, as has already been shown, although a *quasi* admiralty jurisdiction, for purpose of regulating and protecting commerce, may exist elsewhere. But the Crimes acts do not confer jurisdiction on the Federal courts co-extensively with that they have or may have in civil cases. The offense must be committed "out of the jurisdiction of any particular state."

The Federal courts have no jurisdiction over crimes committed in foreign waters with a single exception, viz.: when an inhabitant of an American ship commits a crime against the person or property of another inhabitant; and then only when the foreign government disclaims or declines to exercise jurisdiction. This is not such a case.

Nor have they criminal jurisdiction over the waters of any "particular state."

Now, there are no common, no unappropriated waters on the line of the lakes. The boundary line runs through their centre, and every crime committed upon them is committed within the jurisdiction of some state or that of Great Britian. Where, then, can a crime be committed on these waters, within the admiralty jurisdiction of the United States, and without that of any particular state?

I think both questions should be answered in the negative.

* The following is the statutory provision under which this indictment was found: "If any * * mortal wound shall be given, or other violence or injury shall be inflicted, or poison administered, on the high seas, or on any other navigable waters, or on land, either within or without the limits of this state, by means whereof death shall ensue in any county thereof, such offence may be prosecuted and punished in the county where such death may happen." *Compiled Laws,* §5944.

A second count charged the murder as committed at Port Huron in the county of St. Clair.

On the fourth day of May, 1859, Tyler was arraigned on said indictment, and pleaded thereto as follows:

"STATE OF MICHIGAN, }  In the Circuit Court for the Coun-
County of St. Clair. }  ty of St. Clair.

The People of the State of Michigan vs. William Tyler.

"And the said William Tyler, in his own proper person cometh into court here, and having heard the said indictment read, saith that the People of the state of Michigan ought not further to prosecute the said indictment against the said William Tyler, in respect of the offense in the said indictment mentioned, because he saith that heretofore, to wit, at a special term of the Circuit Court of the United States of America for the District of Michigan, began and held at the city of Detroit, within and for the district aforesaid, on the fourth Tuesday of March, in the year of our Lord one thousand eight hundred and fifty-nine, it was presented by the Grand Jurors of the United States of America within and for the District aforesaid upon their oath,

"That William H. Tyler, late of Detroit, in said district, not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil, on the twenty-ninth day of November, in the year of our Lord one thousand eight hundred and fifty-eight, with force and arms, in the river St. Clair, within the admiralty and maritime jurisdiction of the United States, within the jurisdiction of said court, and out of the jurisdiction of any particular state of the United States, in and on board of a certain vessel, being a brig called the "Concord," owned by a certain person or persons whose names were to the jurors unknown, being a citizen or citizens of the United States of America, in and upon one Henry L. Jones, in the peace of God and the said United States

then and there being, on board said brig called the Con-
cord, in the river St. Clair, within the admiralty and
maritime jurisdiction of the United States, within the
jurisdiction of said Circuit Court of the United States, and
out of the jurisdiction of any particular state of the Uni-
ted States of America, unlawfully, feloniously, willfully,
but without malice aforethought, did make an assault, and
that the said William H. Tyler, a certain pistol, of the
value of two dollars, then and there charged with gun-
powder and one leaden bullet, which said pistol he, the
said William H. Tyler, in his right hand then and there
had and held, then and there unlawfully, feloniously, will-
fully, but without malice aforethought, did discharge and
shoot off, at, and ʃagainst, and upon the said Henry L.
Jones, and the said William H. Tyler, with the leaden bul-
let aforesaid, out of the pistol aforesaid, then and there
by force of the gunpowder aforesaid, by the said William H.
Tyler discharged and shot off as aforesaid, then and there
unlawfully, feloniously, and willfully, but without malice
aforethought, did strike, penetrate and wound him, the
said Henry L. Jones, in and upon the left side of the
head of him, the said Henry L. Jones, giving to him, the
said Henry L. Jones, then and there, with the leaden bul-
let aforesaid, so as aforesaid discharged and shot out of the
pistol aforesaid by the said William H. Tyler, in and upon
the left side of the head of him, the said Henry L. Jones,
and near the left temple of him, the said Henry L. Jones,
one mortal wound of the depth of four inches, and of the
breadth of half an inch, of which said mortal wound he, the
said Henry L. Jones, afterwards, that is to say, on the
twenty-ninth day of November aforesaid, upon the land and
within the the United States of America, to wit: at Port
Huron, in the county of St. Clair, and within the district
aforesaid, died. And so the jurors aforesaid, upon their
oaths aforesaid, did say, that the said William H. Tyler,
him, the said Henry L. Jones, in the manner and by the

means aforesaid, feloniously, willfully and unlawfully did kill, against the peace of the said United States and their dignity, and against the form of the statute of the said United States in such case made and provided.   And the jurors aforesaid, upon their oath aforesaid, did further present, that William H. Tyler, late of Detroit, in said district, on the twenty-ninth day of November, in the year of our Lord one thousand eight hundred and fifty-eight, with force and arms, in the river St. Clair, within the admiralty and maritime jurisdiction 'of the United States, within the jurisdiction of said court, and out of the jurisdiction of any particular state of the said United States, in and upon one Henry L. Jones, in the peace of God and the said United States, then and there being, in the river St. Clair, within the admiralty and maritime jurisdiction of the United States, within the jurisdiction of said circuit court, and out of the jurisdiction of any particular state of the said United States of America, feloniously, unlawfully and willfully did make an assault, and that the said William H. Tyler, a certain pistol, then and there charged with gunpowder and one leaden bullet, which said pistol he, the said William H. Tyler, in his right hand then and there had and held, then and there feloniously, unlawfully and willfully, but without malice aforethought, did discharge and shoot off, at and against him, the said Henry L. Jones, and that the said William H. Tyler, with the leaden bullet aforesaid, out of the pistol aforesaid, then and there, by force of the gunpowder aforesaid, by the said William H. Tyler discharged and shot off as aforesaid, then and there feloniously, unlawfully and willfully, but without malice aforethought, did strike, penetrate and wound him, the said Henry L. Jones, in and upon the left side of the head of him, the said Henry L. Jones, giving to him, the said Henry L. Jones, then and there, with the leaden bullet aforesaid, so as aforesaid discharged and shot out of the pistol aforesaid, by the said William H. Tyler, in and

7 MICH—M.

upon the left side of the head of him, the said Henry L. Jones, one mortal wound, of which mortal wound caused by said shooting, he, the said Henry L. Jones, afterwards, that is to say, on the twenty - ninth day of November aforesaid, upon the land, and within the United States of America, to wit: at Port Huron, in the county of St. Clair, and within the district aforesaid, died. And so the jurors aforesaid, upon their oaths aforesaid, did say, that the said William H. Tyler, him, the said Henry L. Jones, in the manner and by the means aforesaid, unlawfully, feloniously and willfully, but without malice aforethought, did kill, against the peace of the United States of America and their dignity, and against the form of the statute of the said United States, in such case made and provided. And the jurors aforesaid, upon their oaths aforesaid, did further present; that afterwards, on the said twenty - ninth day of November, in the year one thousand eight hundred and fifty - eight, the said William H. Tyler, the offender aforesaid, was first apprehended for said offense in the district of Michigan, and within the jurisdiction of this court.

"To which said indictment the said William H. Tyler having been duly arraigned, pleaded not guilty, and put himself upon the country for trial.

"And afterwards came as well the said United States of America by attorney, as the said William H. Tyler, and the twelve jurors of the jury aforesaid, who being duly chosen, empannelled, tried and sworn, heard the evidence as well for said United States as said William H. Tyler, and said upon their oath that the said William H. Tyler was guilty in manner and form as charged in said indictment.

"Whereupon it was considered by said court that said William H. Tyler be imprisoned for thirty days in the county jail of Wayne county, and pay a fine of one dollar to the United States, which said fine has been paid, and said imprisonment fully served out, as by the record thereof in the said court remaining (a copy of which, duly

attested, the said William H. Tyler here in court produces) more fully and at large appears; which said judgment and conviction still remain in full force and effect, and not in the least reversed or made void.

"And the said William H. Tyler further saith that the said Circuit Court of the United States for the district of Michigan, had full power, authority and jurisdiction to try him, the said William H. Tyler, for the said offense for which the said William H. Tyler was tried, and of which he was convicted and sentenced as aforesaid, and that the said authority and jurisdiction were conferred by section first of the act of Congress of the United States, approved the third day of March in the year of our Lord one thousand eight hundred and fifty-seven, entitled "An Act in addition to an Act more effectually to provide for the Punishment of Certain Crimes against the United States, and for other purposes."

" And the said William H. Tyler further saith that the said shooting at said Henry L. Jones by said William H. Tyler, as alleged in the said former indictment, was in the river St. Clair, within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular state of the United States, and that said Henry L. Jones afterwards died of said shooting on land within the United States, to wit: at said Port Huron, and that said brig Concord was an American bottom, owned wholly by citizens of the said United States, and that both said William H. Tyler and Henry L. Jones were citizens of the said United States, as alleged in said former indictment.

" And the said William Tyler further saith, that the said William Tyler, and the said William H. Tyler so indicted and convicted, are one and the same person, and not other and different.

" And the said William Tyler further saith, that the said act, felony, homicide, shooting, killing and manslaugh-

ter of the said Henry L. Jones, of which the said William H. Tyler was so indicted and convicted as aforesaid, and the said act, felony, homicide, shooting, killing, and murder of Henry Jones, for which he is now indicted, are one and the same act, shooting and killing, and not other or different felonies or offenses; and this the said William Tyler is ready to verify; wherefore he prays judgment if the People of the state of Michigan ought further to prosecute the said indictment against the said William Tyler, in respect of the said offense in the said indictment mentioned, and that the said William Tyler may be dismissed and discharged from the same.

WILLIAM H. TYLER.

WALKER & RUSSELL, *Counsel for Tyler.*"

The prosecuting attorney replied to this plea as follows: "STATE OF MICHIGAN: The Circuit Court for the County of St. Clair.

The People of the state of Michigan *vs.* William Tyler.

"And now the said People of the state of Michigan, by Harvey McAlpine, Esq., Prosecuting Attorney for said county of St. Clair, who, for the said People, prosecutes in this behalf, says, that the said People ought not to be barred from prosecuting this present indictment presented by the grand jurors of the People of the state of Michigan, inquiring in and for the body of the county of St. Clair aforesaid, because, they say, that the said William Tyler was not heretofore convicted of the premises charged in and upon him by this present indictment; for, although true it is that the said William H. Tyler was convicted upon the said indictment in said plea mentioned, and received and suffered judgment thereon, as in and by said plea set forth: and although true it is that the assault, shooting and discharging of a pistol, and striking, penetrating and wounding the said Henry L. Jones with a leaden bullet shot off and discharged from said pistol by said William H. Tyler, whereof the said Henry L. Jones died,

in the said county of St. Clair, as set forth in the said plea of the said William Tyler, is and are the same felonious assaulting, shooting, striking, penetrating and wounding of the said Henry Jones, by said William Tyler, and the same identical, felonious killing and wounding of said Henry Jones by said William Tyler, of the malice aforethought of said William Tyler, as in the said present indictment mentioned, and not other or different: and although true it is that the said Henry L. Jones mentioned in the said indictment in said plea set forth, and the said Henry Jones in the present indictment mentioned, are one and the same person, and not other and different: and although true it is that the said William H. Tyler, so indicted and convicted as set forth in said plea, and the said William Tyler, the defendant in the present indictment, are one and the same person, and not other and different: and although true it is that the said brig Concord, in said plea and indictment mentioned, was an American bottom, owned wholly by citizens of the United States, and that both said William H. Tyler, and Henry L. Jones, were citizens of the United States:

"Yet the said People of the state of Michigan, for replication in this behalf, say that the said assaulting, shooting off and discharging of said pistol, and the striking, penetrating, and wounding of said Henry Jones with said leaden bullet, so discharged from said pistol by said William Tyler, were all done by said William Tyler on board of said vessel called the "Concord," at the time mentioned in said plea, and upon the said river St. Clair, but the said People aver that the same were done beyond the boundary line between the United States and the province of Canada, and within the geographical boundaries of said province, and of the county of Lambton, in said province, without the limits of the United States, and without the boundaries of the state of Michigan, and

of the county of St. Clair, and without the admiralty juris-, diction of the United States. And this the said People of the state of Michigan are ready to verify.

Wherefore, they pray judgment, and that the said Will-, iam Tyler may answer to the said indictment pending in this court.                                HARVEY McALPINE,

H. D. TERRY,                                *Prosecuting Attorney.*
    *Of Counsel for People.*"


To this replication defendant demurred, and the prosecu-tion joined in demurrer.

And thereupon the circuit judge reserved for the opinion of this court the following questions:

*First:* Had the United States, at the time of the said conviction and judgment, admiralty jurisdiction over that part of the waters of the river St. Clair, which is without the boundaries of the United States, and within the bounda-ries of the county of Lambton, in the province of Canada, within the intent and meaning of the act of Congress en-titled "An Act in addition to an Act more effectually to pro-vide for the Punishment of Crimes against the United States, and for other purposes," approved March 3d, 1857 ?*

*Second:* Was the shooting of Henry Jones, by the defend-ant, in the manner, and under the circumstances set forth in the said plea and replication, and in the place set forth, in the said replication, within the admiralty and maritime juris-diction of the United States, for the seventh circuit and dis-trict of Michigan, under the said first section of the act of Congress aforesaid?

---

* The first section of this act is in the fol-fowing words: "Be it enacted," &c., "that if any person or persons upon the high seas, or any arm of the sea, or in any river, haven, creek, basin or bay, within the ad-miralty jurisdiction of the United States and out of the jurisdiction of any particu-lar state shall, unlawfully and wilfully, but without malice aforethought, strike, stab, wound or shoot, at any other person, of which striking, stabbing, wounding or shooting such person shall afterwards die upon land within or without the United States, every person so offending, his or her counsellors, aiders and abettors, shall be deemed guilty of the crime of man-, slaughter, and upon conviction thereof shall be punished as hereinafter provided.,

*A. Russell*, in support of the demurrer:

I. In regard to the first question, which we submit must be answered in the affirmative:

1. The act intends, and means, within the *civil* admiralty jurisdiction of the United States, when it fixes the necessary locality of the shooting as "in a river within the admiralty jurisdiction of the United States."

*a.* The United States have no *criminal* admiralty jurisdiction. The extension of judicial powers, by the Constitution, to cases in admiralty, refers to civil cases belonging to commerce. There was a separate grant of power to define and punish maritime felonies, and when Congress legislated about cases in admiralty, in order to prevent any doubt, it conferred on the admiralty court (the district) jurisdiction over civil cases only, and it gave cognizance of crimes in admiralty neither to that court nor any other, *as over crimes in admiralty*, but gave cognizance of several specified offences to the district courts, and some offences to the circuit courts.— *U. S. Const. art.* 3, § 2; *Ibid. art.* 1, § 8, *subd.* 11; *Jud. Act* 1789, §§ 9, 11, 1 *Stat.* 76, 78; *New Bedford Bridge Case,* 1 *Woodb. & M.* 401, 471, 472, *and passim*; *Taylor v. Carryl,* 20 *How.* 616, *per Taney Ch. J.*

The judgment of Woodbury J. in the Bridge case, is an elaborative and exhaustive treatise on the whole subject. The doctrine is that when a power is conferred, no court can exercise it save under some act of Congress locating the power in the court. No criminal admiralty jurisdiction, as such, has been conferred by any act of Congress, and the United States courts have steadily refused to take cognizance of any admiralty crime as such.

It may be further said, that for two centuries prior to the Constitution, the admiralty in England had exercised no jurisdiction over felonies on the high seas, but these had been exclusively tried by a commission. And it is not certain that mere misdemeanors were ever tried there.

This, taken in connection with the grant in the Constitution, of power to *define* and *punish felonies* on the high seas, in the enumeration of the powers of Congress, although the judicial power was made to extend to all admiralty cases, strongly supports our position.—See 1 *W. & M.* 470, 465, *citing Stat. Ric.*; *Corfield v. Coryell*, 4 *W. C. C.* 383.

It is also apparent, from the *mode of trial* of criminal cases in the United States courts, that these cases are not tried "in admiralty." The procedure is by indictment of a grand jury, and by petit jury, under the Constitution.—*Const. Art.* 3, § 2, *subd.* 3; *Amendments V. and VI.*

So, also, the common law, and not the admiralty, *system of proofs* is used.

*b.* The replication and the question both go upon the idea that some portion of the St. Clair river is within the admiralty jurisdiction.

That the great navigable rivers of the country, the lakes, and the waters connecting them, are, *by reason of their navigability*, within the original grant of admiralty jurisdiction, and of like character with the sea in respect to maritime legislation and jurisdiction, is fully settled.— *The Genesee Chief*, 12 *How.* 443; *Jackson v. Steamboat Magnolia*, 20 *How.* 296; 1 *Conkl. Adm.* 1° *to* 33.

This court has adopted and approved the above doctrine, and held such waters not included in the term "inland navigation."—*Amer. Trans. Co. v. Moore*, 5 *Mich.* 368.

Compare *Rossiter v. Chester* (1 *Doug. Mich.* 169) where the court yields to the then weight of authority, contrary to their expressed views of what ought to be the law.

It remains, then, to inquire whether the civil jurisdiction of the admiralty is ousted if the locality of the tort or service be within the body of a foreign county.

Our position is, that it is not ousted when such is the fact. That, although in England the locality of the marine tort must be out of a domestic county, the rule never was

that it should be out of a foreign county; and that in this country it need not be out of a domestic county.

All the expressions in the statutes of Richard, which originated the *infra corpus comitatus* rule, are to be construed with reference to the territory over which the statutes extend. The legislators knew nothing of the political divisions of the continent.—*See the statutes cited,* 1 *W. & M.* 465.

The Supreme Court has settled the doctrine that the locality of a tort need not be out of a domestic county.— *Waring v. Clarke,* 5 *How.* 441; *Jackson v. Steamboat Magnolia,* 20 *How.*; *Towboat Co. v. R. R. Co.* 5 *Am. Law Reg.* 280; *Brig James Gray v. John Fraser,* 21 *How.* 184.

It is also held expressly that it need not be out of a foreign county.—*Thomas v. Lane,* 2 *Sumn.* 1, 9; *Waring v. Clarke,* 5 *How.* 486, *per Woodbury J.*; *Steele v. Thacher, Ware,* 92; *The Appollon,* 9 *Wheat.* 368. This was a libel for a marine tort, commencing on the Spanish side of Belle River, and terminating in a county of Georgia, analogous to the present case as far as the locality is concerned.

II. But if by the words "admiralty jurisdiction" in the act, *criminal* admiralty jurisdiction *be* intended, we say:

1. Admitting fully that it depends upon locality, the rule in respect to where that locality must be, is the same as that of the civil jurisdiction in the case of torts—which rule, we have shown, was, in England, that the place must be out of a domestic, but not out of a foreign county; and is here, that it need not be out of either; then, as a corollary:

2. the place of the crime need not be out of a foreign county, nor out of a domestic county, unless the statute had carefully so directed.

1. As to the first position,—That the rule of place is the same as to civil admiralty torts and admiralty crimes:— *Waring v. Clarke,* 5 *How.* 469; *Bridge Case,* 1 *W. & M.* 482.

The rule as to both was fixed by the statutes of Rich-

ard, viz.: That the place must be out of a county (1 *W. & M.* 465); and upon the same ground; that there was a local tribunal.

2. As to the second position,—That the place need not be out of a foreign jurisdiction:

The statutes of Richard never extended to this country.— *Waring v. Clarke,* 4 *How.* 453, 461; *Rossiter v. Chester,* 1 *Doug. Mich.* 165.

The act of 1857 was passed subsequent to these decisions, and as it is held that the English rule does not apply to torts, on principle and analogy it can not apply to crimes.—(*Woodbury J.*) 1 *W. & M.* 486.

The fact that Congress has been scrupulous in requiring all crimes punishable in the courts of the United States, to have been committed in places "out of the jurisdiction of any particular state," adds great force to this view.

Under such statutes, the place of the offense may be within the jurisdictional limits of a foreign State, and still upon the "high seas," etc.—*Griffin & Brailsford's Case,* 5 *Wheat.* 184; *U. S. v. Ross,* 1 *Gall.* 624; *U. S. v. Wiltberger,* 5 *Wheat.* 76 (*Marshall Ch. J.*); 1 *Bish. Cr. Law,* §§ 21, 609, 610, 611, 653. Compare *U. S. v. Keefe,* 3 *Mason,* 475; *U. S. v. Davis,* 2 *Sumn.* 482; *Story on Const.* § 1673.

In *Wiltberger's* case, the Ch. J. does not refer to the locality within a foreign territory as the difficulty, but to the impossibility of applying section eight to section twelve (Act of '90).

Congress knew that all vessels navigating the lakes and connecting waters from one state to another, or to Canada, are always within "the boundaries" of United States or Canadian counties, and that those waters are common to both nations, for maritime purposes, both by the law of nations and by treaty.—8 *Stat.* 575, 576; *The Appollon,* 9 *Wheat.* 362; *The Atlantic, Ware* 121; *Campbell J. diss, Magnolia Case,* 20 *How.*

Whether or not the place was within the jurisdiction, is a fact to be found by the jury *under the charge;* and this the verdict settled. (See III. below.)—*Griffin's Case,* 5 *Wheat.* 184; *Kessler's Case,* 1 *Baldwin,* 15.

The argument may be stated, then, as a *reductio ad absurdum.* Either there is admiralty jurisdiction in the county of Lambton, or none the other side of the national boundary line; for the eastern half of the river is all within foreign counties; then, if none in foreign counties, none in domestic, for the rule is the same, it is said; therefore, no admiralty crime can be committed on the river anywhere. But the rule in relation to crimes and torts is the same as to place, on principle and authority; therefore, the United States court can not take cognizance of a collision on this river anywhere; in cases of contract, although the jurisdiction results primarily from the subject-matter, yet the locality is one of the essential elements of an admiralty contract, and jurisdiction to that extent depends upon the place, which must be the same as in torts.—1 *Conkl. Adm.* 33. It further follows, then, that in towage, affreightment, &c., upon this river, there is no jurisdiction.

III. We come, now, to consider the second question reserved.

The replication admits the former trial upon a good indictment showing jurisdiction, and then sets up a fact alleged to be inconsistent with that jurisdiction. The demurrer says: "You admit the trial upon a good indictment, &c. No matter, then, if the alleged fact be true, it can not *now* be averred or proved."

We say, then,—

1. Where jurisdiction appears upon the face of the record, the court and jury before which the proceeding was had, have the sole determination of the jurisdiction, and the judgment on the verdict can not be collaterally impeached.

The courts of the United States, although of limited

jurisdiction, are not inferior courts, and their judgments, although the record does not show jurisdiction, are binding everywhere, until reversed; are merely voidable, not void.

When, therefore, the St. Clair court inquires whether the United States court had jurisdiction, in order to make answer it is necessary only to examine the record pleaded in bar, and to reply that no court can look behind it save by appellate power; that it was for that court and jury to decide upon the existence of facts which give jurisdiction, and that the exercise of it warrants the presumption that the facts necessary to be proved were proved; that the record imports *absolute verity*, not to be impugned by averment or proof to the contrary.—*Ex parte Watkins*, 3 *Pet.* 193; *Grignon's Lessee v. Astor*, 2 *How.* 319; *Huff v. Hutchinson*, 14 *How.* 586; *Voorhies v. U. S. Bank*, 10 *Pet.* 477; *Curt. Dig.* 301, *cases cited; Kemp's Lessee v. Kennedy*, 5 *Cranch*, 185; *Kennedy v. Ga. State Bank*, 8 *How.* 611; *Palmer v. Oakley*, 2 *Doug. Mich.* 475; *Erwin v. Lowry*, 7 *How.* 172; *Griswold v. Sedgwick*, 1 *Wend.* 131. See, also, *Brittain v. Kinnaird*, 1 *Brod. & Bing.* 432 (*The Bum-Boat Case*); *Betts v. Bagley*, 12 *Pick.* 572, *et seq.*; 2 *Phil. Ev. 4th Am. Ed.* 161, 162, *and cases cited.*

The locality of the crime was a fact for the jury, under proper averments.

Here the record shows jurisdiction of the parties and the subject matter, so that it fully appears affirmatively; and the judgment would not be reversable on error.—*Curt. Dig.* 302, *cases cited; Conkl. Treat. 3d Ed.* 142.

2. The phraseology of the second question is also open to some criticism. The act refers to the *place*, and not to the *shooting*, as within the admiralty jurisdiction, and the circuit court has no original civil admiralty jurisdiction; and whether it can, with any propriety, be said to be sitting in admiralty when sitting to try an offense unknown to the English admiralty, created by the statute, as properly under the power to regulate commerce as under the admiralty grant, is very

questionable.—1 *W. & M.* 450, 454, 455, 492; 5 *How.* 487. Indeed, the entire jurisdiction in civil cases in admiralty seems, by the latest decisions, to be referred to the power to regulate commerce.—*Allen v. Newberry*, 21 *How.* ¦244 ; *Maguire v. Card*, 21 *How.* 248; (*Betts, J.*) *Poag v. S. B. McDonald, So. Dist. N. Y. April* 5; *McLean J. Magnolia Case*, 20 *How.* 304;— and so, probably, in maritime *criminal* cases. Under the power to establish post offices, Congress has provided for crimes committed by the agents of the department. Why may it not, under the commercial power, provide for offences on navigable waters ?

We proceed to say a few words in respect to the origin of the act of 1857, its relation to previous acts, and the judicial decisions construing the words of similar acts.

1. An examination of the legislation of Congress, and the decisions of the Federal courts, will show that the act was passed to amend secs. 7, 8, and 12 of the act of 1790, and secs. 4 and 5 of the act of 1825, commonly called the "Crimes Act," and because of the common law doctrine that the crime is committed *where the death occurs*, and not where the injury is inflicted, and the application of that doctrine in the interpretation of the statutes.— *U. S. v. McGill*, 4 *Dall.* 426 ; *Id. v. Id.* 1 *Wash. C. C.* 463 ; *U. S. v. Armstrong*, 2 *Curt. C. C.* 451 ; *U. S. v. Davis*, 2 *Sumn.* 482 ; 1 *Russ on Cr.* 554, *cases cited ;* but see 1 *Bish. Cr. Law*, § 554.

It was drafted, and its passage procured, by Judge Curtis, — a name of deserved eminence among admiralty and constitutional lawyers — and in consequence of Armstrong's case.

Sec. 12 of the act of 1790 did not define manslaughter; the act of 1857 does, or rather creates a new species of it.

The existing evil was that, by the common law, the offender escaped all punishment; the remedy applied was the abrogation of the rule that death must ensue at the place of injury. Congress made the *cause* of the death, — the *shooting* — the offense, and provided that if that offense — *i. e.* the *shooting* — occurred at a given place, no matter where the

death occurred, the proper United States court might proceed to punish the offender.

2.  Sec. 5, of the act of 1825, relative to offenses committed by any of the passengers or crew on American vessels "*lying in* a port or place" within a foreign jurisdiction, deserves comment here.

The replication does not bring the case within this section, because it does not allege that the vessel was lying in a harbor or stopping place, moored or at anchor, and not in motion, &c.

But if it be said that this section limits, or construes, the act of 1857, and that the plea does not allege the defendant and deceased to have been passengers or mariners, and that the replication does properly describe the place defined in the section, we say,—

*a.*  This section, and all other sections, of the acts of 1825 and 1790, can limit and construe the act of 1857 only by the "*inconsistency*" of the former with the plain and explicit terms of the latter—inconsistency, especially in *adding* the further restriction "and out of the jurisdiction of any state or sovereign," and interpreting the words "any person or persons," to mean "any person belonging to the company of, or being a passenger upon, the ship, if the shooting shall be on a ship," &c.

But "all acts and parts of acts inconsistent with the provisions" of the act of 1857, are expressly repealed by sec. 4 of the act.

*b.*  This section of the act of 1825 was *cumulative*, so to speak, and not *restrictive*.  It was passed in consequence of decisions limiting these same general words "any person or persons," which occurred in all the previous acts, to citizens of the United States or employees of American vessels.— *Kessler's Case, Bald. C. C.* 28, 30; *Palmer's Case,* 3 *Wheat.* 610, 31, 2; *Beebe's Case,* 3 *Wash. C. C.* 340; *Holmes' Case,* 5 *Wheat.* 412; *Klentock's Case, Ibid.* 144; *Pirates' Case, Ibid.* 184; *U. S. v. Gilbert,* 2 *Sumn.* 22.

The act gives jurisdiction to punish any offender, whether a citizen of the United States or not, who *sustains a relation to the vessel.*

*The section was intended to meet Wiltberger's Case, the Land-locked Bay Case (Robinson's Case, 4 Mason, 307), and the Dock Case (Hamilton's Case, 1 Mason, 152), and simply recognizes the ancient rule that the* HIGH SEAS *are without any foreign or domestic port, and defines that term — and is totally inapplicable to any other waters,* especially the waters of the St. Clair, and to a vessel in transit on the British side.

c. By the law of nations, the laws of a country extend over the persons of its citizens, and over vessels carrying its flag — everywhere. An American bottom is American soil. *Wheat. Int. Law,* 175; 1 *Kent,* 26, 187; *Vat. B.* 2, *ch.* 8 §§ 107, 111; *B.* 1 *ch.* 19, § 216; *B.* 2 *ch.* 9, § 123; *Palmer's Case ubi supra; Holmes' Case, Ibid ; Pirates' Case, Ibid ; Bish. Cr. Law,* §§ 579, 581; (*Story J.*) *The Appollon,* 9 *Wheat.; Story Confl. L.* § 540. Compare *Rex. v. Sawyer, Russ. &. Ry.* 294; *Reg. v. Azzopardi,* 2 *Moody,* 366.

It is this principle of the law of nations to which we are to look in the application of the statute of 1857 to the facts of this case. *The entire argument in favor of the People must be based on a denial of this doctrine,* and this law can not be said to be abrogated by sec. 5.

This latter is an affirmative statute, and such statutes never repeal the prior law unless expressly contradictory and totally irreconcilable with it. Here there is no direct or implied contradiction. See *Bish. Cr. Law,* §§ 91, 100; *Sedgw. Stat. & Const. Law,* 124 seq.

And it is the character of the *vessel* which gives jurisdiction under the fifth sec. of the act of 1825. *U. S. v. Imbert,* 4 *Wash. C. C.* 702; *Kessler's Case, Baldwin,* 29.

3. There is no clashing of state and national jurisdiction in the case. Secs. 5 and 26 of the act of 1825, and sec. 3 of the act of 1820, expressly refer to concurrency of jurisdiction. See *U. S. v. Marigold,* 9 *How.* 560; *Peters' Case,* 12

*Metc.* 387; *Bevan's Case*, 3 *Wheat.* 336; *Coombs' Case*, 12 *Pet.* 72. Of course when such a concurrency would involve a liability to a double prosecution, in cases affecting life or limb, it can not exist.—*Art. V. Amendments U. S. Const.*

But where Congress has regulated the subject-matter of concurrent jurisdiction, existing state legislation is superseded, and future legislation prevented; and the jurisdiction of the United States is exclusive.—*Caldwell v. Ins. Co.* 1 *La. An.* 85; *Jack v. Martin*, 12 *Wend.* 311, 317; *Martin v. Hunter's Lessee*, 1 *Wheat.* 304; *Houston v. Moore*, 5 *Wheat.* 1; *U. S. v. Lothrop*, 17 *Johns.* 9; *Gibbons v. Ogden*, 9 *Wheat.*— *Ableman v. Booth*, 21 *How.* 515; *Rossiter v. Chester*, 1 *Doug. Mich.* 168. The citizen loses no right of trial by jury, as we have shown, in the Federal tribunals; and would not aside from the constitutional provisions; for before the statute of Henry, as well as by that statute, crimes were tried in admiralty by jury.—1 *Kent*, 364, 365; *The Ruckers*, 4 *C. Rob.* 74, *note* 4.

But we think we have shown that crimes are not tried *in admiralty* in the United States Courts.

Both questions reserved, we submit, with entire confidence, should be answered in the affirmative.

*J. M. Howard, Attorney General*, for the People:

The replication in this case shows that the mortal wound was given within the British boundary, and in the British county of Lambton; and the main question arising in this case is, whether that part of the St. Clair river is "*within the admiralty jurisdiction of the United States?*"

We hold that it is not; and that, therefore, the Federal court had no jurisdiction of the crime committed by the prisoner.

Of course, the language of the act of 1857, "*within the admiralty jurisdiction of the United States,*" must be held to be merely descriptive of the *place* where the criminal act is done; and the phrase is clearly susceptible of no other

meaning. The admiralty jurisdiction of the United States must then be held to embrace such places, and such only, as are referred to in the 2d section of art. 3, of the Federal Constitution, which declares that the judicial power "*shall extend to all cases of admiralty and maritime jurisdiction.*" In whatever place, then, Congress may, under the Constitution, · exert its admiralty power; that is, wherever it may authorize its own courts or functionaries to exercise the admiralty jurisdiction, in a case of admiralty there arising, it may punish the crimes defined by this act. But the place must be one within which Congress is authorized actually to exercise and use the admiralty power; for otherwise the act to be punished is not a case within the admiralty jurisdiction. The United States must, at the time and place of committing the act, have authority under the Constitution and laws of nations, to seize the offender, and try, and punish him. The place is of the essence of their right to do this, and if it be not within the geographical limits, within which the admiralty jurisdiction is restrained by the Constitution or the laws of nations, then the crime is not punishable by the Federal authority.

No such power has ever been granted to the United States over that part of the River St. Clair where this crime was committed. The north-western lakes and their connecting waters have never, for criminal purposes, been treated by the two countries as a part of the "high seas," or as subject to the admiralty jurisdiction; and no jurisdiction can be claimed upon them as such by either party. The high seas are the common highway of all nations; this is their distinctive attribute; and no one can claim or exercise any authority over them, or take cognizance of any criminal cases arising upon them, except upon its own vessels, which, while on the high seas, are held by the law of nations, to be within the jurisdiction of the goverment to which they belong.

Now the north-western lakes have never, like the high seas, been open and free to the travel of all nations. History does not show that France, who first discovered them, and

7 MICH.—N.

held them for a century and a half, ever considered them otherwise than as an integral part of her dominions, over which she exercised all her sovereign powers, as fully as she did within her European possessions.

By the 2d article of the preliminary treaty of peace, dated the third of November, 1762, between Great Britain, France and Spain, the King of France "renounces all pretensions which he has heretofore formed or might have formed, to Nova Scotia or Acadia, in all its parts, and guaranties the whole of it, with all its dependencies, to the King of Great Britain; moreover, his Most Christian Majesty cedes and guaranties to his said Britanic Majesty, in full right *Canada*, with all its dependencies, as well as the Island of Cape Breton, and all the islands in the Gulf and River St. Lawrence, without restriction, and without any liberty to depart from this cession and guaranty under any pretence, or to trouble Great Britain in the possessions above mentioned." And by the 4th article of the Definitive Treaty, (Paris, Feb. 10, 1763), "His Most Christian Majesty renounces all pretensions which he has heretofore formed or might form to Nova Scotia or Acadia, in all its parts, and guaranties the whole of it, and with its dependencies, to the King of Great Britain; moreover, his Most Christian Majesty cedes and guaranties to his said Britanic Majesty, in full right, *Canada*, with all its dependencies, as well as the island of Cape Breton, and all the other islands and coasts in the Gulf of the River St. Lawrence, and in general, everything that depends on said countries, islands, lands, places, coasts, and their inhabitants, so that the Most Christian King cedes and makes over the whole to the said King and to the Crown of Great Britain, and that in the most ample manner and form, without restriction, and without any liberty to depart from the said cession and guaranty, under any pretence, or to disturb Great Britain in the possessions above mentioned."—*Entick's late War, Vol. 5, pp.* 439 453, *London,* 1764; See *also* 16 *American St. Papers, p.* 268

There is nothing in these treaties indicating that the con-

tracting parties considered these lakes as a part of the high seas for any purpose whatever. By right of prior discovery and exploration they were doubtless the property of France until the cession of 1762; and that by the treaty they became the property of Great Britain, and so remained until the treaty of 1783, is indisputable. And this long possession by those parties, without claim by any other nation to treat them as the common highway of nations, must be held conclusive that they were never such.— *Vattel B.* 1. *chap.* 22, § 266.

By the Royal proclamation of October 7, 1763, the laws of England were extended over the whole of the newly conquered territory; (16 *Am. State Papers, p.* 36), and the conquered country governed by the King alone until Parliament had acted on the subject.— *Campbell v. Hall, Cowp.* 204 ; *Mitchel v. United States,* 9 *Pet.* 748.

No provision is found in any subsequent treaty going to show any release or modification of the absolute sovereignty of the owners of those waters over them, except as to the right to navigate them.

By the second article of the Treaty of Peace between Great Britain and the United States, of September 3, 1783, (8 *Stat. at Large,* 81), the boundary between the two countries passed "through the middle of the said lake (Erie) until it arrives at the water communication between that lake and lake Huron, thence along the middle of said water communication into lake Huron, thence through the middle of said lake to the water communication between that lake and lake Superior, thence through lake Superior northward to the Isles Royal and Phellipeaux to Long Lake," &c. This treaty gave neither of the parties to it a right of way by water over the territory of the other, save that it made the Mississippi "free and open" to the subjects of both, from its source to the ocean.—*Art.* 8.

By the Treaty of Commerce and Navigation of the 19th of Nov., 1794, art. 3, (*Ib. p.* 117), the two nations stipulate " that it shall at all times be free to His Majesty's subjects and

to the citizens of the United States, and also for the Indians dwelling on either side of 'the boundary line, freely to pass and repass, by land or inland navigation, into the respective territories and countries of the two parties, on the continent of America (the country within the limits of the Hudson Bay Company excepted), *and to navigate all the lakes, rivers, and waters thereof, and freely to carry on trade and commerce with each other.*

These were the only provisions respecting the boundaries and the use of the waters until the treaty of Washington in 1842 (*Ib. p.* 575). The latter treaty made no changes in the boundary, which had been previously agreed upon, through the chain of lakes, except in the St. Mary's River, and in the part of it which lies in the northern portion of lake Superior; nor does it alter the rights of the parties to navigate all the rivers and waters, and to carry on trade and commerce; simply declaring (art. 7), that the various channels formed by the islands in the St. Lawrence, in the Detroit by Bois Blanc, and the several channels at the mouth of the St. Clair "shall be equally free and open to the ships and boats of both parties."

Thus the three countries have, by their treaties, concurred in regarding the lakes as proper territory for the exercise of their sovreignty, and Great Britain and the United States have bounded their territorial possessions and powers by a line drawn through their centre. It would be absurd to suppose that in thus establishing their boundaries, each party did not believe and intend that it was entirely at liberty to exercise, on its own portion of the watery domain, all and every of the powers of sovereignty which it possessed, in such manner, on such subjects, and at such times as it should see fit, subject only to the privilege stipulated to be conferred on the other party, of a right to navigate the same portion.— *Wheat. Intern. L.* 252, 253; 1 *Bish. Cr. L.* § 575.

It did not enter their thoughts that their sovereign and exclusive legislative power—the power to preserve the peace, and to punish crimes committed within their own dominions

—was in any way affected by the *nationality* of the offender, or by the *ownership* of the craft on which he should commit the crime; circumstances which can be considered only in criminal cases arising upon the high seas, where no nation can claim any jurisdiction except on its own vessels. Indeed the treaty of 1783, defining the boundaries, is, in its nature, an absolute relinquishment of all claim of sovereignty by each of the parties beyond the line of demarkation, and a guaranty that she shall abstain from exercising her powers within the limits of the other. It made each nation sovereign and independent within its new limits, and excluded all powers of the other. — *Wheat. Intern. L.* 115, 121 ; *The Exchange v. McFaddon,* 7 *Cranch.* 116.

The place, then, where the wound was inflicted, was not within the limits of the United States, nor, consequently, within their jurisdiction.

The Constitution contemplates no such absurdity as the granting of power to the Federal courts, to try criminal causes arising within the territorial limits of another sovereignty ; and whether admiralty powers over the *American part* of those waters has been granted to Congress (as held in the *Genesee Chief v. Fitzhugh,* 12 *How.* 450), or not, the federal courts can take no cognizance of crimes perpetrated on the British portion. England has never, by treaty or legislation, impressed upon these lakes and rivers that character of high seas which enables the nation owning the vessel to punish crime committed upon it while on the high seas. To say that the United States may punish such a crime, is to assert that they may establish a court of justice on such a vessel, and authorize it to issue process, make the arrest, try the offender, and punish him on board the same vessel, while afloat in British waters; in short, to enforce the whole criminal code on British waters, and within the British limits. For, if the United States have cognizance of the crime committed in such a locality, they certainly can arrest and try the offender there.

One legal attribute of the high seas is that no nation can appropriate to itself any exclusive dominion over them. *Vattel B.* 1 *Ch.* 23, §281 ; *Wheat. Int. L.*, 6 *ed.* 247, 248, *et seq.* ; 1 *Kent. Com.* 26, 27 ; *The Twee Gebroeders*, 3 *Rob. Adm.* 336, 339, *etc.* ; 1 *Bishop Cr.* § 679: while lakes and rivers belong to the sovereign within whose territorial limits they fall.— *Vattel, B.* 1 *Ch.* 22 ; *Wheat. Int. L.* 252.

In accordance with this principle, the United States, in admitting Michigan into the Union, bounded her on the east by the same divisional line, and declared that she should have *jurisdiction* within it.

Under the territorial government the counties of Wayne, Monroe, Macomb, St. Clair, and Sanilac, were all bounded on the east by the national boundary line, Huron county, Cheboygan, Alpena, Iosco, Alcona and Presque Isle are all bounded by the same national boundary line. Chippeway county (*Code of* 1827, *p.* 692) embraced the whole of the Upper Peninsula, and was bounded on the north and east by the same line.

And it is worthy of note, that by the proclamation of Governor St. Clair, of August 15th, 1796, the original county of Wayne was bounded on the east and north by the national boundary line, commencing on that line in the middle of Lake Erie, and terminating at a point in said line north of the "north-west part" of Lake Michigan *Chase's Laws of Ohio vol.* 3, *p.* 2096.

In October, 1818, the county of Michillimackinac was also bounded on the east by the same line, so that every square inch of the American part of these waters was included in the several counties bordering on them.

By the R. S. of 1838, the counties of Monroe and Wayne had civil and criminal jurisdiction in common on that part of Lake Erie lying within the boundaries of the State; Wayne, Macomb and St. Clair on Lake St. Clair; Saginaw, Michilimackinac and St. Clair, (which three counties formed the western border of Lake Huron), on Lake Huron; and

Chippeway on Lake Superior; and each county could issue civil and criminal processes upon them; though no such common jurisdiction prevailed upon the American part of the *rivers*. The same state of things continues. The state of New York, by her laws, extends her counties bordering on lakes Ontario and Erie, and the rivers St. Lawrence and Niagara, to the same national boundary line (*Manly v. People*, 3 *Seld.* 299); and it is presumed the same is true of the state of Ohio.

Such are the treaties and such the American legislation respecting these waters. They have been treated by us as a portion of the territorial dominions of the United States, and not as high seas. And there is no pretence that England has ever regarded her portion of them in any other light than as a part of her territorial domains; none that her own courts have ever regarded them as at all subject to her admiralty powers. Her courts have steadily held that the admiralty jurisdiction of the kingdom applies only to the high seas, including the mouths of rivers as high up as the tide ebbs and flows.—*See* 1 *Kent. Com.* 365, 366, 367, (*note a*); *The Thomas Jefferson,* 10 *Wheat.* 428, *approved in the Steamer Orleans v. Phœbus,* 11 *Pet.* 175; *Waring v. Clark,* 5 *How.* 463; *U. S. v. New Bedford Bridge,* 1 *Woodb. & M.* 420; *Lord Hale,* (*cited* 6 *How.* 397), 1 *Bishop Cr. L.* § 609.

No argument to sustain the jurisdiction of the Federal court can be drawn from the fact that the [treaty of 1794 allows to the citizens and subjects of each of the parties the right "to navigate the lakes, rivers and waters of the other." This clause confers no jurisdiction, no legislative power over the alien waters, but only a right of passage, which in the absence of such a stipulation would probably have been held to be secured by the laws of nations.

There is no analogy between this simple right of way across peaceful territory and the exercise of any part of the sovereign power over it. The former proceeds from the

latter, not the latter from the former. Besides, such an argument destroys itself by proving too much; for if the jurisdiction in question can be deduced from the right of passage on the British side of the line, the same right of passage on the *rivers* on "either side of the boundary line," would carry the same jurisdiction into all the navigable streams on each side, and would subject the inland rivers and other waters of each party to the exercise of the same jurisdiction; a consequence which all will reject.

The admiralty jurisdiction of Congress is only such as belonged originally to the states, and such as the states have granted to Congress by the Constitution; and can be neither enlarged nor diminished. Congress can not extend it into regions where it did not before exist, any more than it can expand its other powers so as to encroach upon other nations and diminish their sovereignty. It might as well assume to try ejectments, or other real actions, or actions in *rem*, where the subject matter is within a foreign country, in contempt of the *lex rei sitae;* or establish a blockade without ships of war on the coast to enforce it.

Under what grant of power in the Constitution can Congress claim the right to punish such an offense? Not that to punish piracy and felony committed on high seas; because, as we have seen, the place was in no sense part of the common highway of nations. Not that to punish offenses against the law of nations, because neither the law of nations nor the common law holds such an offense (*i. e.* the mortal assault) to be punishable out of the territorial jurisdiction where it is committed. *Vattel B.* 2 §101, remarks that "even in countries which every foreigner may freely enter, the sovereign is supposed to allow him access only upon this tacit condition, that he shall be subject to the laws. I mean the general laws, made to maintain good order, and which have no relation to the title of citizens or of subjects to the state, &c."

Our courts can not punish offenses against a foreign

government nor take cognizance of such offenses. — 1 *Bish. Cr. L.* § 595; *Story's Confl. of Laws* §§ 7 *and* 8; §§ 619 *to* 625 *inclusive.*

Not that granting the admiralty power, because that would be to stretch that power not only over all tide waters, (which, so far as England is concerned, is its proper and exclusive theatre), and all navigable waters within the United States, (as settled in 12 *Howard*), but over a region which lies confessedly within the limits of a foreign sovereignty, where it is not pretended the United States have any power to define or punish crimes. No such power, (except perhaps in cases of treason or mutiny), has been delegated to Congress by the Constitution, nor, it is submitted, ever attempted to be exercised by them. Wheaton, in his International Law, (*p.* 172), although conceding that as a general principle a nation may punish its subjects for crimes committed in a foreign country, yet remarks that England and the United States form exceptions to the rule. In the case of the United States the reason is plain. No power is granted by the Constitution, that would authorize Congress to declare an act criminal, committed in a foreign country which was made such solely by the laws of that country, but which should not of itself violate any law which the Constitution authorized to be passed. To make an act, done in such foreign country by an American citizen, criminal, it must appear that it was done in derogation of some granted power; and nothing of the kind appears in the present case. See *The Exchange v. McFaddon,* 7 *Cranch,* 116.

The Supreme Court have never intimated that an act done on the British side of these waters is within the American admiralty. The farthest they have gone was to declare, in the case of the *Genesee Chief* (12 *How.* 453), that a collision on the American side in Lake Erie, was a case within the admiralty and maritime jurisdiction of the United States; but not that it would have been such had it occurred in British waters.

Nor is the power in question derived from the grant in the Constitution "to regulate commerce with foreign nations, among the several states, and with the Indian tribes." The act of 1857 was obviously not passed in pursuance of that grant. It does not require that the criminal act should be committed with a view to obstruct commerce, or while the offender is engaged, directly or indirectly, in the business of commerce, with any foreign nation, any other state of the Union, or with the Indian tribes; nor does it require that he should be engaged in navigation (which falls within the commercial power,— *Gibbons v. Ogden*, 9 *Wheat.* 1), either to foreign countries or to other states of the Union. It does not require the act to be done on board of an American ship, or any ship unless by mere implication; establishing in British waters two codes, one American, the other British, incompatible with each other. But under the act of 1845 (5 *U. S. Stat. at Large*, *p.* 726), in order to bring an American vessel within this jurisdiction on the lakes, it must be *enrolled and licensed for the coasting trade*, be of *twenty tons burden and upward*, and be at the time *employed in the business of commerce and navigation between ports and places in different states and territories*. None of these facts are averred in the indictment, as to the *Concord*, and in omitting them the pleader has obviously failed, upon the face of the indictment, to present a case which by implication falls within the admiralty jurisdiction, even had it occurred on the American side of the line.

Nor was the act of 1857 passed to punish American citizens, as such, for crimes committed in a foreign country, if Congress have such a power; for it does not even require that the offender shall be an American citizen, and the indictment in the federal court does not aver that either Tyler or Jones was such,—though this is admitted in the replication.

The question arising upon this record is not, however,

whether the United States have power, under the Constitution, to punish American citizens for crimes they may commit in foreign countries (which I insist can be done, if at all, only under the treaty-making power, as in the case of the treaty with China,—8 *U. S. Stat. at Large, p.* 592, § 21); but really whether they may extend their admiralty and maritime jurisdiction into the interior of a neighboring independent nation, which does not recognize the existence there of any such jurisdiction, and whose laws wisely repel it.

If Congress can not assert a power to punish crime, under the admiralty clause, committed within the boundaries of a state of the Union above high water mark (*United States v. Coombs,* 12 *Pet.* 78), it would seem they are at least under as clear a disability in respect to a foreign country.

In *Commonwealth v. Peters,* 12 *Metc.* 387, the prisoner had been indicted in the federal court, under the twenty-second section of the act of 1825 (4 *Stat. at Large, p.* 121), for an assault with intent to kill, committed on board an American vessel lying in the sea, but within the limits of the county of Suffolk, and was acquitted. He was then indicted in the municipal court for the same offense, and pleaded his former acquittal. The court, in overruling the plea, *held,* that the offense was exclusively within the cognizance of the state courts, for the reason that, although there may be a concurrent power in the Federal and state courts to punish crimes committed in the harbors, rivers, etc., within the body of a county, yet that the phrase in that section, "*within the admiralty and maritme jurisdiction* of the United States, and out of the jurisdiction of any particular state," excluded the Federal court. To the same effect is *United States v. Beavans,* 3 *Wheat.* 336.

In *The United States v. Grush,* 5 *Mason,* 290, 299, where the indictment was under the same section, for a like offense, Judge Story held the same thing, though he admitted that

the "arms of the sea," and rivers, harbors, creeks, basins, and bays, where the tide ebbs and flows, although within the body of a county, are within the admiralty and maritime jurisdiction.

In *United States v. Wiltberger*, 5 *Wheat.* 76, the prisoner was indicted under the twelfth section of the act of 1790, for manslaughter committed on the river Tigris, some thirty-five miles from its mouth, but within the ebb and flow of the tide. The court held the place not to be on the high seas; and as the section required that the act should be done on the high seas, the court had no jurisdiction of the offense. But the court do not intimate that, had the language been "within the admiralty and maritime jurisdiction of the United States," they would have had jurisdiction of the offense. But it is quite clear that this section, so far as it punishes manslaughter committed on the high seas, derives its force from that clause of the Constitution which enables Congress to define and punish piracies and felonies on the high seas, and not from that granting the admiralty power; while the power claimed in the present case must, if it exist, spring exclusively from the latter.

Although the present case does not involve the question of the power of Congress to punish crime committed on the navigable waters of a state, within her acknowledged limits, under the admiralty power, yet a state court may, in view of the consequences to the states, well pause before establishing the precedent asked for by this demurrer. For it invites the court to declare that Congress has power under that clause of the Constitution, to extend the admiralty jurisdiction into every inland navigable river in the world, and to try and determine all cases, civil and criminal, arising upon them on board of American vessels. If this may be done, Congress may surely repeal the present limitation in the acts of 1825 and 1857, prohibiting the exercise of the power in the states, and direct that all crimes committed upon their navigable waters, whether arms of the sea, har-

bors, bays, or rivers, shall be tried exclusively in the fede-ral courts, by juries selected by the marshals from the whole district. The doctrine laid down in the case of the *Genesee Chief,* in 12 *How.,* extending this unwelcome and ambitious jurisdiction, in civil cases, not only to the head of tide waters in the states, but to the highest point where the stream is *navigable,* is but the tocsin for as-sumption by the Federal power of the trial of all crimes committed on those waters; and, finally, should a Congress be found sufficiently pliant to yield to the imperial claim, to exclude the state courts from making any effort to pre-serve the peace, and enforce their criminal codes upon them. The possibility of such an attempt has become the ground of just alarm.

And for myself, I seize the occasion here to utter my remonstrance against a construction of the Constitution, which, although it has not yet been actually done, *may* yet absorb within the Federal power a large and very im-portant portion of the power of the state over crimes com-mitted within her limits, and expose an accused person to be tried in a federal court by a jury exclusively selected by a Federal officer, and called from remote parts of the state, far out of the limits of his county, and having no acquaint-ance or sympathy with him; and cordially adopt the lan-guage of Justice Manning, in his dissenting opinion in the *American Trans. Co. v. Moore,* 5 *Mich.,* that "rather than acknowledge such an encroachment on her sovereignty, it would be better for the state to define anew her territorial limits, excluding therefrom that portion of her territory which can no longer be retained without constantly remind-ing her of her political degradation, and the *loss of her sovereignty over her own waters.*"

*H. D. Terry* on same side:

Admitting the language of the act of the 3d of March, 1857 — "within the admiralty jurisdiction of the United

States " — to mean the admiralty jurisdiction as it existed in England and her American colonies at the close of the Re⁻ volution, yet we insist that admiralty jurisdiction was never recognized as existing over, any waters or seas where there was a local jurisdiction of the common law courts. The jurisdiction of the English courts of admiralty in criminal cases was limited to offenses committed on the high seas, or bays, havens, rivers or creeks beyond and outside the borders of counties, and where the jurisdiction of common law courts did not exist. This is the rule laid down in all the books that treat of criminal jurisdiction in admiralty. Even if the place where the shot was fired by the defendant had been within tide waters, still a court of admiralty would have no jurisdiction over the offense, because it was clearly within the borders of a county, and within the jurisdiction of the common law courts of Canada. No English or American case can be found where jurisdiction has been enforced in the admiralty courts, or any other courts, for offenses committed within the jurisdiction of the local courts of a foreign government, and upon any principle of the common or admiralty law; and only one case can be found under the statute of 33 *Hen. VIII. Rex v. Sawyer, Russ. & Ry.* 294; 1 *Hawk. P. C.* 93. Wherever waters lie within the body of a county, or any local, civil or municipal division for judicial purposes, they are not within the jurisdiction of the admi_ ralty for criminal purposes, and never were; and there is, and can be, no such thing as concurrent jurisdiction over criminal offenses by the admiralty courts and courts of common law.

There are a few cases, both English and American, where criminal jurisdiction has been sustained by the admiralty courts, or courts taking jurisdiction as such, when the offenses have been committed within a marine league of the coast, and below low water mark, although the local foreign jurisdiction was there exercised; but in all those cases the jurisdiction was maintained on the ground that the *locus* was on

the high seas. The statute of Richard created no new offense, nor did it extend or diminish any territorial jurisdiction. And before the statute the admiral had jurisdiction only upon the high seas and outside of any local jurisdiction. — 1 *Com. Dig., N. Y. Ed.* 1824, *pp.* 507 *to* 516, 517 *and* 518; 1 *Hawk. P. C.* 254, § 11—15; 2 *East C. L.* 803; 1 *Kent Com.* 364; *Regina v. Serva,* 2 *C. & K.* 53; 2 *Bac. Abr. (Bouvier's Ed.)* 734, 735; 1 *Russ. on Cr.* 101.

In connection with the proposition that the admiralty criminal jurisdiction did not extend to places where there was a local jurisdiction, we say that the same doctrine has been held in this country, and that, too, whether the local jurisdiction was foreign or domestic, even if the places were on the "high seas."— 1 *Bishop Cr. L.* § 611, *and cases there cited*; 2 *N. Y. Legal Observer* 35.

The act of Congress under which the prisoner was indicted makes no mention of any vessel as the place or scene of the offense, nor does it in terms refer to the nationality of any person or persons who may commit it, nor the relations they may bear to any vessel, or the crew or passengers of any vessel. A statute could not be more general. Compare it with the act 3d March, 1825, § 5. What necessity was there to pass this latter act if all the precedent acts, and the present act can be held to include places within the local jurisdiction of foreign sovereigns and independent States? — See *U. S. v. Wiltberger,* as cited in 7th *Ed.* 1 *Kent,* 362 *and* 363, *and the remarks on* § 5. The maxim, "*Expressio unius exclusio alterius,*" applies in this connection with peculiar fitness. But, if it be said that the words "within the admiralty jurisdiction," in the act of 1857, define not only the *locus* of the offense, but include, necessarily, the fact that it must be committed upon an American vessel, by or upon American citizens, then we say that there are no words in the record showing that the *Concord* is one of the vessels included in the act of 1845. (See § 3 *of act* 1845; *Palmer's case,* 3 *Wheat.* 610; 1 *Baldw.* 29, where it is said the character

of the vessel determines the jurisdiction). The admiralty court would have no jurisdiction of a tort committed on such a vessel as the *Concord*, as she is described in the record.

Again, the Federal court could not have jurisdiction over an offense committed in a place where the process could not be served. It would be absurd to say that the process of a court could not be executed in a particular locality, and yet not the same court could have full jurisdiction over an offence committed in that locality. That process could not be served where this offence was committed —See *The Appollon*, 9 *Wheat* 362. See *case Booth, just decided in Sup. Ct. of U. S., sentence of Judge Wilkins.*

Again, we say that the words of *Sec.* 1 of the act of 1857, (upon which the indictment in the Federal court was framed), to wit: "Any arm of the sea, or in any river, haven, creek, basin, or bay," must have the same meaning, and refer to the same places, as when used in the crimes act of 1790, and in the subsequent acts. That is, that the bodies of water referred to must open into and be navigable from the "high seas."—See § 8 *of the act of April* 30, 1790, *Laws U. S., p.* 93; *Brightly's Dig., p.* 207, § 28.

Congress never dreamed of including the American lakes and the straits connecting them, when they passed this section. They simply meant to make the territorial jurisdiction over the offence defined by this section as broad as the then American doctrines in regard to the extent of admiralty jurisdiction. We must look to the circumstances surrounding them to get their intention. — 1 *Kent*, 366 *et seq*. These same words were used by English statutes and writers, hence their adoption in early legislation. — 2 *Bac. Abr.* 735 *and* 741. Section 4 of the act of 3d of March, 1825, uses the same language precisely, and includes the offenses of murder by "shooting, &c., maliciously," when the party dies on shore. So sections 6, 7, and 22 of the act use the same language. Then came the act in question, using pre-

cisely the same language. It can not be said that these words, when used in the act of 1857, must have a different meaning from what they were understood to have in the previous act. It was passed after the extension of the admiralty jurisdiction to the "lakes" and rivers, in 1845. But if it had been the intention so to have extended the criminal jurisdiction, would not the word "lakes" have been used? They had become well known; for, year after year, applications had been made to Congress for appropriations; light houses had been erected, and harbors constructed; and the opening of the mineral regions had attracted the attention of the world. It is a little strange that, if Congress designed to extend criminal admiralty jurisdiction over them, more express and appropriate language had not been used.

Again, if Jones had died on the spot where he was shot, upon the brig, the offense must have gone without punishment, if the ground assumed by the other side be tenable; because there would be no power under any existing act of Congress to punish such an offense.

Besides, the water communication between Lakes Huron, St. Clair, and Erie was never understood as, or called, rivers, until long after the act of 1790; nor do they come within any definition of that word as understood in admiralty law, or by national treaties.—*2d Bouv. L. D., Tit. River; Art. 2 of Preliminary Treaty between U. S. and Great Britain, Laws U. S., Vol.* 1, 196; *so on p.* 203, *in Definitive Treaty*

What was the object of enacting the law of 1857? What evil was to be remedied, or omission to be supplied by it? Section 4 of the act of 1825 makes certain acts (if resulting in death) murder, if the acts are done "*with malice,*" but not providing for the punishment of like acts with like result, but done *without malice*. The of 1857 supplies this defect. And it is to be remarked that the language of the two sections is identical, except in the first case the word "*maliciously*" is inserted, and in the latter

7 MICH—O.

the words "*without malice.*" There is no difference in the language defining the territorial jurisdiction. Is it not clear that no broader construction can be given to the latter statute than to the former? — We think so.

But what seems to us must settle the question that no other construction can be given to the words " river, haven, creek, basin or bay," as used in the act of 1857, than that they mean navigable water communications from the " high seas," is the want of power in Congress to punish maritime crimes except upon the " high seas." This court will hesitate before they pronounce an act of Congress unconstitutional; but if, by giving a construction to an act which it will fairly and reasonably bear, they thereby bring it within the Constitution, they will do so. Now, it is insisted on the other side, very strongly, that the provision of the Constitution extending the judicial power to all cases of admiralty and maritime jurisdiction, does not include the power to define and punish marine offenses, but that this power is found only in the provision authorizing Congress to define and punish felonies committed on the high seas.— *Art.* 1, § 8, *Subdiv.* 9. For the purposes of this branch of the argument this is conceded. Look at the language of this provision: " To define and punish piracies, and felonies committed on the high seas, and offenses against the law of nations." Can there be any doubt how the words "high seas" were understood by the framers of the Constitution? Were not the words understood precisely as they were understood at that time in England? — 1 *Story on Const., p.* 56, § 1159; 1 *Bish. Cr. L.* § 611. So, precisely, has the term been understood as used in the act of 1790, passed in the following year. — *U. S. v. Ross,* 1 *Gall.* 624 ; *U. S. v. Furlong,* 5 *Wheat.* 184; *U. S. v. Wiltberger,* 5 *Wheat.* 76.

But we say, what we think must be conclusive of this case, the Circuit Court of the United States had no jurisdiction of the offense charged in the indictment in that court, because the killing of Jones was within the state of

Michigan, and therefore the offense was not committed " out of the jurisdiction of any particular state," within the intent of the act of 1857, but was within the jurisdiction of the state of Michigan. If a state court had jurisdiction, then it is clear the Federal court had none. The jurisdiction of the state of Michigan is co-extensive with her legislative power.— *U. S. v. Bevans*, 3 *Wheat.* 336; 1 *Hawk. P. C.* 254, §16; *Leach. Cro. Ca.* 432; *Coombs' Case;* 1 *Shaw*, 339; *Rex v. Alsop*, 1 *Russ. on Cr.* 101; *Ibid.* 554; *U. S. v. Davis*, 2 *Sum.* 482; *U. S. v. Grush*, 5 *Mason*, 290; 12 *Metc.* (*Peters' case*) 387; 3 *Park. Cr. Cas.* 199.

A want of jurisdiction in the court pronouncing a judgment or decree may always be set up when it is sought to be enforced, or when any benefit is claimed under it; and the principle which ordinarily forbids the impeachment or contradiction of a record has no sort of application to the case.— *Cow. & Hill's Notes*, 801, 825 *and* 6; 2 *Doug. Mich.* 476; 19 *Johns.* 33; 15 *Johns.* 141; 1 *Pet.* 340; 3 *How.* 750; 1 *Day*, 168; 5 *Wend.* 148; 12 *Metc.* 387.

The main propositions may be summed up as follows: That the statute of 1857 does not and can not apply, either in its spirit or its letter, to the lakes and rivers of the northwest, whether lying within the geographical boundaries of Canada or the United States, because the local jurisdiction of the several states and Canada excludes it. The act of 1857 is confined to the "high seas," and "rivers, basins, creeks, havens, and bays" which are a part of the "high seas," and which are also beyond and outside of any local jurisdiction.

If the act of 1857, by its letter and terms, included the offense charged as having been committed at the place specified, it would clearly be utterly null and void, as contrary to and beyond the provisions of sub-division 11, section 3, article 1st of the Constitution: "Congress shall have power to define and punish piracies, and felonies committed on the high seas."

Now the government of the United States can not define or punish any offenses when committed beyond the boundaries thereof, except only under this provision, and where they are committed on the high seas, which, Judge Story says, "may be taken to mean that part of the ocean which washes the sea coast, and is without the body of any county according to the common law," and, of course, where no local jurisdiction exists. This provision of the Constitution is the one under which all the acts defining felonies and piracies on the high seas have been passed, including the acts of 1790, 1825, 1835, and 1857; and Congress could not, under this provision, if they desired so to do, extend the power to the lakes and rivers of the north-west, because they are not "high seas," and because they are all either within the local jurisdiction of the several states bounded thereon, on the one side, or the jurisdiction of Canada, on the other; and if Congress intended, as in section 5 of the act of 1825, to punish felonies when committed *within a foreign jurisdiction* on the high seas, they would have expressly provided therefor. But the offense described in the indictment was clearly within the jurisdiction of the state of Michigan, and, therefore, expressly excluded from the Federal courts by the very act of 1857.

*Russell* in reply:

If, as is said by the Attorney General, the court will take notice, from the former indictment, that the place was in Canada, why did he not *demur*, instead of replying the locality, as new matter, in the nature of a confession and avoidance?

The first argument for the People is, that in order that the place mentioned in the act of 1858 and required to be "within the admiralty jurisdiction" may be so, it must be a place where Congress may "*exert its admiralty power*;" "may actually exercise and use it;" "the United States must at the *time* and *place* of the act, have authority to *seize* and *try*, and punish." And again it is said, "To say that the

United States may punish such a crime, is to assert that they may establish a court of justice in British waters, arrest, try, and punish there, and enforce the whole criminal code within British limits;" " cognizance of the case at all, involves this power to arrest and try the offender at the place of the crime." Here is a fallacy—a *non sequitur*, of the most extraordinary kind. What is *jurisdiction?* It is "to have the power to inquire into the facts, to apply the law, and to declare the punishment, in a regular course of judicial proceedings." (*Shaw Ch. J.* 3 *Metc.* 462; 2 *How.* 319, 338; 6 *Pet.* 691, 709). This power in a court depends upon the subject matter and the parties; and may be said to be dormant until the regular course of judicial proceedings is instituted. That can be instituted only within the *territorial* jurisdiction of the court and where its process may run. Take the case of a collision on Detroit river—the District Court of Northern Ohio or that of Michigan has jurisdiction. But only that court can *exercise* it within whose territorial limits the vessel shall be brought. Take the case of the Echo or the Wanderer. Any circuit court of the United States has jurisdiction to try the offense against the slave trade acts, but the offender must be apprehended within the district. Personal process to the marshal directs arrest "if found within the district." See *Ex parte Graham*, 3 *Wash. C. C. R.*

But, again; waters within the admiralty jurisdiction are waters which may be the locality of a tort or service cognizable by the admiralty court, if that court ever gets hold of the vessel. The argument of the Attorney General is twofold—first, he says this place is not within the civil admiralty jurisdiction—then, if it be, the act of 1857 giving power to punish a crime committed there, is unconstitutional. Why is not this place within the civil admiralty jurisdiction? Because, says he, that jurisdiction cannot exist except on waters accessible to all the powers of the earth. In what text book or judicial decision do we find this criterion? Was not the Baltic the cradle of admiralty law, and yet a *mare clausum,*

where to this day Denmark exacts a toll for passage? If the two greatest commercial nations of the globe have access to the lakes, is there not a theatre for this jurisdiction? Did not Clay claim the St. Lawrence to be a strait? But it is said that by the treaty of Paris of 1763, and by the treaty of 1783, no provision was made for admiralty jurisdiction. Population and commerce exists where there is such jurisdiction. Neither existed on the lakes then; they were as unknown as the Niger. The high contracting parties did not know whether they were fresh or salt. During this century England has furnished an armed vessel on Lake Ontario with *fresh water tanks*. Now the internal commerce of the lakes exceeds in value the entire foreign commerce of the United States.

The Attorney General then says that England restrains admiralty jurisdiction to the tide, and never exercised admiralty jurisdiction anywhere else, or on the lakes, or that part of this river in Canada; and cites the case of the *Thomas Jefferson*, and *N. O. v. Phœbus*, and 2 *Haggard*. *Ergo*, this court is asked to hold that the English rule prevails here, and to overrule the United States Supreme Court decisions since 1845. The whole argument against civil admiralty jurisdiction on the other side of the line proves too much; it sweeps away the jurisdiction on this side equally See 20 *How.*, *Magnolia Case*.

But, says the Attorney General, this statute is unconstitutional. Congress has no power, he says, to enact that a crime, committed by one of our citizens in a foreign country, may be punished here. Under what clause, he asks, can the power to pass this statute be found? The power to regulate commerce, we answer. The admiralty power is really the same thing, as *McLean J.* says in his opinion in the *Magnolia Case*, 20 *How.*; and, as before said, by the law of nations.

But if it be, says the Attorney General, under this power, then the tonnage and employment of the vessel should have been averred. By no means. The act of 1845 relates solely

to civil cases of tort and contract, and confers jurisdiction on the district courts.

The tonnage and employment upon certain waters give jurisdiction in civil cases over the vessel, and the waters where such vessels *are employed* become admiralty waters. Any crime committed on an American vessel on these waters, we say, is punishable.

The ownership gives jurisdiction, provided the vessel is on admiralty waters. Take the case of the *Fashion*, 21 *How.* 244. Suppose a crime committed on that vessel, or any other vessel although plying between ports of the same state; she would be on waters within the admiralty jurisdiction.

Does the act of 1845 say employed on the *American* side of the lakes and connecting waters? The question did not arise in 12 *How.* As a matter of fact the collision there was on this side. But in *Scott v. Young America*, 1 *Newb.*, and many other cases, and in the great collision case of the *Atlantic and Ogdensburg*, 1 *Newb.* and 21 *How.*, the collisions were in Canada. So in the *Appollon* case the tort was begun in a foreign country. In the *Wiltberger* case it is clearly manifest that if the words of the 8th section could have been engrafted on the 12th, the court would have sustained the jurisdiction.

But if the doctrine of the Attorney General is true, the act is an absurdity. Where are the "rivers, creeks, havens, basins, and bays," outside of any state, which are not in foreign countries?

The *place* of the shooting is to be without the jurisdiction of the state; not the offense. If the United States has no jurisdiction, because the state has, then the United States can not punish counterfeiting because the state can.—1 *Cond.* 278; *Ch. J. in Bevans' case.*

How surprising the assertion that if we can legislate for the punishment of citizens returned here for crimes committed abroad, it follows, as a consequence, that we can enact that they shall not be amenable to local laws abroad, and

that foreign authorities shall not provide their own criminal code, and that we may set up our own courts abroad !

The law of nations, as interpreted by Vattel, Bishop, Story, Wheaton, English and Federal legislation and decisions, Marshall, Johnson, Baldwin, and Hopkinson—the admiralty decisions of the Supreme Court—the very precedents in the form books—recognize the doctrines for which we contend. Wheaton, page 175, is enough to settle the whole matter. The common law is no part of Federal law; but the law of nations is.

If there was no power to punish maritime felonies, to regulate commerce, or try admiralty cases, yet by the law of nations as laid down by Wheaton, the United States may punish offences of its own citizens everywhere.— *Wheat.* 175 ; *Story Confl. L.* § 540 ; *Vattel* cited above ; *Bish. Cr. L.* § 601 ; 1 *Taunt.* 26 ; *Reg. v. Sawyer*, 2 *C. & K.* 101 ; *Whart. Prec.* 93.

Negative answers to the questions of the court below involve the holding the acts of 1825, § 5, 1845, and 1857, unconstitutional, and a disregard of the decisions of the Supreme Court of the United States since 1845.

CAMPBELL J.:

The facts, as set up in the pleadings, show that Tyler shot Jones on an American vessel on the St. Clair river, within the limits of Canada, and that he died of the wound at Port Huron, on land, within the county of St. Clair, in this state. The question presented for our consideration is, whether Tyler's offense came within the United States laws, and within the jurisdiction of the United States Circuit Court.

It is much to be regretted that this question was not presented to the consideration of the Circuit Court of the United States, where the trial was had. It is fairly raised here upon the issue of a former conviction, and the very able arguments we have listened to have exhausted the subject.

Homicide has always been treated as an offence depending on locality, and it is so regarded by the act of Con-

gress under which Tyler was indicted.  Where death does not immediately follow the mortal blow, and happens in another jurisdiction within the realm, the place of death was generally, under the views taken by the common law authorities, the proper place of jurisdiction; inasmuch as the crime was not complete without it.  There is some doubt whether, at the common law, originally such offenses were provided for at all.  But, as the blow itself may be made a punishable assault, there is no very good reason for not allowing it to be punished as an assault, qualified by its natural and legitimate consequences.—1 *Bish. Cr. L.* §§ 554, 555.  This is the plain design of the act of Congress, which punishes an assault upon the water, when death ensues upon land either within or without the United States.  There are very few places in the United States where a crime of violence would come within the Federal jurisdiction.  In this case, the place of death being within the state jurisdiction, the authority of Congress to punish the assault could only be deduced from a jurisdiction existing where the assault was committed. And, inasmuch as under our treaties with Great Britain the place was under the exclusive territorial jurisdiction of that country, the case presents the question whether, under this act of Congress, a person who commits the offence charged within a foreign jurisdiction, is made punishable here.

Upon the high seas, every vessel, public or private, is, for jurisdictional purposes, a part of the territory of the nation of its owners.  An offense committed on board of such vessel, is an offense against the sovereignty of that nation.  But, when a private ship enters a foreign jurisdiction, it becomes at once, with all on board (in the absence of treaty stipulations to the contrary), subject to the municipal laws and control of the country it visits.—*The Schooner Exchange v. McFaddon*, 7 *Cranch*, 116. Any crime committed there may be punished by the local laws.  The right to enter upon and navigate the waters of any country, is subject in all cases to the condition of tem-

porary obedience to its laws. And, if the laws of Canada made provision for the punishment of such an assault as the one under consideration, no doubt Tyler, if found there, would have been properly amenable to those laws—whether amenable to our laws or not.

The matter to be investigated resolves itself into the inquiry whether the act of Congress, under which the trial was had in the United States court, is, upon fair rules of construction, intended to cover just such a case as this. If the case falls within it, an inquiry may then arise into its constitutional validity.

By the words of the statute, if taken literally, and without qualification, every person, of whatever nationality, who, upon the waters mentioned in the act, whether in a vessel or not, commits an assault without malice upon any other person, of whatever nationality, and whether in or out of a vessel, of which the assaulted person dies on land, within or without the United States, is guilty of manslaughter, and punishable in the Federal courts.

No one would contend for a moment that the act should be so broadly construed. It would occur at once that there are several classes of objections to such a construction. It is obvious that Congress could by no possibility have power in all these cases. It is also plain that, if any of these places are off the high seas, some provisions which might be valid on the high seas, would not be so elsewhere. And it is further manifest that, whether on or off the seas, the citizenship of the parties might become an important element in the inquiry. Other difficulties might arise, which it is unnecessary to refer to more particularly.

It is undoubtedly true that every word which goes to the description of an offense, or the circumstances under which it is punishable, must be regarded; or, in other words, that no one can be held liable unless he comes within all the particulars of the offense described. But there is no rule of construction which requires, when a legislature, out

of abundant caution, enumerates a great variety of possible places, and punishes crimes committed in any of them, that the law must be regarded as an assertion that there are such places within the jurisdiction. And it does not, therefore, necessarily follow, because Congress has provided for the punishment of offenses upon bays, creeks, havens, and rivers not within states, nor forming a part of the high seas, that we must assume the existence of such within the admiralty jurisdiction—much less that Congress intended to include within that list all navigable waters on the globe without the United States. And there is no principle which would include Canadian waters that would not require this unlimited construction.

The phrases describing the waters named in this act of Congress, are substantially borrowed from English statutes relating to the admiralty. Under those statutes, the havens, bays, &c., named, were all understood to be within the realm, and opening from the sea, although, by the prevailing authority, their enumeration was nugatory; for, according to many cases, none were in fact within the admiralty jurisdiction. The decisions on this point were not uniform. In the conflict of opinion on the extent of admiralty jurisdiction, it was wise to include such places in any general act; and yet their inclusion, as qualified, could not be regarded as corroborating the admiralty claim. In borrowing phrases from old statutes, it is usually deemed proper to take them as construed. If this be done, the statute before us is satisfied without departing from the republic. If there are such waters as are there described within the republic, and not within states, they are included. If there are no such waters in the country, still the act is not impaired, but is only applicable, as in England, to the high seas.

This act was passed in 1857, but it is amendatory and supplementary to other acts, of identical extent, as old as 1790. And it is not to be supposed that it was meant to use language in any different senses at the different periods.

A reference to the condition of things existing when the Constitution was adopted, as well as subsequently, will show that, whatever may have been the real state of the case, there were, in more than one locality, navigable waters open from the ocean, and not admitted to have been within the exclusive jurisdiction of any particular state. Such seems to have been the case with Delaware bay (see 1 *Kent Com.* 29), and even the Delaware river was held in Pennsylvania, in *Montgomery v. Henry*, 1 *Dall.* 50, not to be within the body of any county. The same difficulties existed in New York bay and the lower part of Hudson river, which, in 1808, were the source of serious controversies between New York and New Jersey.—*N. Y. Rev. L. of* 1813, *vol.* 1, *p.* 238. It was not until 1834 that the controversy was settled; and now each state has the right to serve process over all of the lower waters, while the jurisdiction and property are parceled out in a very different manner from that usually adopted by neighboring states.—3 *N Y. Rev. Stat. p.* 175. There were also waters opening into the Gulf of Mexico which were within territories; and the subsequent acquisition of Louisiana and Florida continued this state of things up to the admission of Florida into the Union. Upon the Pacific coast, we have still some waters of this description. There is, therefore, no necessity to go beyond our own territory to satisfy the act. And the jurisdiction referred to, by the language used, being a local one, referring (as was held in *United States v. Bevans*, 3 *Wheat.* 336) to a fixed natural locality, and not satisfied by a vessel, even although that vessel was a public man-of-war, we ought not to extend a claim of criminal jurisdiction into foreign parts, unless such an intention is very clearly expressed.

Whether, apart from the jurisdiction over commerce, any such prerogative exists over citizens as to authorize us, as is done in England, to take cognizance of their offenses wheresoever committed, or whether, if possessed, it is vested in the individual states, which have exclusive supervision of

all ordinary transactions at home, or in the Federal government, which at home has no concern with such acts, is an interesting inquiry, but entirely unnecessary for the purposes of this case. No case is reported in which jurisdiction over the delinquencies of absent citizens has been exercised by the United States courts on any such ground. And I have discovered no act of Congress which purports to provide for such cases. The offenses committed out of the country, which are made punishable (except military delinquencies, and correspondence with foreign powers, and possibly treasons) are all confined to the waters.

The power to define and punish piracies, and felonies upon the high seas, and offenses against the law of nations, is given by the Constitution in the broadest terms. The Crimes act of 1790 uses as broad language as the act before us, namely: "*If any person or persons shall commit, upon the high seas, or in any river, haven, basin, or bay, out of the jurisdiction of any particular state,*" &c. 1 *L. U. S. p.* 113. And the language thus used was not qualified by the phrase which is found in the acts of 1825 and 1857, "*within the admiralty jurisdiction* of the United States." The act literally reached "any person" who might commit the offenses charged in any navigable waters. Murder and robbery committed there were declared to be piracy, as murder and robbery on the sea were piracy at common law. In the case of the *United States v. Palmer,* 3 *Wheat.* 610, it was expressly held that robbery committed on the high seas by American citzens, upon a foreign ship, did not come within the intent of the act, although the language of the act was broad enough to cover such a case, and it was also within the power of Congress. This ruling was based upon the doctrine that the law was only intended to punish crimes against the United States; and a crime committed on board of a foreign ship on the high seas, or upon a foreigner, not on an American ship, was no offense against the United States,

because not committed within her jurisdiction. In *United States v. Holmes*, 5 *Wheat.* 412, the same doctrine was recognized as to vessels having a lawful national character. In *United States v. Klintock*, 5 *Wheat.* 144, where the offense charged was alleged to have been committed on a piratical vessel which had no nationality, it was held to come within the act, because it was an offense against all nations, and of universal jurisdiction. But the doctrine as to foreign vessels is reiterated in this language : "Those general terms ought not to be applied to offenses committed against the particular sovereignty of a foreign power; but we think they ought to be applied to offenses committed against all nations, including the United States, by persons who, by common consent, are equally amenable to the laws of all nations." In the case of the *United States v. Certain Pirates*, 5 *Wheat* 184, Johnson J., intimates a doubt whether, in cases of robbery, which he deems general piracy, the fact that it was committed on a foreign ship should exempt it from our jurisdiction. He, however, lays it down very clearly that murder on a foreign ship is no offense against the United States, and in no sense within her jurisdiction; but he also intimates a doubt whether, if committed by an American, it may not be reached by reason of his allegiance. The court, however, has never departed from the doctrine in *Palmer's* case. It was held in the *Pirates'* case that a piratical offense, committed on a piratical vessel, was punishable, although committed within a marine league of the shore of a foreign country, provided it was upon the high seas; because the neutral rights allowed in favor of nations over that space of the ocean, render it neutral to war only, and not to crimes. And it is well settled that the maritime jurisdiction accorded to nations over their contiguous waters, is not an absolute and exclusive one, but is subject to the peaceable use of all parts of the open ocean as a common highway of nations, but liable to any regulations

necessary for the safety and protection of commercial rights and the fisheries, as well as the preservation of neutrality. A foreign vessel, upon any part of the high seas, has been regarded as foreign territory.

In the *United States v. Kessler, Baldw.* 15, the question came up directly, whether an offense committed on a French vessel, within a marine league of our coast, was punishable in the Federal courts; and it was held that such a vessel was foreign territory, and for that reason a crime committed on her was not punishable by our laws. In the *United States v. Davis,* 2 *Summ.* 482, an American officer of a vessel, who, while on his own vessel on the high sea, but within a short distance of the shore of the Society Islands, shot a person on a vessel belonging to those islands, was held not punishable under the acts of Congress; and the court regarded the offense as exclusively punishable by the local authorities. The decision was given by Judge Story, who drew the Crimes act of 1825, and whose inclination was generally in favor of giving a liberal extension to the Federal jurisdiction. This decision is in accordance with *Palmer's* case.

Every principle which takes out of the operation of the acts of Congress crimes committed by Americans on foreign vessels on the high seas, applies with greater force to offenses committed within the acknowledged and fixed territorial limits of a foreign nation, because it is dependent entirely on the national character of the place of the offense, and can not, by any sound reasoning, reach that which is territory by implication only, and yet be excluded from that which is actual territory.

This view of the courts is strengthened by the fact, that those statutory marine offenses which are not confined to place, are all mutinous offenses, committed on board of American vessels by their crews. The only case expressly provided for in foreign waters, is where offenses are committed by persons belonging, as passengers or crew, on board of Ameri-

can vessels, on others occupying similar relations to the same ship, and committed on the ship (see §5 *of act of* 1825). And, even in that case, which is plainly within the power to regulate foreign commerce, it is expressly provided that, if the offense be punished by the local authorities, such punishment shall be a bar to further proceedings in this country. This act shows that it could never have been intended to regard offenses committed abroad, as offenses against the United States, merely because committed by American citizens, or on American vessels, unless some other element entered into the account.

It is further worthy of consideration whether the mischief of the old law is not to be regarded, as in great measure, the occasion of the new. The act of 1790 punished manslaughter only when committed on the high seas. In the case of the *United States v. Wiltberger*, 5 *Wheat.* 76, it was decided that, under that act, manslaughter committed on an American ship near Whampoa, in a river navigable from the ocean, was not punishable. That decision was made in 1820. A revision of the Crimes acts was made in 1825, and yet it was not considered necessary to make any new law on the subject. As Whampoa was then without the jurisdiction of any country which had recognized the general law of nations, there was certainly strong occasion for a change, unless the policy of this country had been regarded as fairly expressed in *Palmer's* case. And, if the British portion of St. Clair river is within the purview of the act of 1857, we shall have presented the singular anomaly, of an assault which constitutes a crime if followed by death on land, either within or without the United States, and yet is no crime or offense whatever if followed by death on the spot. The act of 1857 was occasioned by the result of a trial before Judge Curtis for a fatal assault committed on the high seas, and which would have amounted to manslaughter, under the old statute, if the wounded man had not survived long enough to be landed. *United States v*

*Armstrong* 2 *Curt. C. C.* 451.   The bill was introduced by Mr. Fessenden, who made this statement on its introduction; and it passed without any examination or debate. There is no reason to suppose its intention was to go beyond the class of assaults made manslaughter under the former statute, or to do more than provide for the cases of death on land resulting from attacks which already were punishable where death occurred at the place where the fatal blow was given. If designed to go further, it creates a new *casum omissum* by no means less formidable than the one it was meant to supply. I am very strongly inclined to the opinion that, even if the other statutes had received no construction, the effect of this, as an amendatory act, should be confined to the high seas. But, be this as it may, I have no doubt whatever that it can not be extended to cover an assault made in a foreign country, unless made by one of a ship's company or passengers upon another of the inhabitants of the ship.

These considerations would, to my mind, be sufficient to dispose of the case before us, without regard to the views which have been presented to us as applicable to these particular waters.   Although they are navigable, and actually used for commerce of a maritime nature, which, when foreign, or between different states, may, perhaps, be open, under the legislation of Congress, to the forms of admiralty remedies, where the option of a jury trial is allowed, yet every portion of the lakes and their connecting waters is the exclusive property of Great Britain, or of some American state. And the Supreme Court of the United States has recently decided that upon these waters, as upon the internal tide-waters of the states, the jurisdiction of the admiralty is not local and territorial, but is transitory, and attaches only to such commerce as has been, by the Constitution of the United States, submitted to the control of Congress (*Allen v. Newberry* 21 *How.* 244; *and Maguire v. Card, Id.* 248).   There is no construction of the act of 1857

7 MICH.—P.

which, under any theory of jurisdiction, could extend it to offenses committed on the *lakes*, for they come within none of the terms used; and it would be a very forced construction which should apply the statute to their connecting waters.

Without expressing any opinion upon the power of Congress to punish such an offense as Tyler's, I am entirely satisfied that no act of Congress now in force can be fairly construed to embrace it. I am therefore of opinion that the case was not within the jurisdiction of the Circuit Court of the United States for this district, and was not within the intent of the act of 1857.

Both questions reserved should be answered in the negative.

CHRISTIANCY J.:

I fully concur with my brother Campbell in the opinion given by him in this case, not only in the result, but generally in the process of reasoning by which the result is reached. And in an ordinary case I should be content with this declaration, without expressing any views of my own. But as he has not alluded to all the considerations which tend to the same conclusions (though, I think, fully sufficient to sustain them) and as he has contented himself with a slight reference to some principles which will bear further illustration, the great importance of the case itself, as well as some of the questions involved, will justify me in submitting some additional considerations, which have an equal tendency in bringing my own mind to the same conclusions. But I shall endeavor, as far as consistent with logical sequence of the propositions I discuss, to avoid mere repetition.

The first question reserved for our consideration is, in form, entirely abstract; but it must be understood, like the second, to have reference to the facts of the case as presented by the pleadings; and the two questions reserved may be considered together as involving substantially this question: Had the Circuit Court of the United States for the district of Michigan jurisdiction under the act of March 3d, 1857 (for

none is claimed otherwise) to try, as a crime, the charge contained in the indictment set forth in the plea of former conviction? — the place where the mortal wound was given being admitted to have been on board the vessel called the Concord, in the river St. Clair, beyond the boundary line, and without the limits of the United States, and within the county of Lambton, in the Province of Canada; — for such is the question presented by the replication.

But as the general demurrer to the replication opens the whole record, it is proper to notice here that the question presented by the plea is in substance the same, with the single exception that the acts of the defendant, charged in the former indictment, would not, had the question been raised upon the plea alone, have appeared to have been committed in the county of Lambton. Thus, by the Definitive Treaty of Peace between the United States and His Britannic Majesty, Sept. 3d, 1789, the middle of the St. Clair River (the water communication between Lake Erie and Lake Huron) was established as the boundary line between the United States and Great Britain. By the second section of the act of Congress " to establish the northern boundary line of the state of Ohio, and to provide for the admission of Michigan into the Union," June 15th, 1836, and by the subsequent act by which she actually became a state of the Union, the state of Michigan extends to the boundary line between Great Britain and the United States, along the whole length of the St. Clair river ; and as the jurisdiction of the state, in the language of Chief Justice Marshal (*United States v. Bevans*, 3 *Wheat.* 336), "is co-extensive with her territory, co-extensive with her legislative power," if the act charged by the former indictment as an offense, was committed, as that indictment alleges, " in the river St. Clair, out of the jurisdiction of any particular state of the United States," it must have been committed on the British side of the line ; and by no legal or physical possibility could the place described in the indictment be elsewhere. The effect of the allegation in the indict-

ment must therefore be the same as if so expressly charged. The same may be said of the act of Congress in question; if it extends to offenses committed on any part of the St. Clair river, it can only apply to that part of the river which lies entirely without the United States, on the British side of the line; and this is equally true of the whole chain of great lakes through which the national boundary line runs; since every state of the Union bordering upon them extends to that line. The act, therefore, if it applies to the lakes and connecting waters, can only take effect without the United States, and within British waters; since, by the very terms of the act, all the waters within the jurisdiction of any particular state are excluded from its operation.

As to the jurisdiction of the Circuit Court of the United States, it may be proper, in general terms, to say here, that the Federal government itself has no general criminal jurisdiction, but only of such crimes as, for national purposes, the Constitution has given it the right to punish — the great mass of ordinary criminal jurisdiction still remaining with the several states.

The criminal jurisdiction of its *courts* is still more restricted. No Federal court has jurisdiction over common law offenses, or crimes in admiralty, *as such.* They can punish no act as an indictable offense (unless specifically declared such, and sufficiently defined by the Constitution or a treaty) until Congress, by statute, have declared it an offense, and in some way defined it; though for the purpose of such definition Congress may refer to the common law, and perhaps to other known systems or codes of law.

When the offense has been thus created, no court has jurisdiction to try it, until Congress, by the same or some other statute, has confered that jurisdiction on the particular court. The circuit courts, therefore, have no general criminal jurisdiction, but a very special and limited, though not an inferior jurisdiction. The jurisdiction being thus special and limited, the presumption in any case is against it until it be made affirmatively to appear.

It is well settled, as a general principle, that the laws of no nation have any extra-teritorial force — that criminal laws especially can not operate beyond the territorial limits of the government by which they are enacted. From this principle mainly, but not entirely, results another general principle, that, to give any government or its judical tribunals the right to punish any act or transaction as a crime, the act must have been committed, or the transaction must have occurred within its teritorial limits. Hence, by the common law, which in this respect, has always been acted upon in the United States, criminal offenses are considered as entirely local. — *Story Confl. Laws*, § 620.    But the general principle, that the laws of a country can not render an act criminal when committed beyond its limits, is subject to some qualifications or exceptions. Thus, every sovreignty has the right, subject to certain restrictions, to protect itself from, and to punish as crimes, certain acts which are peculiarly injurious to its rights or interests, or those of its citizens, *wherever committed;* at least, if committed by a citizen or subject of such sovreignty; and *unless* calculated to injure the sovreignty or its citizens, no government can have any legitimate right to punish offenses committed within or without its limits.    Most crimes are brought within this principle, and become injurious, only by reason of being committed within such limits.    In general they have this effect only when so committed.    But when committed within the territory they must always have this effect, to a greater or less extent; as they tend to endanger the peace and good order of the community, or the property, interests or lives of the citizens, to obstruct the laws, or to bring them into contempt if not enforced. Hence, also, it becomes the duty of every government to repress crimes within its own dominions.    But though crimes in general thus become injurious to the sovreignty only when comitted within its territories, there are exceptional cases standing upon peculiar grounds, as already intimated.    Thus (without attempting to enumerate all), the citizen may commit treason

by acts or combinations abroad; the commerce of a nation may be injured, or its pacific relations with other governments endangered, by the criminal conduct of the crews or passengers of its ships in foreign ports. In such cases the offender may be punished by the government of which he is a citizen; with this qualification, that he be afterwards found within the territory or jurisdiction of the latter, or be brought there without a violation of the rights of the sovreignty within which the act was committed; for he can not be arrested there without the consent of the latter.

But these cases being exceptions to the general rule of the locality of crimes, are never understood to be included in the general provisions of criminal statutes, but require to be specifically mentioned and defined. The general provisions of criminal statutes should always be construed with reference to the general rule, and not as intended to operate within the acknowledged territory of another sovereign; but, to give them this effect, the intent that they should so operate should be apparent upon the face of the statutes, either from the peculiar nature of the offense as there described, or from the express language, or the natural, if not necessary, inference from the language used. Because there must, in all ordinary cases, be a strong presumption against the intent to give the act an extra-territorial effect, or to punish offenses committed in a foreign jurisdiction. Statutes for the punishment of crimes upon the high seas do not constitute an exception to this rule; since vessels upon the high seas are considered as a part of the territory of the nation to which they belong. In view of this principle, Congress, by the fifth section of the act of March 3d, 1825 (4 *Stat. at Large*, 115), have expressly provided for offenses committed on board American vessels in foreign ports, and places " within the jurisdiction of any foreign state or sovereign," by any person belonging to the company of any ship, or a passenger, upon any other of the ship's company or a passenger.

But, if the general provisions of the acts of Congress punishing offenses upon navigable waters had been under- stood to operate in a foreign jurisdiction, without an ex- press declaration of such intent, there could have been no possible necessity for this section, which defines no offense, but simply extends into a foreign jurisdiction the provi- sions of the several acts of Congress against crimes upon the high seas; and this not generally, but as to such persons, and such only, as sustain the specified relations to the ship; and even as to these, so far only as relates to offenses committed upon other persons sustaining the same relations.

Independent of the general rule above stated, there is great propriety, at least, in requiring a special enactment in such cases.  Thus, the offenses committed against the United States (under section five above cited) would gene- rally, if not always, constitute also offenses against the foreign sovreignty, though not necessarily of the same kind or grade, and might be there tried and punished. The punishment so inflicted would have no respect to the offense against the United States, and, technically at least, would be for a different offense.  And, as the courts of one nation would not be bound to notice the criminal laws of another, the offender might be liable to be twice punished for the same act.

Hence the propriety of inserting in a statute of this kind a provision, as to ordinary offenses at least, against a second trial in the home jurisdiction; if the offender shall have been tried in the foreign jurisdiction; as has been very properly done in the section last alluded to. But the act of 1857, under which alone jurisdiction is claimed for the Federal court in this case, is neither ex- tended by express terms to a foreign jurisdiction, nor does it contain any provision against a second trial.  It is but reasonable to conclude that, if this act had been intended so to operate, such a provision would have been made.

Again, Congress, in passing the act of 1857, as an addition to that of 1825, must have been aware that neither this act of 1825, nor that of 1790, rendered any act criminal if committed in a foreign jurisdiction, unless committed by one of the ship's company, or a passenger, upon another person sustaining the same relation to the ship. — *United States v. Imbert,* 4 *Wash. C. C.* 702. Why, then, if the act of 1857 was intended to operate in a foreign jurisdiction, was it made general, applying to all persons, whether belonging to the ship or not, and to all offenses of the kind mentioned, upon whomsoever committed? *Murder,* if there committed, would be no offense, unless by or upon one of the ship's company or a passenger. Is a wounding without malice, where the party wounded happens to live long enough to die upon land, an offense of greater enormity? I can not but infer that, if Congress intended to give effect to this act in a foreign jurisdiction, they would have confined its operation to offenses committed by and upon the same persons mentioned in the fifth section of the act of 1825; or that they would so have amended that section as to make its provisions also general. That act could not have escaped their notice, as this act of 1857 is but an addition to it.

But it has been urged with much ingenuity and ability by the counsel for the defendant, that the place in question is not to be considered as strictly within a foreign jurisdiction, but that those parts of the St. Clair river and the lakes beyond our national boundary line, being free to the navigation of our vessels, are to be put upon the same ground, with respect to the jurisdiction, as the high seas; that, as the act of the defendant was committed on board of an American vessel, such vessel is to be considered a part of our national territory, like a vessel upon the high seas.

There is strictly no averment of the American character contained in the indictment, but merely an averment

of American ownership. This would doubtless be sufficient under those particular provisions of statute which, in terms, make the ownership only material; such as sections 5, 6, 10, and 22 of the act of March 3d, 1825 (4 *Stat. at Large* 115 *et seq.*), but there is no pretence that this case comes within any of these statute provisions. And, upon principle, independent of any statute applicable to the question, the American ownership alleged in the indictment would seem to be entirely consistent, as well with the foreign, as with the American character of the vessel. I am aware of no law, of which this court or the Federal courts can take judicial notice, which renders it incompetent for American citizens to own vessels entirely foreign in their character, officered by foreigners, with foreign papers, and sailing under the flag of any nation. An allegation of foreign ownership might be equivalent to one of foreign character; because with such foreign ownership she could not obtain the American character under our laws, of which we are bound to take judicial notice. But we can not notice foreign laws; and an averment of American ownership, therefore, stands upon different grounds.

The question, what constitutes the American character of a vessel, is sufficiently settled by acts of Congress for the registry and recording, or licensing and enrollment of vessels. See act of December 31st, 1792, (1 *Stat. at Large* 287); act of February 18th, 1793, (*Ibid.* 305); act of March 2d, 1831, (4 *Ibid.* 487). By these acts it will be readily perceived that something beyond American ownership is declared to be necessary to give the American character to a vessel: it must be registered or enrolled and licensed as such; and to obtain this registry, or license and enrollment, the master must be an American citizen, certain bonds must be given, &c. That American ownership and American character are distinct, and the former does not include the latter, see *United States v. Rogers*, 3 *Sumn.* 342; 4 *Opin. Att'y. Gen'l.* 188; 6 *Id.* 383. If it were neces-

sary that the national character of the vessel should appear, in order to bring this case within the jurisdiction, I am inclined very strongly to the opinion that this allegation of ownership is not sufficient; and if not, certainly the plea could not help the case, though admitted by the replication. If the Federal court had no jurisdiction of the case as presented to that court, and when tried there, it could not, for the purposes of that case, acquire such jurisdiction *ex post facto*, after the case was disposed of in that court; nor could the case be helped by any proof at the trial. No defect of this kind in an indictment could, I think, be cured by verdict. The defendant could only have been tried upon the case set out in the indictment, and *as there set forth*. What is not alleged in an indictment, nor clearly included in its allegations, does not exist, for the purposes of that prosecution.

It may well admit of doubt whether the American ownership, or anything short of the national character of a vessel, is sufficient, without express statute applicable to the case, to bring a vessel, even upon the high seas, within the principle which recognizes it as a part of the national territory. Though owned by Americans, if foreign in its character, or sailing under a foreign flag, could the United States have jurisdiction over it, as part of its territory? For aught that appears this vessel was never in American waters, never had an American officer or crew, and was not in use for any purpose. There is, therefore, it would seem, no allegation of the facts which constitute national character, nor is there any general averment of such character.

But I do not view this question as at all material to the present case, nor do I intend to express a definite opinion upon it.

But admitting the case, as presented by the pleadings, to be in all respects such as to bring it clearly within the act of Congress, if committed on the high seas; I proceed to inquire whether the views urged by the defend-

ant's counsel, as to the character of the waters of the St. Clair river, can be maintained?

Why are vessels upon the high seas recognized as parts or elongations of the territory of the nation under whose flag they sail? Because the ocean generally is incapable of permanent appropriation as property, or domain, by any one nation; and, being common alike to all mankind, no one nation can (without treaty, at least) acquire any greater rights or jurisdiction over it than another. All have "a common right and a common jurisdiction;" each over its own vessels, and of crimes injurious to itself; none an exclusive right or jurisdiction, or over the vessels of the other. The exercise of jurisdiction, therefore, over its own vessels upon the high seas, can not come in conflict with the right of any other nation to exercise the like jurisdiction, nor with any rightful jurisdiction of another sovereignty. Besides, as no general territorial sovereignty extends there, the vessels and citizens of any nation would be under the protection of no law and amenable to none, except the law of nations (and could therefore only be punished for piracy), unless the laws of the country to which the vessels belong, were extended over them. Hence, whenever a vessel reaches a place clearly within the territorial dominions and rightful and complete jurisdiction of another sovereignty, the jurisdiction of the nation to which the vessel belongs terminates, and that of the foreign sovereignty begins.— *Wheat. Int. Law,* *6th Ed. p.* 158, &c. It is true the jurisdiction of the nation to which she belongs continues, to a qualified extent, over the ship and its company, and for some purposes over its citizens, as already intimated; but such jurisdiction can only be there exercised by the permission of the foreign sovreignty.

Such being the principles and reasons on which the vessels of any nation upon the high seas are recognized as parts of the territory of the nation to which they belong, let us see whether the same principles apply to the St. Clair river,

and to the lakes and connecting waters through which the national boundary line runs.

If these lakes and rivers are incapable of appropriation as territory or national domain; if not, in fact, within the territory, and rightful, ordinary and complete jurisdiction of any nation, if all nations have a common right and common jurisdiction over them; if no nation has a right to punish crimes there committed *simply on the ground of territorial sovreignty* over the *place*, but *only* by reason of its rights over its own vessels or citizens; if, as in the case of the ocean, a vessel upon the lakes, or the St. Clair river, would be without and beyond the protection of the municipal laws of every government, and amenable to none, without extending to such vessel the laws and jurisdiction of the government under whose flag she sails; then the same principles, as respects jurisdiction, should be applied to these waters as to the ocean. But it is a well settled principle of the law of nations, that the territory of a state or nation includes the lakes and rivers entirely within its limits. They are a part of its domain.— *Vat. B.* 1 *c.* 22; *Wheat. Int. Law* 252.

Within this rule the whole of Lake Michigan, as between this government and all foreign governments, is as completely a part of the territory, and under the jurisdiction, of the United States, as if the same area were land not covered with water. On the other hand, Lake Winnepeg, Lake Simcoe, Lake Manitouline (or Georgian Bay), and all the other lakes of British America, are as much a part of British territory, and as completely within the exclusive jurisdiction of the British government, as the land which surrounds them; and the same rule applies to the rivers entirely within the limits of either nation.

Being thus susceptible of appropriation as territory, in the same way as the land, they must, in like manner, be capable of division, by which a part may be appropriated by one adjoining nation, and a part by another. If divided between contiguous nations, the portions assigned or belong-

ing to each, would be as completely a part of its territory as the whole lake or river if wholly within the territory.

"The empire or jurisdiction over lakes and rivers is subject to the same rules as the property of them. Each state naturally possesses it over the whole *or that part* of which it possesses the dominion. The nation, or its sovereign, commands in all places in its possession."—*Vat. B. 1 Ch.* 22, § 278; *and see Ibid. B. 1 Ch.* 20, § 245; 1 *Bish. Cr. Law*, § 575; *Wheat. Int. Law*, 113, 115.

Again: "The sovreignty, united to the domain, establishes the jurisdiction of the nation in her territories, or the country that belongs to her. It is her province, or that of her sovreign, to exercise justice in all the places under her jurisdiction, to take cognizance of the crimes committed, and the differences that arise, in the country. Other nations ought to respect this right."—*Vat. B. 2 c. 8, § 84.* The "rule as to navigable waters is this: Every independent nation has the exclusive jurisdiction over the navigable waters lying within its territorial limits."—*Per Taney Ch. J. in Wheeling Bridge Case*, 13 *How.* 582.

Such are the principles of international law, independent of treaty. What these recognized principles prescribe, has been in no respect altered, but fully recognized by treaties.

All these lakes and connecting waters were claimed by, and were once within, the rightful territory and jurisdiction of ·France, and were ceded, with the surrounding lands, to Great Britain, by the treaty of Paris, February 10th, 1763. They thence became the exclusive property, were within the sole jurisdiction, and constituted a part of the possessions and territorial dominions of Great Britain, in the same complete sense as the lands which enclosed them.

When the colonies were finally recognized as an independent nation, it became necessary to establish a boundary line between the territories or national domain of Great Britain and the United States. If these lakes and connecting waters had been considered in the light of high

seas, either the boundaries would have been simply ex-
tended to the lakes, or the lands on either side would
have been assigned to each respectively; thus leaving the
lakes, like the ocean, unappropriated by either, as common
to all nations.

But by the Definitive Treaty of Peace between the United
States and His Brittanic Majesty, September 3d, 1783, the
boundary line, after reaching the St. Lawrence (then the Iro-
quois or Cataraquy), is thus described: "Thence along the
middle of said river into Lake Ontario, through the middle of
said lake until it strikes the communication by water between
that lake and Lake Erie, thence along the middle of said
communication into Lake Erie; through the middle of said
lake until it arrives at the water communication between
that lake and Lake Huron" (of which the St. Clair river
forms a part); "thence along the middle of said water
communication into the Lake Huron; thence through the
the middle of said lake to the water communication be-
tween that lake and Lake Superior; thence through Lake
Superior, northward of Isles Royal and Phelipeaux, to
the Long Lake; thence through the middle of said Long
lake, and the water communication between it and the
Lake of the Woods, to the said Lake of the Woods,"
&c.—See *Treaty*, 8 *U. S. Stat. at Large*, 81, 82. For the
actual establishment of this line by commissioners under
the sixth article of the treaty of Ghent, as to all below the
Neebish Rapids in St. Mary's river or straits, see 8 *Stat.
at Large*, 274 *to* 277. The second article of the treaty of
1842 defines and slightly alters the boundary line beyond
this point.—*Ibid. p.* 572.

Thus, Great Britain and the United States appropriated
to themselves, as part of their territorial domains, the lakes and
water communications on their respective sides of the boun-
dary line, as fully and unreservedly as the lands on either side.
No distinction was made. It would have been a startling
project, in that age or in this, thus to have divided the ocean.

Now, as Great Britain before owned, and held exclusive jurisdiction over, all these waters, and as she gave up nothing on her side of the line, the waters on her side must still have remained as before. The United States acquired an equally exclusive property and jurisdiction on their side of the line. By this treaty, there was not even a stipulation that these waters should be open to the citizens or subjects of the two nations for the purposes of navigation, while such a provision was inserted as to the Mississippi.— *Art.* 8.

By the third Article of the Treaty of Amity, Commerce and Navigation, of November 19th, 1794, known as Jay's Treaty (8 *Stat.* 117), it was agreed "that it shall at all times be free to His Majesty's subjects and to the citizens of the United States, and also to the Indians dwelling on either side of the boundary line, freely to pass and repass, by land or inland navigation, into the respective territories and countries of the two parties, on the continent of America (the countries within the limits of the Hudson's Bay Company only excepted), and to navigate the lakes, rivers and waters thereof, and freely to carry on trade and commerce with each other." But here, again, in the provisions just quoted, no distinction is made between land and water, as to the right of entering, passing, and carrying on commerce; and if any jurisdiction, exclusive or concurrent, was ceded by either party over the waters on its own side of the line, it was equally so over the land.

By the boundary line thus established, owing to the division of the channel in the St. Lawrence, the Detroit and St. Clair rivers, by islands, some of the channels between certain islands, and between islands and the main shore, were entirely within the territorial limits of one government, others within those of the other; and as the right of passage over these was thought not to be sufficiently provided for by the foregoing treaty, it was, by the seventh article of the treaty of 1842 (8 *Stat. at Large,*

575), agreed that these channels or passages "shall be equally free and open to the ships, vessels and boats of both parties." But this is no more than that "innocent use" of the waters which is permitted, without any surrender of jurisdiction, by the principles of international law, except that the latter, being an imperfect right, is subject, in many respects, to the will of the nation in which such channels may be; and, therefore, without treaty, might be refused by either.— *Wheat. Int. Law*, 253. Certainly, it can not be claimed that this provision can detract, in any respect, from the entire and exclusive jurisdiction which each party held in its own waters, over persons there being or passing, any more than if this right of passage had been given to either over the lands of the other. This is demonstrated by the provision in the second article of the same treaty, which applies the same provision to a passage or carriage by land as well as by water, "it being understood that all the water communications, and all the usual *portages* along the line from Lake Superior to the Lake of the Woods, and also the Grand Portage" (which is eight miles in length, and is wholly within the state of Minnesota), "from the shore of Lake Superior to Pigeon river, as now actually used, shall be free and open to the use of the citizens and subjects of both countries.

Nor is there anything in the treaty of June 5th, 1854, known as the Reciprocity Treaty, which can, any more than the treaties of 1783, 1794, and 1842, affect the jurisdiction of either nation over the waters within their respective territorial limits. By the fourth article of that treaty, it is provided (subject to the right of suspending the article on notice) "that the citizens and inhabitants of the United States shall have the right to navigate the river St. Lawrence, and the canals in Canada used as a means of communicating between the great lakes and the Atlantic ocean, with their vessels, boats, and crafts, as fully and freely as the subjects of Her Brittanic Majesty, subject only to the same tolls and other

assessments, &c. It is further agreed that British subjects shall have the right freely to navigate Lake Michigan with their vessels, boats, and crafts, so long as the privilege of navigating the River St. Lawrence, &c., shall continue. And the government of the United States further engages to urge upon the state governments to secure to the subjects of Her Britannic Majesty the use of the several state canals, on terms of equality with the inhabitants of the United States."

If any jurisdiction of either nation, over persons who might pass over the lakes or rivers, is ceded by this provision, it was equally so as to the canals. Such a construction would be little short of an absurdity. The mere right of passage, by land or water, for commercial purposes, can not, I think, in any case be construed as a surrender of jurisdiction. It is too clear to admit of any serious doubt, that there is nothing in any of these treaties depriving the British government of that complete and exclusive jurisdiction over that part of the lakes and rivers on her side of the line, which any nation may exercise upon land within her acknowledged territorial limits.

Under all these treaties it must, I think, be very clear, that while the citizens or subjects of either nation should be within the territorial limits of the other, they would be bound to conform to, and would be protected by, the laws of the nation or state to which the territory belonged, according to the settled principles of the law of nations.— *Vattel B. 2, ch. 8, § 101, 102.*

And, though it should be admitted that the great lakes, owing to their size and the amount and nature of the commerce upon them, ought, upon principle, to be put upon the same footing as the ocean with respect to jurisdiction, yet both Great Britain and the United States would seem to be estopped, by their own treaties, from thus considering them. Both have appropriated them as territory, as domain—and each has clearly acknowledged the jurisdiction of the other over those portions within their respective limits. It is diffi-

7 Mich.—Q.

cult to perceive upon what principle the courts of either, while these treaties remain, can consider them, for jurisdictional purposes, and especially for criminal jurisdiction, as differing, in any respect, from the lands within their respective limits. The waters on the British side of the line certainly constitute a part of British territory, as much as the lands; and, in the language of Chief Justice Marshall (*Schooner Exchange v. McFaddon,* 7 *Cranch* 136), "the jurisdiction of the nation within its own territory is necessarily exclusive and absolute, susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty, to the same extent, in that power which could impose such restriction."

But there are still other considerations which lead me to infer that Congress never intended the act of 1857 to extend to the lakes or their connecting waters, or to operate in a foreign jurisdiction.

I. The offense described in the act is not one of that peculiar character, which would be equally calculated to injure the Federal government or its citizens, *wherever committed.* The statute makes the locality of the act a necessary ingredient in the offense. It is not alone the act committed, but the *place* also where committed (and the result), which constitutes the offense, and gives jurisdiction to the Federal court. There is a jurisdiction not dependent upon locality, but growing out of the character of the offense, or the nature of the cause of action. But it is evident, I think, from the language of this act, as well as from the nature of the offense provided for, that the place where the offense is committed must be one maritime in its character, over which, *as a locality*, the Federal government have the right to exercise their admiralty and maritime jurisdiction.—(See *United States v. Coombs* 12 *Pet.* 74 *et seq.*

Criminal statutes are to be strictly construed; and as the

Federal government only obtains jurisdiction by reason of the place where the mortal wound is given, without reference to the place where the death occurs, the terms "within the admiralty jurisdiction of the United States," used in this act as descriptive of place, must, I think, be understood to be confined to those localities where that jurisdiction is complete; where the United States have the right to exercise that jurisdiction by enforcing, upon their own vessels and citizens at least, the observance of their laws; to places where they have a right to send their executive officers to enforce the laws, to prevent the commission of offenses, to seize the vessels and arrest the persons offending. This it is not pretended could have been done where this offense is charged to have been committed. Can a place, *as a locality*, be said to be within the admiralty jurisdiction of the United States, where no executive officer has the right to enforce the admiralty law of the United States, and no right to arrest an offender for crime? If so, then the entire surface of the earth, land as well as water, may, with equal propriety, be said to be locally, not it is true within the admiralty, but within the *criminal* jurisdiction of the United States : since the United States undoubtedly possess the jurisdiction to punish certain criminal offenses, wherever committed; such as treason, offenses against the laws of nations, and even against her laws regulating commerce. It is true the government would be subject to the inconvenience of not being able to arrest the offender in the foreign sovereignty, where the offense might have been committed; but this is the precise difficulty in the case before us. It is very clear that such a jurisdiction is not jurisdiction over place, nor dependent upon locality; but simply over *persons and offences of a certain character ;* and, therefore, essentially transitory.

II. This is not the first act of Congress for the punishment of offenses upon navigable waters, in which terms of similar, and, so far as this case is concerned, identical import, have been used to describe the locality of the offense.

Thus the eighth section of the act of April 30th, 1790, (8 *Stat. at Large*, 113, 114) uses the terms "upon the high seas, or in any river, haven, basin or bay, out of the jurisdiction of any particular state." The act of March 3d, 1825, entitled "an Act more effectually to Provide for the Punishment of certain Crimes against the United States and for other purposes," in the fourth section, uses the words, "upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin or bay, within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular state" (4 *Stat.* 115). The same words are repeated in the 6th, and (with the omission of the word maritime) in the 11th and 22d sections.

The act of March 3d 1857, (11 *Stat.* 250) is, by its title, an addition to the last named act, and describes the place in the very words of the 11th and 22d sections of that act.

If any one of these acts includes localities not included in the others, that of 1790, so far as relates to the case before us, is least limited in its operation. It omits, it is true, the words, "arm of the sea," and "creek" which are embraced in those of 1825 and 1857. But if these were not virtually included in that of 1790, the term *river*, which is the only one in question here, is used equally in all. And if these acts are to be taken literally, and limited by no construction, that of 1790 is certainly most extensive; as it omits the words, "within the admiralty (and maritime) jurisdiction of the United States," which, if they have any effect, limit, rather than extend, the local operation of the act. Yet, as shown by my brother Campbell, the 8th section of the act of 1790 was never held, by the Federal courts, to extend into a foreign jurisdiction. If the words, "within the admiralty jurisdiction," &c., have the effect to take the provisions of the statute of 1857 out of the general rule, which requires a

clear indication of the intent to give effect to a statute in a foreign jurisdiction, it must be because such admiralty jurisdiction extends to places within such foreign jurisdiction. But the obvious, and, as I think, conclusive answer to this, is, that Congress, whose intent, when discovered, is alone to govern in the construction of their acts, seem to have been clearly of a different opinion. Thus, the act of 1825 contains these same words in reference to admiralty jurisdiction; and yet it is very clear that Congress did not understand them as thus extending the act, or the fifth section would have been entirely unnecessary, and even to some extent incongruous.

This section, therefore, clearly shows that Congress considered "ports and places within the jurisdiction of a foreign state or sovereign" as being out of the admiralty jurisdiction of the United States; an opinion exactly in accordance with the general, if not entirely uniform, current of judicial decisions, both in England and this country.

Now, as it is clear by judicial decisions, the 8th section of the act of 1790 did not extend to places within a foreign jurisdiction, and from the principles of these decisions, and from the fifth section of the act of 1825, that the general provisions of the latter were not so extended by the words "within the admiralty jurisdiction," &c., can it be supposed that Congress, in passing the act of 1857, as "an addition" to that of 1825, would, if intending to extend the provisions of the act of 1857 to a foreign jurisdiction, use for that purpose, those words, and those only, which, when used in the act of 1825, had not, and were never understood to have, any such effect? Such a supposition is entirely inadmissible.

The places mentioned in the eighth section of the act of 1790, were limited by the nature of the enactment, and the principles of judicial decisions, to such as were "within the admiralty and maritime jurisdiction of the United States"; and the sections of the act of 1825 referred to, and the first section of the act of 1857, were thus limited by

express words. It can not well be doubted that the terms, "river, haven, basin, and bay," and the words, "without the jurisdiction of any particular state," are used in precisely the same sense in all these acts. Nor can it be doubted that the clause in reference to the admiralty jurisdiction has the same extent of meaning in the act of 1825 and that of 1857. They occur in the same connections; and it would be unreasonable, in the highest degree, to construe any of the words common to all these acts (as "river") to mean one thing in one of them, and a different thing, when used in the same connection, in another: But

III. The eighth section of the act of 1790 can not, for another, and, to my mind, a very conclusive reason, be understood to apply to any waters not essentially maritime in their nature, and virtually constituting a part of the *high seas*. This section "defines and punishes piracy on the high seas," and could only have been passed in pursuance of the power expressly given by Art. 1 § 8 of the Constitution, "to define and punish piracies and felonies committed on the high seas." It, in fact, makes every offense mentioned in it, piracy. Now as the power is given in express terms, which recognize the offense (in accordance with opinions of all writers upon the common law and the law of nations) as being confined to the high seas, Congress can have no power to punish it elsewhere; unless, where a power is expressly given in the Constitution subject to limitation, we are at liberty to ignore the express power, and to infer the same power, without the limitation, from some other provision of the Constitution in which it is not expressed; which would render the Constitution waste paper. I do not here speak of mere accessorial or collateral offenses, but of piracy as such. Under the power to regulate commerce, and several other powers, Congress may punish offenses committed either on land or water. — See *Opinion of Story J. in United States v. Coombs*, 12 *Pet.* 78.

IV. It can not be supposed that Congress intended to

extend the operation of any of these acts to the rivers or connecting waters between the great lakes, and yet to exclude from their operation the lakes themselves. If they intended to exclude the one and to include the others, every consideration would have induced them to include the lakes and to exclude the rivers; as the lakes are vastly the more important, in extent, and in commerce, and bear in every respect a much greater resemblance to the ocean. But if Congress thought it necessary specially to designate, "havens, creeks, basins, and bays," which are in effect parts of the ocean, in order to bring them within the operation of the acts, upon what principle — if intended to be embraced — could they omit to mention the lakes, which lie wholly in the interior, and in no sense constitute a part of the ocean? There might be strong ground for holding that "havens creeks, basins, and bays," — to say nothing of rivers where they open into the sea — were included, without special enumeration, in the term *high seas* (*Montgomery v. Henry*, 1 *Dall.* 50) ; none for holding such lakes to be thus included. There are, unquestionably, "rivers" also which, at and near their mouths, are maritime in their nature, and virtually con stitute parts of the high seas; such as the Amazon, the St. Lawrence, and many others. These are sufficient to satisfy this term in the acts.

From these considerations, as well as those mentioned by my brother Campbell, and many others which might be urged with equal force, I am entirely satisfied, that Congress, whatever may be its power, has not so exercised that power as to make the transaction set out in the former indictment, at the place and under the circumstances there stated, a crime punishable by the Federal courts; that Congress never understood or intended the act of 1857 to extend to any waters not essentially maritime ; much less to a river a thousand miles in the interior of a continent, not navigable from the ocean; and, least of all, to a part of that river within the territory and exclu-

sive jurisdiction of a foreign sovereignty. I must therefore consider the question of jurisdiction over the case set forth in the indictment in the Federal court, in the same light, and as resting on the same principles, as if the offense had been charged to have been committed on land, in the interior of any county in England.

On the argument of this cause it was assumed by the counsel for the defendant, that the majority of this court, in *The American Transportation Company v. Moore*, 5 *Mich.* 368, had admitted the existence of the admiralty jurisdiction upon the lakes, and expressed an approval of the decision of the Supreme Court of the United States in the case of *The Genesse Chief v. Fitzhugh*, 12 *How.* 443. Having, with the Chief Justice, concured in the opinion of my brother Campbell in that case, I deem it proper to say that no such question was involved in the case, nor was any opinion intended to be expressed upon it, as I then understood, and still understand, the opinion. The question in that case was whether "An Act to Limit the liability of Ship Owners, and for other purposes," approved March 3d, 1851, applied to the lakes. The majority of the court held the act did so apply. That act was, as I thought and still think, very clearly a regulation of commerce. The contract in question was one between a transportation company in the city of New York, and Moore & Foote of the city of Detroit, for the transportation of merchandise from the city of New York, by way of the Hudson river, the Erie canal, Lake Erie, &c., to Detroit, Michigan; and the vessel on which the fire occurred was bound from Buffalo to Detroit. The facts, in my opinion, brought the transaction within the definition of commerce between states. It was therefore, in my view, within the constitutional power of Congress. But the single question was, whether the lakes were intended to be included within the operation of the act. For this purpose, and for this

only, it became important to enquire what had been the course of legislation by Congress, and the decisions of the Federal courts, in reference to the lakes. The decision in the *Genesee Chief* case was cited for no other purpose, and its citation can not, therefore, be construed as an approval of the principle there decided; nor was it so understood, I think, by the majority of the court; certainly I did not so understand it. But, to prevent all misapprehension of my own views — though the main point in the case of the *Genesee Chief* is not, I think, essential to the present case, and will not therefore justify an extended discussion — I will here say, that, after a most careful consideration of all the grounds upon which the opinion in that case purports to rest, and of all the authorities within my reach bearing upon the question, with a very high respect for the ability of the eminent jurist who pronounced the opinion in that cause, and the majority of the court who concurred in that opinion, I have not been able to bring my mind to the same conclusion. Nor can I resist the conviction, that so much of that opinion as declares, that the lakes, and all the navigable rivers of the United States, are " within the scope of admiralty and maritime jurisdiction, as known and understood in the United States when the Constitution was adopted," is not only unsupported by any satisfactory proof, but is in direct opposition to the most overwhelming evidence, historical and judicial, both in this country and in England. This evidence will be found sufficiently collected and ably presented in the dissenting opinions of Mr. Justice Daniel and Mr. Justice Campbell in *Jackson v. The Steamboat Magnolia,* 20 *How.* 296, and the dissenting opinion of Mr. Justice Woodbury, in *Waring v. Clarke,* 5 *How,* 467, &c. See also the opinions of Judges Daniel and Woodbury, in *New Jersey Steam Navigation Co. v. Merchants Bank,* 6 *How.* 395, *et. seq.* (In the latter case I am inclined to think the jurisdiction might be maintained upon the ground of a marine tort, as suggested by

Mr. Justice Catron). The constitutional objections, which will appear in these opinions, against including the lakes and rivers of our country generally within the admiralty jurisdiction, have never, I think, been fairly met or answered; nor, in my opinion, can they be answered until the political and judicial history of England, and the contest which deprived her of her colonies and resulted in the adoption of the American Constitution, shall be re-written from materials not yet extant.

As the decision in the case of the *Genesee Chief* was an entire departure from the uniform current of English decisions and those of the Federal courts, from the adoption of the Constitution down to that time, and as it established an entirely new and much more extended definition of admiralty jurisdiction, it is but just to infer that the reasons given by the court for the conclusion at which they arrived, were the strongest and most conclusive which, in their opinion, could be given for that conclusion. And, as the objections to such an extension of that jurisdiction were not unknown, but had most of them been previously and ably urged in the same court by Mr. Justice Woodbury in *Waring v. Clarke,* and by him and Mr. Justice Daniel, in *New Jersey Steam Navigation Co. v. Merchant's Bank,* it was but reasonable to expect an answer to those objections, in this case, if any such answer could be given. It is much to be regretted, that the court should have thought it unnecessary to refer to or attempt to answer these objections. Most of the reasons actually given, I am compelled to say, in my view not only fail to support the conclusion, but have a strong tendency to disprove it.

The act of February 26th, 1845, entitled "An Act extending the jurisdiction of the District Courts to certain cases upon the Lakes and Navigable Waters connecting the same," which is referred to in the case of the *Genesee Chief,* and there held to have been enacted under the grant of admiralty power in the Constitution, must, I think, so far as it has any con-

stitutional validity, rest upon the power to regulate commerce between the states, and the power to establish courts and to define their jurisdiction. That it was understood and intended by Congress mainly as a regulation of commerce, I can see no reason to doubt; and this intent, I think, is apparent on the face of the act.

I. The entire act is confined to steam boats and other vessels, employed in the business of commerce and navigation between ports and places in different states and territories. This is an evident reference to the commercial power for the whole scope of the act.

II. It does not purport to adopt, even as to these boats and vessels, the whole maritime law of the United States, but only "so far as the same is or may be applicable thereto "— an implied admission, at least, that the whole could not be applied.

III. It secures to the parties the right of trial by jury, and it secures a concurrent remedy at the common law, and by the state laws.

Most of these features were entirely unnecessary, and some of them a little extraordinary, if the act was passed as an admiralty regulation, and under that power in the Constitution.

I am aware it is said in the opinion in the case to which I allude, that " the law contains no regulation of commerce " that "it merely confers a new jurisdiction on the district courts." I am compelled to think this but a partial view of the act. That it confers a new jurisdiction on the district courts, I do not deny; but I think it does more; it creates, I think, an important regulation of commerce (and, to some extent, of navigation) which was to be the field or subject of that new jurisdiction. If the law had specifically provided, at length and in detail, the rules which should be applied to and govern the " cases of contract and tort " arising in, upon or concerning, the vessels employed in the business of commerce and navigation mentioned in the act — prescribing what should be the rights of the parties in specified cases and un

der specified circumstances, no reasonable doubt can, I think, be entertained that this would have been a regulation of commerce; and that, too, though it should be found that each of these specific provisions was identical in effect with what the maritime law would have prescribed for the like cases and under the like circumstances.

Is it any the less a regulation of commerce, when the maritime law (so far as the same can constitutionally apply to the commerce in question) is adopted in gross, instead of specifying each particular provision?

Suppose Congress, instead of the maritime law, had expressly enacted that the common law should apply to the commerce in question, or govern in the cases mentioned in this act; would it not be a regulation of commerce, because each specific requirement of the common law was not enacted in detail? By adopting the maritime law of the United States only " so far as the same may be applicable thereto " we are to understand, I think, that Congress intended to adopt it so far only as it may be applicable to commerce between states (to which the whole scope of the act is confined) and subject to all the limitations and qualifications incident to the power to regulate commerce between the states. Any feature of the maritime or admiralty law beyond this would be inapplicable to the class of cases referred to, because in conflict with the Constitution; hence the limitation. Such, if I understand the opinion, must have been substantially the view taken of this act by the Supreme Court of the United States in the recent case of *Allen v. Newberry, et al.,* 21 *How.* 244 (And see *McGuire v. Card. Ibid.* 248).

I can not, however, think with Mr. Justice McLane, (20 *How.* 304) that the admiralty and maritime jurisdiction is so essentially a commercial power, that it is necessarily limited to the exercise of the latter power by Congress. Though intimately related, in respect to the subjects upon which they are intended to operate, they are, I think, distinct and independent of each other; and the admiralty power, where it has

any rightful existence, can not, I think, be circumscribed by the limitations attaching to the commercial power.

But it is said, "if the admiralty jurisdiction in matters of contract and tort, which the courts of the United States may lawfully exercise on the high seas, can be extended to the lakes, under the power to regulate commerce, it can, with the same propriety, and upon the same construction, be extended to contracts on land, where the commerce is between different states. And it may also embrace the vehicles and persons engaged in carrying it on. It would be in the power of Congress to confer admiralty jurisdiction upon its courts over the cars engaged in transporting passengers or merchandise from one state to another, and over the persons engaged in conducting them, and deny to the parties the trial by jury." It is true a jury might be denied in the cases mentioned if Congress, under the power to regulate commerce, could confer admiralty jurisdiction *as such*, over the lakes and the railroads, and that without any of the limitations attaching to the commercial power. But that Congress could, *under* the commercial power, go *beyond* the *limits* of that power, I had not supposed could ever have been seriously claimed. And if Congress can, as by this act I think it has attempted, confer a jurisdiction only so far resembling the admiralty jurisdiction as is permitted under the commercial power, and subject to all the limitations incident to that power, no such consequence can follow. What is said in the above extract, as to the "propriety" of extending the admiralty jurisdiction to torts or contracts on land (if the power were admitted) I am compelled to think slightly overstated.

Congress may, doubtless, without violating the Constitution, abuse any power it possesses; but we have the same security against such abuse in the case of the commercial power, as in the case of any other power. The possibility that Congress may so far forget the dictates of common sense, as to apply to the land, and land transportion, principles of law and modes of procedure applicable only to the water

is, I think, too remote to constitute just cause of alarm. We may, I think, take it for granted that the good sense of Congress will always enable them to see the utter impropriety of such an experiment.

To the act of 1845, as above explained, I can see no objection in point of constitutional power or sound public policy. But the reference to this act as a legislative interpretation of the admiralty power under the Constitution, is, I think, peculiarly unfortunate, as it tends to refute the conclusion for which it was cited. The reference to the ninth section of the judiciary act of 1789, for the like purpose, is, I think, equally so. But for this I shall here only refer to the opinions already cited in opposition to such extension of the admiralty power.

It is not my purpose here to review the decision in the case of *The Genesee Chief*, nor to discuss the question whether there can be *any civil* admiralty jurisdiction over the lakes and their connecting waters; since, if it extend to these waters at all, it can only extend, as a complete admiralty jurisdiction, to those parts of them within the national boundary line; and these are excluded from the operation of this, and every other, act of Congress in reference to crimes upon the water, by the express words of the acts. And whatever jurisdiction the Federal courts may exercise over matters of contract and tort, arising beyond that line, does not spring from any right or jurisdiction over the place, as a locality, but from the nature of the cause of action; while the act of 1857 clearly contemplates an admiralty jurisdiction over the place as a locality, where that jurisdiction may be enforced—in other words, a complete, unqualified admiralty jurisdiction.

But there is one principle of constitutional interpretation which seems to have been recognized in the case of *The Genesee Chief*, so fraught with danger to the permanency of the Constitution itself, that I can not forbear to notice it here. After stating that the English writers and judicial

decisions always speak of the admiralty jurisdiction as confined to tide waters, the opinion proceeds to say: "At the time the Constitution was adopted, and our courts of admiralty went into operation, the definition which had been adopted in England was equally proper here. In the old thirteen states the far greater part of the navigable waters are tide waters. And in the states which were at that period in any degree commercial, and where courts of admiralty were called on to exercise their jurisdiction, every public river was tide water to the head of navigation. And, indeed until the discovery of steamboats, there could be nothing like foreign commerce upon waters with an unchanging current resisting the upward passage. The courts of the United States therefore naturally adopted the English mode of defining a public river, and consequently the boundary of admiralty jurisdiction."

Now, admitting the matters here stated to be true—and of their truth there can be no question—let them be placed side by side with the conclusion of the court, that the lakes and all the navigable rivers of the United States are within the admiralty jurisdiction, as known and understood in the United States at the time the Constitution was adopted; would it naturally be supposed that these considerations and this conclusion belonged to the same argument, or that they formed parts of the same process of reasoning?

If these admitted facts be taken as premises, can such a conclusion be drawn from them? Is it not apparent that such a conclusion needs other, if not opposite premises?

So far as these premises have any relation to this conclusion it is a relation of utter hostility. It is true these considerations and this conclusion do not stand in immediate proximity, nor do the court purport to draw the latter directly from the former. But these considerations are urged by the court as showing the existing state of things at the time of the adoption of the Constitution, and when "our courts of admiralty went into operation;" a state of things

with reference to which it is claimed the courts "naturally" adopted the English definition of admiralty and maritime jurisdiction, confining it to tide water. And this definition the court admit was proper with reference to that state of things.

Now, if that state of things was sufficient to make this definition proper for the courts when they went into operation under the Constitution, I must confess my utter inability to see why the same considerations did not make the same definition equally proper for the convention who framed the Constitution. If the courts "naturally" looked to the then existing circumstances of the country, and "naturally" adopted the definition of admiralty jurisdiction, with reference to them, is it not equally reasonable to conclude that the convention as "naturally" did the same, and that they, therefore, used the terms, "admiralty and maritime jurisdiction," in the same sense?

Or, is it more reasonable to suppose that the Convention, gifted with a spirit of prophecy, foresaw the invention of steamboats, the revolutions they were destined to effect in navigation, and all the changes which have since taken place in the circumstances of the country, while all these things were concealed from the vision of the courts? Or is it the intention to assert that it is proper for a convention to construct a constitution upon one set of principles, and for the courts to expound it upon another?

Does not the power to change the meaning of words used in the Constitution, include the power of changing the Constitution itself? I may have misapprehended the opinion; but as I understand it, considerations of convenience and expediency occupy a conspicuous position, and constitute, to a great extent, the basis of the decision — not considerations of convenience arising from the condition of the country, or other circumstances, known and appreciated at the time the Constitution was adopted, and which, therefore would be entitled to some weight, as bearing upon

the question of intent — but considerations of convenience growing out of a state of things not then existing, and which there is no good reason for supposing was foreseen or contemplated by its framers.

Such considerations of convenience can have no legitimate bearing upon the construction of a written constitution; as they can, at the most, only tend to show what, in the opinion of the court, the convention *would have intended* and provided, had such. a state of things *been foreseen.* To admit such a principle of construction, is to admit the power of the court to change or amend the Constitution, as in their views of convenience or expediency may be required to meet the altered circumstances of the country, and the ever varying exigencies of the times; and this, with no limit but their own discretion. And if this can be done in one case it can in any other.

This power of amendment exists only in the people, from whose will alone the Constitution itself derives validity. They have refused to delegate this power of amendment to any tribunal or body of men, not chosen by themselves for that specific purpose; even to their own direct representatives in Congress, chosen at short intervals by, and accountable to them.

No sane man will contend that the Constitution could ever have been adopted, had it been understood that such a power was to be vested in the judiciary.

Considerations of convenience of this kind might, it is true, be very legitimate under an unwritten constitution, like that of England; the chief excellency of which consists in its capacity of adaptation to the changing circumstances of the country, and the progress of society; but which, for this very reason, lacks that certainty, and that absolute and inflexible control over the legislature and the judiciary, which, for the security of liberty, have always been deemed necessary under our form of government, and which consti-

7 MICH.—R.

tute the chief excellence of a written constitution, making it an impassable barrier against encroachment.

In England, any error of the judiciary, even upon a constitutional question, may, as to future cases, be corrected by parliament, in which the people are represented, and which has, to some extent, at least, the power to modify the Constitution itself. But here any decision which has the effect virtually to change or amend the Constitution, at the same time puts it beyond the corrective power of the legislature; for, as the amendment is effected by construction of the written Constitution, it, in effect, becomes a part of it. Hence, the same court which effects the amendment, must hold it obligatory upon the legislative and every other department of the government, and upon the people.

Statesmen and jurists have doubted and differed, and may continue to doubt and differ, as to the respective merits of a written and an unwritten constitution. Doubtless, each has excellencies and defects, advantages and disadvantages, peculiar to itself. One may be better fitted for one country, or for one age; the other, for another. Either may operate well by itself, secure the liberty of the people, and effect substantially the objects of a wise and beneficient government. But it requires neither the sagacity of the statesman, nor the practiced eye of the jurist, to see that the two systems, differing essentially in their principles, can never be blended harmoniously into one, nor the principles of construction appropriate to the one, be applied to the construction or interpretation of the other, without producing uncertainty, confusion, chaos; beyond which the result can not be foreseen by the wisest.

The two questions reserved for our opinion should, I think, be answered in the negative.

MANNING J.:

I think the act of Congress of February 26th, 1845, extending the admiralty jurisdiction over our lakes and

the navigable waters connecting them, is unconstitutional and void, for the reason that it gives the Federal courts cognizance of a class of cases not given by the Constitution.

The question is one of great importance, involving, as it does, the line of jurisdiction between the Federal and state courts.

The whole judicial power of the Federal government is to be found in subdivision one, section two, article three, of the Constitution, and is in these words:

"1. The judicial power shall extend to all cases in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority; to all cases affecting ambassadors, other public ministers, and consuls; to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more states; between a state and citizens of another state; between citizens of different states; between citizens of the same state claiming lands under grants of different states; and between a state, or the citizens thereof, and foreign states, citizens or subjects."

The grant, it will be observed, is in five separate clauses, each containing a distinct class of cases. The

1st: Includes all cases of law and equity arising under the Constitution and laws of the United States, and treaties. The

2d: All cases affecting ambassadors, or other public ministers and consuls. The

3d: All cases of admiralty and maritime jurisdiction. The

4th: Controveries to which the United States are a party. And the

5th: Controversies between two or more states, between a state and citizens of another state, &c.

The language of the Constitution is remarkably clear; so much so that there would seem to be nothing to hang

a doubt on, were it not for the supposed uncertainty rest-
ing on the third clause of the grant, relative to admiralty
and maritime jurisdiction.

The admiralty and maritime laws of different countries
differ somewhat, and it is this that has given rise to the
supposed difficulty. In construing this part of the grant, the
first question that presents itself is, To what admiralty and
maritime laws does the Constitution refer? Is it to the
admiralty and maritime laws of England existing at the
time the Constitution was formed? We think it refers to
them, and to none other. If we are correct in this, another
question arises, viz.: Is the grant limited to the particular
cases of which the English court of admiralty had cogni-
zance at the adoption of the Constitution, or is it restricted
only to the territory or locality in which those cases must
arise, or to which they must have reference for perform-
ance to give the court cognizance of them?

That we may be clearly understood on this point, at
the outset, we will state what we mean in a different way.
The civil jurisdiction of the English court of admiralty
extended, in torts, to cases arising on the high seas only;
and in cases of contracts to such as were both made and,
to be performed on the high seas, and to some few others
made on land to be performed on the high seas. A libel
for seamen's wages is a case of this description. But it
did not extend to all contracts made on land, although
they were to be performed on the high seas.

From this, it is obvious the third clause in the judicial
grant is susceptible of two different constructions, either
one of which the framers of the Constitution may have
had in view. They may have intended to give the Federal
courts cognizance of those cases only of which the English
admiralty then had cognizance, or they may have intended,
in addition thereto, that they should also have cognizance
of such other cases of contracts made on land to be per-
formed on the sea, as Congress, in its wisdom, should think

proper to vest them with. The first of these constructions would make the cases of which the English admiralty had cognizance the limit of the constitutional grant; the other, the high seas, or territorial jurisdiction of the court, its limit. The first is most favorable to the states—the last to the Federal government. We are inclined to think the last the true construction. However this may be, we shall confine our remarks to it, as either construction will alike answer our purpose.

The object or design of the admiralty clause was to give something not already given by the two preceding clauses in the grant. It was intended to give the Federal courts cognizance of a class of cases of which they would not have had cognizance under the preceding clauses. In *The American Insurance Co. v. Carter*, 1 *Pet.* 545, Ch. J. Marshall, in speaking of the first three clauses of the constitutional grant of judicial power, says: "The Constitution certainly contemplates these as three distinct classes of cases, and if they are distinct, the grant of jurisdiction over one of them does not confer jurisdiction over either of the other two. The discrimination made between them, in the Constitution, is, we think, conclusive against their identity. If it were not so, if this were a point open to inquiry, it would be difficult to maintain the proposition that they are the same. A case in admiralty does not, in fact, arise under the Constitution or laws of the United States."

We mention these things here that they may be kept in mind as we proceed, for they, or some of them at least, do not appear to have been noticed, or clearly presented to the consideration of the court, in any of the cases in which this clause of the Constitution has been drawn in question.

Constitutions are to be construed by the same rule by which statutes are construed. When the language is ambiguous or doubtful, it is to be interpreted with reference to the circumstances existing at the time of, and that gave rise to their adoption. To understand them aright, as they were

intended and understood ¸by their makers, which should ever be the object of the court, we must take the standpoint they occupied, keep before us the objects they had in, view, and see those objects in the light they were at the time seen by them. This is a universal rule of interpretion that overrides all others, and to which all minor rules of construction must give way when they come in conflict with it.

In the case of *The People v. The Utica Insurance Co.* 15 *Johns.* 380, Thompson Ch. J. says, "such construction should be put upon a statute as may best answer the intention which the makers had in view. And this intention is sometimes to be collected from the cause or necessity of making the statute, and sometimes from other circumstances; and whenever such intention can be discovered, it ought to be followed, with reason and discretion, in the construction of the statute, although such construction seem contrary to the letter of the statute. When any words are obscure or doubtful, the intention of the legislature is to be resorted to, in order to find the meaning of the words. A thing which is within the intention of the makers of a statute, is as much within the statute as if it were within the letter; and a thing which is within the letter of the statute, is not within the ₍statute unless it be within the intention of the makers. And such construction ought to be put upon it as does not suffer it to be eluded."

The government of the United States is a limited government. It is a government *sui generis,* formed under peculiar circumstances, and · for particular objects only; and in construing the Constitution those objects should ever be kept in view. They are as essential to a true understanding of it as the points of the compass to a successful navigation of the ocean.

The Convention that formed the Constitution was divided into two parties, one of which, disgusted with the weakness and inefficiency of the government under the Articles. of Confederation, was in favor of a strong central govern-

ment, regardless, in a manner, of the state governments; while the other, over-partial perhaps to the state governments, was opposed to any great increase of power over what the government then had. They were jealous of state rights, and feared they might be encroached on by the central government, and that it would in time absorb their powers, and consolidate the whole sovereignty in itself. The Constitution was intended to be, and is, a compromise of these conflicting views. And as the only ground common to all, and on which all could stand, it was, we think, intended to give the Federal government all external national powers, or powers to be used outside of the states, with such internal powers to be used within the states as are expressly mentioned in terms in the Constitution itself. The former are necessary for the security of the states against foreign nations, and the protection of the citizen in the enjoyment of national rights when abroad, and in his commercial relations with foreign countries. The Federal government was formed chiefly for the protection of those rights. They are in their character national and not municipal rights, and are to be protected and enforced as such, by the national government. It is therefore but reasonable to suppose that, in relieving the states from the performance of these duties, and imposing them on the Federal government, the Convention at the same time intended to vest it with all the powers the states possessed, as independent sovereignties, to effect the same objects, unless there is something in the Constitution repelling such inference. For all external purposes the states, under the Constitution, are a unit, while for all internal or municipal purposes they are separate and independent sovereignties, each retaining all the municipal powers it had originally, except so far as such powers are in express terms ceded to the Federal government.

As the government is one of limited and not of general powers for all purposes, it has been supposed by some that each power must be expressed in terms clearly indi-

cating such power by itself, or that it must be a power incident to 'the execution of such a power, or that the power has no existence. We do not think this, as a rule of interpretion, is applicable to the Federal Constitution, as it does not discriminate between the two classes of powers to which we have referred — external and internal. It does not recognize the two distinct objects the makers of the Constitution had in view; a national government for national purposes, and state governments for municipal purposes. It supposes, or takes it for granted, that their intentions all centered in one object, and makes that object a limited government, mistaking the means for the end. Any rule of construction that does not recognize these two distinct objects, must fail to give a true interpretation of the Constitution.

The people had nothing to fear from the strong arm of the Federal government when wielded outside of the Union. It was their interest, as well as their duty, to strengthen it in that direction. National pride, national power, and national rights, all prompted it, as well as depended upon it. It was the fear of Federal power within the states that first caused a division in the Convention that formed the Constitution, and that afterwards gave head to the opposition the Constitution met with, when before the people for adoption. So great and powerful was this opposition that Madison and Hamilton, who were members of the Convention, to overcome it wrote and published a series of papers, since known as the Federalist, explaining the different parts of the Constitution, and showing the fallacy of many of the objections urged against it.

The rule alluded to is the true rule when expounding the internal powers of the government; for there is no presumption in their favor, but the reverse. It is only when applied to the external powers of the government it is to be deprecated. And not then because it stays the hand of government, which it seldom if ever does; but because search is mad-

for the power when needed among the specific powers of the Constitution (on the supposition there are no general powers) which, in order to furnish it, are wrested from their true meaning to purposes as opposite to it as light is to darkness. Few persons, if any, doubt the power of the Federal government to acquire territory outside of the states; and yet how much difficulty has been experienced in locating this power—one referring to this specific power in the Constitution, another to that, and a third to some, other. The power to govern or provide, for the government of such territory when acquired, has also, in the minds of some been attended with like difficulty. A rule of construction leading to such opposite results, it must be obvious to all, can not be the true rule; for, instead of elucidating, it practically makes that which is certain uncertain, and thereby breaks down the barriers of the Constitution, and obliterates the line that separates the power of the two governments.

When we take into consideration all of the circumstances connected with the making of the Constitution, the early day at which it was made, before written Constitutions were as common as they are now, and when there was less knowledge and experience in regard to them; the weakness and inefficiency of the government under the Articles of Confederation, especially its dependence on the states in many cases to execute its will; the opposition to a change, and the grounds of that opposition; the division of the people into two parties, one favoring a strong central government, and the other, zealous of state rights, and for that reason opposing it; and the common object which both had in view—a national government that should be respected abroad, for the protection of national interests, and state governments for all internal matters; it is but reasonable to presume the makers of the Constitution intended to form a central government with plenary national powers, outside of the states, and, with a few exceptions, with such powers only; and to leave all local matters to the states. Will the Constitution bear such an interpretation?

We think it will, and that it is the true construction of the instrument.

In forming state constitutions the several powers of the government are not stated. Were it necessary, it would be attended with many difficulties, as it is impossible to see in advance the many contingencies that may require legislative action. Hence the office of our state constitutions is to organ. ize the government, assign to each department its appropriate functions, and inhabit the action of the government in certain cases. They sometimes also contain what is called a declaration of rights. It was objected to the Federal Constitution that it did not contain such a declaration. There was certainly very great impropriety in the objection, if the Constitution was supposed to be a grant of specific powers only. A declaration of rights is a kind of reservation of power to the people; and where there is no general grant of power there is no need of a reservation. If it was the object of the makers of the Constitution to give all external powers to the Federal government, it is not to be presumed, for the reason we have stated, that they would have attempted to give a list of them in the Constitution. They have mentioned some of them, as "to define and punish piracies and felonies committed on the high seas," and the legal maxim "*expressum facit cessare tacitum*" it will be objected stands in the way of our theory. This rule, like all others that have been adopted to aid us in the investigation of truth, must receive a reasonable construction. Its object is to prevent interpolations, and not to shut out any ray of light, however faint or weak, which the instrument itself emits, and which, conjointly with that furnished by surrounding circumstances, reveals the object the maker of the instrument had in his mind when he penned it.

The first power given Congress is, "To lay and collect taxes, duties, imposts, and excises; to pay the debts, *and provide for the common defence and general welfare of the United States ;* but all duties, imposts, and excises, shall be uniform throughout the United States." — *Sub.* 1, § 8, *Art.* 1.

Here is but a single power given, we think, viz.: a power to raise a revenue. If we read the whole sentence with a comma, instead of a semi-colon, after "excises," this will appear more manifest. But whether we consider the words, "to pay the debts and provide for the common defence and general welfare of the United States" as a general grant of power, or as merely expressive of the objects for which taxes and duties are to be collected, is wholly immaterial. For if it is merely declaratory of the objects for which a revenue may be raised, it is more comprehensive by far than the specific powers of the Constitution. The language is "the common defence and general welfare of the United States." It is not, for the common defence and the execution of the particular powers hereinafter given. The words "general welfare of the United States," are very comprehensive, and include everything that Congress (for it is the sole judge on that subject) may determine will contribute to the well being of the nation. And to suppose the Convention intended to give Congress power to raise a revenue for such purposes, and not, at the same time, to give it power to execute its purposes, would be absurd.

By section ten of article first, the states, among other things, are expressly forbid the exercise of sovereign power outside of their respective territories, as "to enter into any treaty, alliance, or confederation; grant letters of marque and reprisal," and the like. Why this denial of external sovereignty to the states, if it was not intended to confer it on the Federal government? For all external purposes the Federal government would stand as much in need of this power to enable it to perform its duties, as the states did when each performed those duties for itself. There was no annihilation of sovereign power intended. All that existed previously was, after the adoption of the Constitution, still to be found in one or other of the two governments.

"The migration or importation of such persons as any of the states now existing shall think proper to admit,

shall not be prohibited by the Congress prior to the year one thousand eight hundred and eight," &c. — *Sub.* 1 § 9, *Art.* 1. There is no specific power authorizing Congress to prohibit the migration or importation of persons. It is no part of the power to regulate commerce. For to regulate does not mean to prohibit or destroy. The limitation is proof of the existence of the power itself, and clearly shows the intention of the makers of the Constitution to give it.

"No title of nobility shall be granted by the United States." — *Art.* 1, § 9, *Sub.* 7. Why this inhibition, if the framers of the Constitution did not suppose they were conferring powers not specifically mentioned in the Constitution? There is no specific power named in the Constitution on which a title of nobility could be ingrafted. It is an incident of sovereignty, and was therefore forbidden to the Federal government on the same principle it was forbidden by the Constitution to the states; its incompatibility with free institutions. — *Art.* 1, § 9, *Sub.* 10.

It is the duty of the Federal government to protect its citizens when in foreign countries. Nothing is more common. The government that would not do it would hardly deserve the name of a government. But in what part of the Constitution is the power to be found? In the power to regulate commerce, which is too frequently made a pack horse to carry powers that do not belong to it? Certainly not. What has a power to make rules and regulations governing the importation and exportation of commodities from one country to another, to do with the wrongful imprisonment of a citizen in a foreign country? Neither is it to be found in the power to declare war. It may lead to a war, but the power to declare war is one thing, and a right to demand the release of a citizen from imprisonment in a foreign country, is another and wholly different thing. The two powers are by no means the same because the power to do the one may call for the exercise of the other.

Other instances might be given in which there is no doubt of the power of the Federal government, although it is not to be found among the specific powers mentioned in the Constitution.

These powers are but a part and parcel of the general power, if it be one, to provide for the "general welfare of the United States;" and, if it be not given in express terms, it is clearly to be inferred from the different parts of the Constitution (some of which would be a dead letter without it), and the objects the makers of it had in view, as intended to be given by them. "A thing which is within the intention of the makers of a statute" (or constitution, for there is no difference in the rules of construction applicable to them) "is as much within the statute as if it were within the letter."—*Thompson Ch. J.*

If we are correct in our interpretion of the Constitution, the clause "all cases of admiralty and maritime jurisdiction," is an external and not an internal power, and is therefore confined to the high seas. It must have had some definite meaning attached to it by the Convention, or it would not have found a place in the Constitution. What was that meaning? For what it meant when the Constitution was formed it means now. Constitutions do not change. Man may change, and the meaning of words may change, but written instruments never.—what they once mean they always mean. They may be wrongly interpreted, but they never change.

Whatever difficulties exist now in ascertaining its meaning, none existed when the Constitution was made. They have grown up since, and are probably to be ascribed more to the proverbial infirmity of courts to increase their judicial power than to all other causes.

The phrase, "admiralty and maritime jurisdiction," was as deeply inbedded in English jurisprudence, and as well understood by English and American lawyers, when we were colonies, and at the Revolution, and adoption of the Constitu-

tion, as *habeas corpus, ex post facto* law, or bills of attainder, all of which are to be found in the Constitution. It is to the English law at the two last named periods we must look for its meaning. To go any $\frac{1}{2}$ where else, unless it can be shown it was used in the colonies in a different sense from what it was in the mother country, is voluntarily to shut our eyes to the light, and to grope in the dark for what is not there to be found.

As a text book, Blackstone's Commentaries, from its known celebrity and the scarcity of good text books at that day, was probably in possession of every lawyer in the colonies. And most of them were undoubtedly in possession of Bacon's Abridgment, Comyn's Digest, and the English statutes, or some of them. To sources like these, colonial as well as English lawyers would go for the meaning of admiralty and maritime jurisdiction, as they would for the meaning of *habeas corpus, ex post facto* law, or other legal phrase or term. Fortunately for us we have, at this day, all the light our ancestors had on this subject. We have the same fountains to go to, for none of them are dried up, and they are now what they were then; and we can to-day partake of the waters flowing from them, and determine its quality with as much certainty as our ancestors could.

Blackstone, in speaking of the "injuries cognizable by the courts maritime or admiralty courts," says, "These courts have jurisdiction and power to try and determine all maritime causes; or such injuries, which, though they are in their nature of common law cognizance, yet being committed on the high seas, out of the reach of our ordinary courts of justice, are therefore to be remedied in a peculiar court of their own. All admiralty causes must be therefore causes arising wholly upon the seas, and not within the precincts of any county. For the statute 13 *Rich.* II. *c.* 5 directs that the admiral and his deputy shall not meddle with anything, but only things done upon the sea; and the statute 15 *Rich.* II, *c.* 3 declares that the court of the admiral hath

no manner of cognizance of any contract, or of any other thing, done within the body of any county, either by land or by water."—3 *Bl. Com.* 106.

Again, "The maritime courts, or such as have power and jurisdiction to determine all maritime injuries, arising upon the sea, or in ports out of the reach of the common law, are only the court of admiralty, and its courts of appeal."—3 *Bl. Com.* 68, 69.

And again, "The high court of admiralty, held before the Lord High Admiral of England, or his deputy, styled the Judge of the Admiralty, is not only a court of civil but also of criminal jurisdiction. This court has cognizance of all crimes and offences committed either upon the seas, or on the coasts out of the body or extent of any English county."—4 *Bl. Com.* 268.

In Bacon's Abridgement we find the following: "It is laid down as a general rule in our common law books, that the admiral's jurisdiction is confined to matters arising on the high seas only, and that he can not take cognizance of contracts, &c., made or done in any river, haven, or creek, within any county; and that all matters arising within these are triable by the common law" *Of the Court of Admiralty, A. Ed.* 1807.

In Comyn's Digest we find the following: "The admiral has cognizance and jurisdiction of all things done *super altum mare* out of any county.—4 *Inst.* 134: *Vide the St.* 5 *El.* 5, § 30. On the main sea, or coasts of the sea, out of any county, cinque port, haven, or river.—*Vide* 4 *Inst.* 137," *Com. Dig.* "*Admiralty*" (*E.* 1).

Again: "But the court of admiralty has no jurisdiction in any cause which arises upon land, or within any county.— 4 *Inst.* 134, 135;" *Com. Dig.* "*Admiralty*" (*F.* 1).

By the 13 Rich. II. c. 6, upon complaint of encroachments made by the admirals and their deputies, it is enacted: "That the admirals and their deputies shall not meddle of anything done within the realm, but only of a thing

done upon the sea, according to that which hath been duly used in the time of the noble King Edward, grandfather of our Lord the King that now is."—2 *Bac. Ab.* 735, *Ed.* 1846.

It is said the admiralty jurisdiction originally was co-extensive with the ebb and flow of the tide. However that may be, it is of no kind of importance in the present inquiry, unless it can be shown the makers of the Constitution were antiquarians, and made this part of it (for they certainly did not any other part of it) with reference to a state of things existing two centuries before, and not the then existing state of English and colonial jurisprudence. This is not very probable. Nor is it by any means clear the jurisdiction of the admiralty ever, of right, extended to tide waters within the body of a county. That it was claimed by the admiralty, there is no doubt, and that it was viewed as an encroachment on the territorial jurisdiction of the common law courts there is as little doubt. It was to put an end to this encroachment the statute of 13 Rich. II., and several other statutes, were passed.

Lord Mansfield, in speaking of the statutes of 13 and 15 Rich. II. and 2 Hen. IV. says: "These statutes manifestly relate to the usurpations of the Instance court of admiralty, in causes *civil and maritime,* relating to *contracts, pleas,* and *quarrels* only triable at law." Again: "The view, purport, and tendency of these statutes, is to prevent the admirals from trying matters triable at law. * * * These statutes don't exclude the common law, in any case, and they confine the admiralty by the locality of the thing done which is the cause of action. It must be done upon the high seas. If done in ports, havens, or rivers within the body of a county of the realm, the admiralty is excluded. Again, he says: "In causes civil and marine, to give jurisdiction to the court of admiralty, the libel must allege the cause of suit to be done upon the high seas."—*Lindo v. Rodney, in note to Le Caux v. Eden, Doug.* 615. The men of the Revolution were too bitterly opposed to usurpations of all kinds to go back two centuries for one to embalm in the Constitution.

We have already stated that the papers of the Federalist were written by Hamilton and Madison, to overcome the opposition made to the adoption of the Constitution. This opposition, it should be remembered, came from those who were opposed to a strong central government, for the reason that its tendency, like all governments and accumulations of political power, would be to enlarge its powers and sphere of action at the expense of the states. To remove all apprehensions of that character, and show the powers of the proposed government were not as great as they were supposed to be—that they were clearly defined, and that the state governments would have nothing to fear from it— was the main design of these papers. Number eighty of the series, written by Hamilton, has so strong a bearing on the question before us, that we shall be compelled to extract largely from it. It commences as follows:

"To judge with accuracy of the due extent of the Federal judicature, it will be necessary to consider, in the first place, what are its proper objects.

"It seems scarcely to admit of controversy, that the judiciary authority of the Union ought to extend to these several descriptions of cases: 1st: To all those which arise out of the laws of the United States, passed in pursuance of their just and constitutional powers of legislation: 2d: To all those which concern the execution of the provisions expressly contained in the articles of union: 3d: To all those in which the United States are a party: 4th: To all those which involve the peace of the Confederacy, whether they relate to the intercourse between the United States and foreign nations, or to that between the states themselves: 5th: To all those which originate on the high seas, and are of admiralty and maritime jurisdiction; and, lastly, to all those in which the state tribunals can not be supposed to be impartial and unbiassed."

He then takes up and discusses each of these points in the order in which it stands, to show the propriety and

7 Mich.—S.

necessity of giving cognizance of the cases mentioned in it to the Federal judiciary. In speaking of the fifth point, he says:

"The fifth point will demand little ˌanimadversion. The most bigoted idolizers of state authority have not thus far shown a disposition to deny the national judiciary the cognizance of maritime cases. These so generally depend on the law of nations, and so commonly affect the rights of foreigners, that they fall within the considerations which are relative to the public peace."

He then speaks of "the reasonableness of the agency of the national courts, in cases in which the state tribunals can not be supposed to be impartial," &c., and then proceeds as follows:

"Having thus laid down and discussed the principles which ought to regulate the constitution of the Federal judiciary, we will proceed to test, by these principles, the particular powers of which, according to the plan of the Convention, it is to be composed."

He then makes an extract from the Constitution, of the judicial grant, and proceeds to show that each of the several classes of cases mentioned in it, taking them up and considering them severally, falls within some one or more of the five classes of cases mentioned by him in the commencement of his paper. When he comes to the third class ˌhe says: "Third: To cases of admiralty and maritime jurisdiction. These form, altogether, the fifth of the enumerated classes of causes, proper for the cognizance of the national courts."

We shall make but one more extract from this paper, which is as follows:

"Sixth: To cases between the citizens of the same state *claiming lands under grants of different states.* These fall within the last class, and *are the only instances in which the proposed Constitution directly contemplates the cognizance of disputes between the citizens of the same state.*"

The italics are Hamilton's, not ours.

Of Hamilton, as a statesman and jurist, it is not necessary for us to speak. If not the first, he certainly stood among the first in the country, in the estimation of his fellow citizens. He was a member of the Convention that formed the Constitution, and belonged to that part of it which was in favor of a strong national government. The opinion of such a man, in such circumstances, is deserving of great weight. He confines the admiralty and maritime jurisdiction of the Constitution to cases originating " on the high seas." He so explained the Constitution to the people before its adoption. He says nothing of the ebb and flow of the tide — nothing of rivers or lakes, whether navigable or not, whether they contained much or little water, for the reason, undoubtedly, that they had nothing to do with admiralty jurisdiction. The states, while colonies, derived all their notions, both of the court and its jurisdiction, from the mother country. There is no evidence a different or more extensive jurisdiction, except as to revenue cases of which the English admiralty never had jurisdiction, had grown up in all or a majority of the colonies or states, before or after the Revolution. If there had been any thing of the kind, and the Constitution was formed with reference to it, no one would have been more likely to have known of it than Hamilton. Besides, we should, in such an event, expect to find something in the Constitution itself indicating the enlarged sense in which the words were used by the Convention.

Hamilton says, "The most bigoted idolizers of state authority, have not thus far shown a disposition to deny the national judiciary the cognizance of maritime cases." This was probably true, as the idolizers of state authority feared the power of the Federal government in the states only, and not on the high seas. They were jealous of its internal, not its external powers. They had nothing to fear from the latter, but every thing to hope from it; as the

united power of all the states would be more effectual in protecting their rights, outside of the states, against foreign wrong and oppression, than the power of any one single state. Their fears were all internal, that in admitting among them a power not wholly dependent upon them for its existence, to fight their battles and protect them against dangers from without, it might, in time, change its character from an ally to a conqueror, and subvert the local government it was formed to protect.

Hamilton was very particular, as appears from one of the extracts we have made, to state that " *the only instances in which the proposed Constitution directly contemplates the cognizance of disputes between citizens of the same state,*" are, when they " *claim lands under grants of different states.*" He was so particular on this point as to italicise his language, as we have already stated. But what he states is not true, if the jurisdiction of the Federal courts in admiralty is not confined to the high seas. If it is co-extensive with the ebb and flow of the tide in harbors and rivers within a state, or can, by Congress, be extended to lakes and rivers in the interior of the country, hundreds if not thousands of miles from the sea, then it not only may, but will frequently, happen that the Federal courts will have cognizance of cases arising wholly within a state, and between its citizens, to the exclusion of the state courts. It is not to be supposed the Convention ever intended to give cognizance of such cases to the Federal judiciary. We can see a reason for the cognizance given in other cases, but none for this. As well might it be extended to all cases of litigation between the citizens of a state. No national considerations make it necessary, for there is nothing national involved in such a case. It affects the rights of the parties litigant only, and not the nation, and it in no respect differs from other litigation between the citizens of a state of which, the state tribunals have exclusive cognizance.

In a case between citizens of different states, or between a citizen and a foreigner, we can readily conceive, although we do not think it at all probable at the present day, of a state of ill feeling existing in the state where the action is brought, against a sister or foreign state, of a character to interfere with an impartial administration of justice in the state tribunals. And in the further case provided for "*between citizens of the same state, claiming lands under grants of different states*," we can suppose a state of things to exist, growing out of the conflicting grants, that would make it improper for the state tribunals to determine the right. But with this single exception we know of no case in which the state judiciary may not with safety be trusted to administer justice between the citizens of a state.

In *Chisholm v. Georgia*, 2 *Dall*. 475, Ch. J. Jay says, "the judicial power of the Union was extended to cases of admiralty and maritime jurisdiction, because, as the seas are the joint property of nations, whose rights and privileges thereto are regulated by the law of nations, and treaties, such cases necessarily belong to national jurisdiction." The Chief Justice agrees with Hamilton in confining the jurisdiction to the high seas. There can be no mistake as to his meaning on this point, for he speaks of the *seas* as the *joint property of nations*.

The admiralty court as an instance court, for we have nothing to do with it as a prize court, is properly a national and not a municipal court, and has concurrent jurisdiction with the national courts of other powers over the high seas.

Hamilton and Jay agree in stating the nationality of the court as the reason why cognizance was given of admiralty and maritime cases to the Federal judiciary.

We have come to the conclusion, from what we have stated, that the admiralty and maritime jurisdiction of the United States is limited to the high seas, for the following reasons:

1st. As the Constitution vests the Federal government with two distinct classes of powers, one external and the other internal, the former plenary, the latter limited and special, that the admiralty power belongs to the former class and not to the latter, and is therefore confined to the. high seas.

2nd. Because the admiralty and maritime jurisdiction of' England from which we received both the admiralty and common law, at the Revolution and for a long time previous thereto, and at the adoption of our Constitution, was confined to the high seas.

3d. Because Hamilton, who was a member of the Convention, and among those who were willing to go furthest in giving power to the Federal government, in expounding the Constitution to the people before its adoption, confines it to the high seas; and Ch. J. Jay in *Chisholm v. Georgia*, says it means the high seas. And

4th. Because, unless the territorial jurisdiction is limited to the high seas, or at most, in addition thereto, to the ebb and flow of the tide within the limits of a state, as. was held by the court in *Waring v. Clarke*, 5 *How.* 441, this part of the Constitution is a *carte blanche* in the hands of' Congress.

The English court of admiralty never had " original jurisdiction of cases arising under the revenue laws, or laws concerning the navigation and trade of the kingdom. They belonged exclusively to the jurisdiction of the court of exchequer." *Nelson J.*, in delivering the opinion of the court in *N. J. Steam Navigation Co. v. Merchants' Bank*, 6 *How.* 386; 1 *Kent's Com.* 374, 375. There was no court of exchequer in the colonies, and the colonial vice-admiralty courts, it would seem, for that reason, had cognizance of cases arising under the revenue laws. Justice Daniel says, "Mr. Brown in his second volume of *Civ. and Adm. Law*, *p.* 491, accounts for the jurisdiction of the vice-admiralty courts in America, in revenue cases, by tracing it to the.

statute of 12 Charles II., commonly called the Navigation act, and to statute 7 and 8 of William III., c. 22, and designates this as totally foreign to the original jurisdiction of the admiralty, and unknown to it." — *N. J. Steam Navigation Co. case,* 6 *How.* 407.

By the Judiciary act of September 24th, 1789, jurisdiction is given to the district courts among other cases, " *of all civil cases of admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation or trade, of the United States, where the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burthen, within their respective districts, as well as upon the high seas.*" This act, it is said, is a statutory construction by Congress of the admiralty clause in the Constitution. Admitting it to indicate the understanding Congress had at that time of the Constitution, it makes more in favor of our construction than against it. In no view, when correctly understood, can it be said to favor a different construction from the one we give the Constitution.

If seizures under the navigation laws were properly cases of admiralty, within the Constitution, Congress performed a work of supererogation in mentioning them particularly in the act, after having vested the district courts with the entire admiralty jurisdiction of the government, in civil cases, in the language of the Constitution itself. After giving the whole, what more could it give? But why use the word "*including,*" if something was not thereby intended in addition to what had already been given? Does not the whole include all its parts? And why, after mentioning seizures on "waters navigable from the sea," add, "as well as upon the high seas"? Was it that the admiralty jurisdiction of the Constitution extended to the high seas only? and that Congress intended, in revenue cases, it should extend to waters navigable from the sea also? If such waters were within the admiralty jurisdiction of the Constitution, why mention them at all? Or, if the admiralty jurisdiction

of the Constitution was co-extensive with the ebb and flow of the tide, why did not Congress say, "whether the tide ebb and flow in said rivers or not," instead of, "as well as upon the high seas"? Congress certainly did not intend the jurisdiction should stop with the ebb and flow of the tide, if the river was navigable for the craft mentioned higher up.

Suppose however, Congress did not consider seizure under the revenue laws to be cases of admiralty, within the constitutional grant, but, nevertheless, intended to give the district courts cognizance of them as admiralty cases, as the colonial vice-admiralty courts had had cognizance of them as such; what, under a different construction of the Constitution would be a work of supererogation is now one of necessity. The act, no longer seen through a false medium, becomes clear and intelligible. Its language agrees with the intention of its makers, and its several parts with each other. There are no superfluous words; all have their appropriate meaning and plan. We see a reason, not only for the word "*including*," but also for describing the waters on which the seizures are to be made; as, without such a description, they would have to take place within the limits of the constitutional jurisdiction. And also why, after having said on "waters which are navigable from the sea," are added, "as well as upon the high seas;" as the latter otherwise would not be a part of the statutory jurisdiction, and the court would have cognizance of seizures on waters navigable from the sea only. When a statute is susceptible of two constructions, one giving full force and effect to its language, and an adaptation of its several parts to each other, and another bringing its parts in conflict with one another, and superceding, in part, its language, is not the former the true construction? Can the latter, in any circumstances, be?

If we are right in our conjecture, the Congressional construction to be inferred from the Judiciary act of 1789, is

in our favor: we have more reason for our construction of the act than they who contend for a different construction have for theirs. Waiving this, the question before us was not, and could not have been before Congress in passing the act of 1789, otherwise than incidentally, as we have supposed; for there is no question the Federal courts have cognizance of all seizures under revenue laws under the first clause of the judicial grant, of all cases of law and equity arising under the Constitution and laws of the United States, &c. The only constitutional question that could, by possibility, have been involved in that part of the act we have been considering, was not whether the Federal courts had cognizance of seizures under the revenue laws, for there was no doubt on that point, but whether Congress could take away the right of trial by jury in such cases, as that act did in making them admiralty cases.

This was the only constitutional question decided in *La Vengeance*, 3 *Dall*. 297. The question we are considering did not arise, and could not have arisen, in that case, for the reason we have already stated. It was a libel in the District Court of the United States for New York, for exporting arms contrary to law. The district judge decreed a forfeiture of the vessel, which decree was reversed on appeal to the circuit court. The case was then carried to the Supreme Court by the Attorney General. He asked a reversal of the decree of the circuit court on two grounds: 1st: That the cause was a criminal and not a civil cause, and should not have been removed to the circuit court, as [the judgment of the district court was final in criminal causes: 2d: That if it was a civil suit, it was not- a suit of admiralty and maritime jurisdiction, and should be remanded to the district court to be tried by a jury. Both points were ruled against him. The question was not one of power in the Federal courts to hear and decide the case. That, as we have already stated, could not have arisen in the case, incidentally or other-

wise. The Constitution does not establish a court of admiralty, or define its jurisdiction should one be established by Congress. The judicial power is vested in " one Supreme Court, and in such inferior courts as the Congress may, from time to time, ordain and establish." Neither does the Constitution, should a court of admiralty be established by Congress, assume to regulate its proceedings, or require admiralty causes to be tried by the then existing mode of trial, or by the court instead of a jury.— See *Ch. J. Taney's opinion in the Genesee Chief case.* The only question before the court, after it had decided the cause was a civil and not a criminal suit, were: 1st: The construction of the act: Did Congress intend to make seizures under the navigation and revenue laws admiralty causes? 2d: The power of Congress under the Constitution to take away the right of trial by jury in such cases, by making them admiralty causes, without at the same them securing to the parties a trial by jury. Hence, the argument of the Attorney General on this part of the case, that as the party was entitled to have the case tried by a jury, it was not a case of admiralty and maritime jurisdiction. Whether these questions were decided rightly or not, it does not become us to express an opinion, as they belong exclusively to the Federal judiciary. They do not present a case of encroachment on state rights, and therefore do not affect the state or states, however much the individual citizen may feel himself aggrieved by the decision.

The decision in this case, though afterwards adhered to, did not give general satisfaction at the time, and it was soon followed by other cases presenting the same questions for the consideration of the court, viz.: *The United States v. The Schooner Sally,* 2 *Cranch,* 406; *The United States v. The Schooner Betsey,* 4 *Cranch,* 443; and a number of other cases.

We now pass to another class of cases relied on to show that the territorial jurisdiction of the court, under

the Constitution, is co-extensive with the ebb and flow of the tide. They are *The Thomas Jefferson*, 10 *Wheat.* 428; *Peyroux v. Howard*, 7 *Pet.* 324; *Steamboat Orleans v. Phœbus*, 11 *Pet.* 175; and *The United States v. Coombs*, 12 *Pet.* 72.

The *Thomas Jefferson* was a libel for wages from Shippingport, in the state of Kentucky, up the river Mississippi, and back to the port of departure. It is hardly necessary to say the voyage was above tide waters. Judge Story, in delivering the opinion of the court, says: "In respect to contracts for the hire of seamen, the admiralty never pretended to claim, nor could it rightfully exercise, any jurisdiction, except in cases where the service was substantially performed, or to be performed, on the sea, or upon waters within the ebb and flow of the tide. This is the prescribed limits, which it was not at liberty to transcend."

This was a case under the third clause of the judicial grant. If it was one of admiralty and maritime jurisdiction, within the meaning of the Constitution, the Federal courts had cognizance of it; otherwise not. The court decided it had not jurisdiction of the case. It was not like the revenue cases we have been considering, of which the Federal courts had cognizance in any and all circumstances, under the first clause of the judicial grant. Nor was it necessary for the court to decide, in that case, that the constitutional jurisdiction extended to tide waters within a state. The only question before the court was, whether it extended to waters in which the tide did not ebb and flow. The court decided it did not. All it was necessary for the court, in deciding the case, to say, was: Admitting the constitutional jurisdiction extends to tide waters, it does not extend to waters in which the tide does not ebb and flow. This is the extent of the decision; all beyond it is *dictum*, nothing more. It may be correct, it may be erroneous. It is not *res judicata*.

In *Peyroux v. Howard*, which was a libel for repairs of a steamboat at New Orleans, the question of admiralty juris-

diction over tide waters was not raised. The jurisdiction was conceded by appellant's counsel — the case turning on other points.

In the case of the *Steamboat Orleans v. Phœbus*, the boat was engaged in trade between New Orleans and the interior towns on the Mississippi and its tributaries. The point decided was the same as in the *Thomas Jefferson*. The case was the same, except that one terminus of the voyage in which the vessel was employed was in tide waters. The court say: "Though in her voyages she may have touched at one terminus of them, in tide waters, her employment has been, substantially, on other waters. The admiralty has not any jurisdiction over vessels employed on such voyages. * * * The true test of its jurisdiction in all cases of this sort is, whether the vessel be engaged, substantially, in maritime navigation, or in interior navigation and trade, not on tide waters. In the latter case, there is no jurisdiction."

As to *Coombs'* case, it has nothing to do with the question we are considering, except the *dictum* it contains regarding tide waters. It was an indictment for stealing property on Rockaway beach, above high water mark, belonging to a vessel in distress on the sea. In the course of the opinion Judge Story, in speaking of admiralty jurisdiction, says: "Does it, in cases where it depends upon locality, reach beyond high water mark? Our opinion is, that in cases purely dependent upon the locality of the act done, it is limited to the sea, and to tide waters, as far as the tide flows; and that it does not not reach beyond high water mark."

*The Thomas Jefferson*, decided in 1825, and *The Steamboat Orleans* decided in 1837, are direct authorities to the point, that the admiralty jurisdiction of the United States does not extend beyond tide waters.

We have been thus particular in noticing these cases, and the Judiciary act of 1789, and the decisions under it, as they are greatly relied on by Judge Wayne in *Waring*

*v. Clarke*, 5 *How*. 441, to show the admiralty jurisdiction of the Constitution extends to tide waters within a state. The question for the first time was directly before the court in that case, which was one of collision on the Mississippi river where the tide ebbed and flowed, and the court was divided on the question. The judges stood five to four, if they were all present at the argument and participated in the decision — the report of the case giving us no light on this subject — otherwise four to four. This last we think was the true state of the court. The jurisdiction was sustained by a majority, judges Woodbury, Daniel and Grier, dissenting, and Judge Catron, who agreed in the views of his dissenting brethren, going with the majority in favor of sustaining the jurisdiction in that case, on a ground peculiar to himself, and "because of the divided opinion of the judges on the question," as he tells us.

Judge Wayne delivered the opinion of the court sustaining the jurisdiction. He places it on several grounds, two of which, the judiciary act of 1789, and the previous decisions of the court, we have already noticed, and shall now proceed to notice the other grounds stated in the opinion.

The learned judge admits " the general rule in England has been, since the time of Lord Coke, upon the interpretation given by the courts of common law to the statutes 13 and 15 Richard II and 2 Henry IV., to prohibit the admiralty from exercising jurisdiction in civil cases, or causes of action arising *infra corpus comitatas*." But he says : "It has always been contended by the advocates of the admiralty, that ports, creeks and rivers, are within its jurisdiction, and not within those statutes, meaning that the ancient jurisdiction in such localities was not excluded by the words of the statutes." He admits Brown in his Civil and Admiralty Law thinks they were within the statute. He then says, " we think they were not."

Admitting they were not, what evidence have we the members of the Convention took that view of the statutes?

Or that they intended, in forming the Constitution, to ignore the common law, and set up in its place the claim of the admiralty lawyers in England? If they intended to discard the common law doctrine in regard to the admiralty, and to take part with those who claimed a more extensive jurisdiction, why have they not told us so? Why do we not find something in the Constitution itself indicating such an intention? Why did they not say, to all cases of admiralty and maritime jurisdiction arising on the high seas, and on navigable waters in which the tide ebbs and flows?

There would have been something to base the claims of the admiralty lawyers on, if the admiralty court had not, like other courts, been subject to the statutes of the realm. But of what avail is such a claim in opposition to an act of Parliament? The language we have already quoted from 13 *Rich. II. Ch.* 5, would seem to settle the question beyond all controversy. The admiralty and their deputies are not to "meddle of anything done within the realm, but only of a thing done upon the sea." What language could be more explicit? They had meddled with things done within the realm, and this statute was passed to prevent their doing it thereafter. What mattered it whether they had done so of right or not, before the statute? They could do so no longer. The language, "according to that which hath been duly used in the time of the noble King Edward, grandfather of our Lord the king that now is," would seem to brand such action with usurpation. Lord Mansfield, as we have already stated, in speaking of this statute and 15 Rich. II, and 2 Henry IV, says that "they manifestly relate to the usurpation of the Instance court of Admiralty."

The learned judge proceeds, "Having thus admitted, to the fullest extent, the locality in England within which the courts of common law permitted the admiralty to exercise jurisdiction in cases of collision, we return to the ground taken, that the same limitation is to be imposed, in like

cases, upon the admiralty courts of the United States. We have already said, it can not be maintained. It is opposed by general and also by constitutional considerations, to which we have not heard an answer." What are these general and constitutional considerations? He says: "In the first place, those who formed the Constitution, and the lawyers in America in that day, were familiar with a different and a more extensive jurisdiction in most of the states when they were colonies."

With the exception of cases of seizures under the navigation laws, we must say, with all deference to the learned judge, that the facts relied on by him to show an enlarged admiralty jurisdiction in the colonies do not, in our opinion, establish that fact. They are met, and the negative of what they were intended to prove, so far as a negative can be established by testimony, is, we think, proved by other historical facts, referred to and commented on by Judge Woodbury in his dissenting opinion, and in his opinion in the *N. J. Steam Navigation Co. v. Merchants' Bank*, 6 *How*, 422, and the dissenting opinion of Judge Daniel in the last mentioned case.

It does not appear that Hamilton knew anything of this enlarged jurisdiction in the colonies, if it in fact ever existed. And who, of all the great men that composed the Convention, would have been more likely than he to have known of it? He makes no mention of it in the Federalist, and if it existed, and the Convention acted with reference to it, he must have known of it. Charge him with such knowledge, and in what light does he stand, as an expounder of the Constitution? In the light of a trickster, with Madison for an accomplice, when he tells the people the jurisdiction is confined to cases "which originate on the high seas," and when he further tells them, that the only instances in which the proposed Constitution directly contemplates the cognizance of disputes between the citizens of the same state "are where lands are claimed "under grants of different states."

The learned Judge further says: "there is in our opinion an unanswerable constitutional objection to the limitation of " all cases of admiralty and maritime jurisdiction," as it is expressed in the Constitution, to the cases of admiralty and maritime jurisdiction in England when our Constitution was adopted. To do so, would make the latter a part and parcel of the Constitution; as much so as if those cases were written on its face. It would take away from the courts of the United States the interpretation of what were cases of admiralty and maritime jurisdiction. It would be a denial to Congress of all legislation upon the subject."

Suppose these consequences, one and all, to follow; what is the "unanswerable constitutional objection?" Have not the people a right to form a constitution in their own way? In what consists a constitutional objection to a constitution? Is it in taking from the Legislature the power to legislate on any particular subject; or in confining the judiciary within certain bounds? This appears to be the burden of the argument. Congress can not legislate on the subject; the courts can not interpret what are, and what are not, cases of admiralty and maritime jurisdiction. We had always supposed the legislature and judiciary were creatures of the Constitution, and bound by its provisions. That one of the objects of a Constitution was to take from the legislature and judiciary certain powers which they would otherwise have, or to give them power within certain limits, and not beyond those limits. Bouvier says: "The judges are bound to interpret or construe the law with fidelity and skill; they are required to judge according to law, not to judge the law."—1 *Bouv. Inst.* 39.

If it was the intention of the Convention to give the Federal courts jurisdiction in admiralty of those cases, and those cases only, of which the English admiralty had cognizance at the time, it is binding on Congress, although it may take from it the power to legislate on that sub-

ject. It is also binding on the judiciary, although it may take from the judges the right to declare other cases than those of which the English court had cognizance, cases of admiralty and maritime jurisdiction. The only question for the judiciary to decide in construing a constitution is, what does it mean? what is it? Not, what should it mean? or what should it be? When the latter questions usurp the place of the former, and become subjects of inquiry with the court, what is the consequence? The court judges the Constitution, and in judging it makes its judgment a part of the Constitution, instead of declaring what the Constitution is.

If the admiralty clause is susceptible of two constructions, as we think it is, either of which the Convention may have had in view, the considerations stated by the learned judge may have weight in adopting one of these constructions instead of the other, but they clearly furnish no good reason for rejecting the clause itself, by rendering it meaningless.

He then takes the several grounds of congressional interpretation by the act of 1789, the adjudications under the seizure clauses of that act, and the decisions of the court in the case of *The Thomas Jefferson*, and the other cases we have mentioned and commented on.

We wish to add but one word as to the congressional interpretation, and that is, that as fond as Judge Story was of admiralty law, and as great an advocate as he was for the ancient jurisdiction of the English admiralty, he could not see the force of the argument of congressional interpretation. In *The Thomas Jefferson*, he says: "Some reliance has been placed in argument upon the clause in the judiciary act of 1789, which includes seizures. But this is a statutory provision, and limited to the case therein stated."

*Waring v. Clarke* was decided in 1846; in 1851, five years thereafter, the case of the *Propeller Genesee Chief v.*

7 MICH.—T.

THE PEOPLE v. TYLER.

*Fitzhugh*, 12 *How.* 443, was decided. It was a case of collision on Lake Ontario, under the act of 1845, extending the admiralty jurisdiction of the United States to the northwestern lakes. It was objected that the act was unconstitutional, and an attempt was made to sustain its constitutionality under the power of Congress to regulate commerce. The opinion of the court was delivered by Ch. J. Taney—Justice Daniel dissenting—the other justices concurring in the opinion of the Chief Justice.

By a masterly train of reasoning, the Chief Justice shows, most conclusively, that Congress had no power to pass the act under the clause to regulate commerce. Having done this, he proceeds by a course of reasoning in which we can not concur, to a conclusion which we deem erroneous, viz.: That the admiralty jurisdiction of the United States is not confined to the high seas, or limited by the ebb and flow of the tide.

His reasoning is not expository, but for the most part is based on expediency alone. It is not to show what the Convention that formed the Constitution meant by admiralty and maritime jurisdiction—the only question involved in a constitutional inquiry—but to prove the country had outgrown the Constitution, and that the Constitution should therefore be amended so as to conform to the new state of things. The inquiries, what object had the Convention in giving this power to the Federal government? and what did they understand to be the jurisdiction of admiralty in 1787, when the Constitution was formed? are ignored, and light is sought in a different quarter. Facts lying at the foundation, and forming the substratum of the Constitution, and of which it may be said the Constitution is itself but a product, are passed by to give prominence to a state of things existing more than a half century afterwards. Why is this done? What rule of interpretation is it that directs us to look to 1851 to explain what was done in 1787? It would be well enough, if the Constitution in the hands of Congress

was as clay in the hands of a potter, and Congress had power to mould it from time to time to suit their will; or it contained a sliding scale to be adjusted by the judiciary-as occasion might require.  If constitutions are subject to such mutations at the hands of the legislature or judiciary, they have hitherto been very much overrated by the people, and we venture to say, had our forefathers been aware of such an inherent infirmity, or defect, in the Federal Constitution, it would never have been adopted by them.  They were too jealous of their liberties, too partial to their state governments with small territories, ever under their eye, and subject to their control, to part with any of their privileges for a government at a distance from them, however splen-did, with powers to interfere with their municipal rights.

The Chief Justice says: "if the meaning of these terms was now for the first time brought before this court for consideration, there could, we think, be no hesitation in saying that the lakes and their connecting waters were embraced in them."  What does this mean?  If it had any bearing on the question then before the court, it is, that the Constitution is to be construed with reference to the then existing state of the country, and not with reference to things as they existed at the time of its adoption.  It does not mean that Marshall, and Story, and the other able men who had presided in that court, were less capa-ble of construing the Constitution than their successors, but that had the country reached its then existing state of prosperity at an earlier period, the Constitution would have received a different construction from the one that had been given to it by their predecesors.

He then says, "These lakes are in truth inland seas. Different states border on them on one side, and a foreign nation on the other.  A great and growing commerce is carried on upon them between different states and a for-eign nation, which is subject to all the incidents and hazards that attend commerce on the ocean."

The lakes are large bodies of water, for waters so far inland from the sea. But in point of magnitude they are no more to be compared to the ocean, than the smallest pond that floats an Indian canoe is to be compared to them. None of them are on a level with the ocean, and some of them hundreds of feet above it; nor are they navigable from the ocean without the aid of artificial works, or canals. In navigating them it is seldom the navigator is out of sight of land, in a clear day. How different from this is it with the ocean. On the one you may circum- navigate the globe, be out of sight of land for months, and a vessel be from home for years in the prosecution of a single voyage. On the other the longest voyage is performed in a few days, or weeks, at most, along a coast seldom out of sight of the navigator, and even now well supplied with harbors, and that will, ere long, be studded with them. The ocean is the private property of no na- tion, but the common property of all; and all have a right to navigate it. The lakes belong to England and the several states bordering on them. No other nation has a right to navigate them. The bed of them, as well as the water, is the private property of Great Britain and the several states within whose limits they lie. Three quarters at least of the American part of the upper lakes, Huron, Superior, and Michigan, belong to the state of Michigan. A quarter if not a third of the state of Michigan is covered with the waters of the lakes. As to the commerce on them between the states, what matters it whether such com- merce be carried on by water or by land? Shall the states, owning these waters, be deprived of the right of using them in trading with each other, unless they will submit the property of their citizens, while on them, to the jurisdiction of the Federal courts? What signifies it whether the water on which such commerce is carried on is much or little? whether it be a lake or a river? We are not aware that the United States have any greater powers on

the waters of a state than on the land. We know of no provision in the Constitution recognizing any difference between the two. If there be, it has escaped our notice. We do not believe the admiralty jurisdiction was given for any such purpose.

He further says, "Hostile fleets have encountered on them, and prizes have been made,"—the same thing has taken place on lake Champlain,—"and every reason which exists for the grant of admiralty jurisdiction to the general government on the Atlantic seas, applies with equal force to the lakes."

If this were so, does it follow, as a necessary consequence, that our ancestors intended these lakes should be subject to admiralty jurisdiction? We have no evidence of such an intention; but conclusive proof, or what we regard as such, to the contrary.

But we can not admit the same necessity exists on the lakes for admiralty law as on the ocean. We have already pointed out, in part, the difference between them. In our commerce with the world, vessels of foreign nations, thousands of miles from home, are constantly visiting our ports lying on the borders of the ocean. It is necessary to have a court of admiralty, or other court, at such points, to take cognizance of cases arising under the laws of nations, on board of such vessels while prosecuting their voyages on the high seas; as otherwise the ends of justice would frequently be defeated, and the commerce of the world would suffer, from the additional hazard that would attend it, if no appeal could be made for justice in such circumstances to any but the judicial tribunals of the country to which the vessel belonged. Upon our lakes we have no foreign nation to trade with, except the subjects of Great Britain; and neither they or we stand in need of any foreign tribunal to protect their or our rights while navigating them. Would a proceeding in admiralty, at Detroit, against a Canadian vessel for seamen's wages, be submitted to by Great

Britain? Or a like proceeding at Windsor against a vessel owned in Detroit, by the American government? We hardly think the laws of nations would uphold such proceedings.

The other grounds taken by the Chief Justice, viz: "That the Union is formed upon the basis of equal rights among the states;" that "it would be contrary to the first principles on which the Union was formed to confine these rights." (the admiralty laws) "to the states bordering on the Atlantic, and to the tide waters connected with it, and to deny them to the citizens who border on the lakes," that, "there is nothing in the ebb and flow of the tide that makes the waters peculiarly suitable to admiralty jurisdiction, nor anything in the absence of a tide that renders it unfit" and the like, are of the same character with those we have been considering. None of the states, we believe, bordering on the lakes have ever looked on the admiralty law as a boon, or ever claimed it under the Constitution, or petitioned Congress for it. If such were the case, it would not make that constitutional which is otherwise unconstitutional. No state can constitutionally, of itself, change its relative position in the Union to its sister states, or the Federal government. It could not, if it would, surrender its constitutional rights to the general government. Neither can the latter, with the assent of one or more states, constitutionally assume a power within them not given by the Constitution itself.

The Chief Justice admits that "At the time the Constitution of the United States was adopted, and our courts of admiralty went into operation, the definition which had been adopted in England was equally proper here." In this, it seems to us, he admits the framers of the Constitution understood the admiralty jurisdiction was confined to the high seas, or at most to tide waters. The definition of a word at the time it is used, is its meaning at that time, and we know of no rule governing contracts, or their interpretation, that changes a contract from its original meaning, by reason of a subsequent change in the meaning of a word or phrase used in it.

He also admits that the *Thomas Jefferson* and the *Steamboat Orleans* stand in his way. But he says: "The *Thomas Jefferson* did not decide any question of property, or lay down any rule by which the right to property should be determined. If it had, we should have felt ourselves bound to follow it, notwithstanding the opinion we have expressed. * * * It was a question of jurisdiction only, and the judgment we now give can disturb no rights of property, nor interfere with any contract heretofore made."

Is not the Constitution a contract? and does not it interfere with the rights of the states under it? Are the rights of a citizen in property more sacred than the rights of the states? Is property dearer than liberty, that the former should restrain the court, and the latter not, from overruling its own decisions? In the *Thomas Jefferson* and the *Steamboat Orleans*, it was expressly decided that the admiralty jurisdiction of the Constitution did not extend above the ebb and flow of the tide; but not that it extended to tide waters within a state. The former it was necessary to decide in those cases, but not the latter. So far those decisions were a construction of the Constitution of the United States; and that in litigation between individuals, to which the states were not a party, and in which they had no right to be heard. We are told that had these decisions laid "down any rule by which the right of property should be determined," the court would have adhered to them; but, as the question was one of jurisdiction only, the court was at liberty to disregard them. Did not the question of jurisdiction in these cases, so far as it went, settle the rights of the states over their own waters? And does not the decision we are now considering sweep away those rights in part? What rights have the states under the Federal Constitution? In 1825, and again in 1837, they are told they have the same rights over the waters within their territory, above the ebb and flow of the tide, as over the land. In 1851, they are

told that their rights on land and water are not the same. It is a little remarkable, that the rights of the states, which were by far the most important point in all of these cases, have been thrust aside, or overlooked, in the decision of them, and the cases have been treated as ordinary cases of litigation, which the Federal courts had a clear right to hear and decide.

While the court defend the Constitution against assault, in one quarter, they break down its barriers in another, for the admission of the assailant in the garb of a friend. And that part of the Constitution which had been assaulted twice before, and had proved too strong for the enemy in both cases, is razed to the ground by a species of judicial reasoning, which, should it hereafter be sustained by the court, it appears to us, may be made the means of · subverting the entire Constitution, and of substituting in its place the decisions of the judiciary, to be themselves overturned by others, when the supposed wants of the country may require it.

This is the sum and substance of the reasoning of the court on this part of the case, as we understand it, when analyzed. We believe the phrase "to all cases of admiralty and maritime jurisdiction," had a definite meaning attached to it by the makers of the Constitution, and that it was not thrown in as so much rough material, to be afterwards wrought into the texture of the Constitution, by Congress or the judiciary, in extending the powers of the Federal courts.

The admiralty law of England, as well as the common law, was brought to this country by our ancestors as a part of their birthright. No judicial tribunal, we believe, has ever felt itself warranted in disregarding the English common law as it existed at the commencement of the Revolution, as a part of the law of the land (except so far as it had been modified or changed in the states), and in going to France, or Austria, or Russia, or Prussia, or

other foreign country, for the law. This principle, however, appears to have been disregarded, as to the admiralty law, by some courts, on the ground, perhaps, stated by Justice Wayne in *Waring v. Clarke*, viz.: that to adhere to the English admiralty law would take away from the courts the interpretation of what were cases of admiralty and maritime jurisdiction.

If this be the ground—we know of no other—we do not, we confess, see the force of the reasoning. We never heard, that we now recollect, such a reason assigned for getting rid of the common law. To make cases of admiralty and maritime law, is one thing; to declare what are cases of admiralty and maritime law under a given system of jurisprudence, is altogether a different thing. The first is legislative, the last, judicial power. Should the Parliament of Great Britain pass an act giving the admiralty court of that country cognizance of a class of cases of which it had not cognizance before, it would be making cases of admiralty, not interpreting the admiralty law. The claim as made on behalf of the courts by Judge Wayne, is one of legislation, it seems to us, and not of construction.

It is a claim of power in the courts to discard the admiralty law of the country at the adoption of the Constitution, and to substitute in its place one made by the courts. We do not think the makers of the Constitution intended to vest the Federal courts with any such power, or to give Congress power to enlarge the territorial jurisdiction in admiralty. Nor do we think our forefathers intended that Congress, or the Federal judiciary, should have power to subject every stream and pool of water in the interior of our vast country to admiralty jurisdiction, with or without a trial by jury. Let it not be said that Congress has not done this, and that there is no danger of it. That is not the question we are discussing; but one of power. If the admiralty jurisdiction is not confined by the Constitution to the high seas, or at most to the

ebb and flow of the tide, it has no limits whatever, other than what Congress and the courts, from time to time, may think proper to impose. The states have no guaranty that every stream and pool of water that will float a log, or bear up a canoe, will not, sooner or later, be brought within the admiralty jurisdiction of the United States. Or that every contract that smells of water, whether it be salt or fresh, much or little, will not be made cognizable in the Federal courts; for the admiralty power hitherto has been as vigilant in hunting up admiralty cases on land as on water; as ready to take cognizance of contracts of affreightment made on land (see *N. J. Steam Navigation Co. v. Merchant's Bank*, 6 *How.* 377), as of cases of collision on our rivers.

One consequence of this unbounded claim on the part of our admiralty courts, is, that no one knows what is a case of admiralty and maritime jurisdiction until it has been decided by the court. For as Judge Woodbury says in the case of the *United States v. The New Bedford Bridge* (1 *W. & M.* 457), "one Judge thinks he ought to go to the Rhodian laws for the text, another to the *Consulate del Mare*, another to the laws of Oleron, another to the laws of Wisby, another to the era before Richard II., another to the Black Book of the admiralty, another to the 13 and 15 of Richard II., another to the act of Parliament of 28 Henry VIII., another to periods still later.—See 5 *How.* 441. Some trace the power which is to be the standard to Saxon, some to Norman, some to Saracen or Carthegenian, some to Rome, and some to Turk or Crusader."

Again: "One judge gets admiralty jurisdiction, both civil and criminal, by the locality of the act, as if on the ocean at all; another, if on it where the tide ebbs and flows; another, if on it, without the limits of a county; another, if on great rivers navigable below their bridges, though not salt; another, by the subject matter, if maritime or not; another, by the parties, if seamen or landsmen."

THE PEOPLE v. TYLER.

As no part of the river St. Clair, on which the offense, is charged to have been committed, in my opinion, is, within the admiralty jurisdiction of the United States, I answer the questions reserved by the circuit judge for the opinion of the court, in the negative.*

*Ordered certified*, as the opinion of this court, that both the questions reserved should be answered in the negative.

---

- * The opinion of the Court having been certified to the Circuit Court for St. Clair County, the case was brought to trial in that court, at the November term thereof, 1859, and defendant convicted of murder in the second degree, and sentenced to imprisonment in the State Prison for six years. A stay of proceedings was subsequently obtained, and the case removed by writ of error to this court, where it is now pending.